**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TEXTRON, INC. SECURITIES LITIGATION, | Index No.: 19-cv-07881 (DLC) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

**KIRKLAND & ELLIS LLP**
Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Kevin M. Neylan, Jr.
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
kevin.neylan@kirkland.com

*Counsel for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

     A.     Factual Background ................................................................................. 2

     B.     Textron's Alleged Misrepresentations ................................................... 4

     C.     The Third Quarter of 2018 ...................................................................... 6

     D.     This Lawsuit ............................................................................................ 7

APPLICABLE LAW ........................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

I.    THE COMPLAINT FAILS TO ALLEGE THAT TEXTRON MADE FALSE OR
     MISLEADING STATEMENTS. ................................................................................. 8

     A.     Textron's Inventory-Related Statements Were Not False or Misleading. .............. 8

           1.   Factual statements about past inventory reduction are not actionable. ............. 9

           2.   Textron's forward-looking opinion statements about Arctic Cat and
               Textron's future performance are not actionable. ........................................... 12

     B.     Textron's Integration-Related Statements Were Not False or Misleading. .......... 14

II.   PLAINTIFF'S SCIENTER ALLEGATIONS ARE DEFICIENT. ...................................... 18

     A.     The Complaint Fails to Plead Motive and Opportunity for Each of the
           Alleged Misrepresentations. .................................................................. 19

     B.     The Complaint Fails to Plead Conscious Misbehavior. ....................................... 21

           1.   Conscious recklessness cannot be inferred with respect to the alleged
               misstatements about inventory reduction and future performance. ................. 22

           2.   Conscious recklessness cannot be inferred with respect to the alleged
               misstatements about integration. ..................................................................... 24

           3.   Conscious recklessness cannot be inferred with respect to the alleged
               misrepresentation about impairment of goodwill or intangible assets ............ 25

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007).................................................................................2, 8, 18, 19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)......................................................................................10

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)......................................................................................21

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).........................................................................19, 21, 25

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011)......................................................................................25

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
    2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir.
    2019) ...........................................................................................................................16

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010)......................................................................14

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................23, 24

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003)...................................................................................21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)....................................................................................................7

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
    Scot. Grp., PLC*,
    783 F.3d 383 (2d Cir. 2015)......................................................................................15

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)...................................................................................................11

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).................................................................................19, 20

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019)...............................................................................................11

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..............................................................21, 22, 23, 24, 25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)...................................................................................13, 14, 18

*In re Razorfish, Inc. Sec. Litig.*,
  2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001).......................................................15

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..............................................................................10, 16

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009).................................................................................21, 24

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015).......................................................................13

*Sfiraiala v. Deutsche Bank Aktiengesellschaft*,
  729 F. App'x 55 (2d Cir. 2018) ..............................................................................23

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015).......................................................................................25

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)......................................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................8, 19, 21, 23

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ........................................................................................10

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016).....................................................................................13

**Statutes**

15 U.S.C. § 78j.............................................................................................................7

15 U.S.C. § 78t.............................................................................................................7

15 U.S.C. § 78u-4 ............................................................................................8, 18, 20

15 U.S.C. § 78u-5 .......................................................................................................14

**Regulations**

17 C.F.R. § 240.10b-5............................................................................................7, 10

**Rules**

Fed. R. Civ. P. 9 .................................................................................................................8, 10

Defendant Textron Inc. and the individual Defendants, Textron's CEO Scott C. Donnelly and CFO Frank T. Connor, (collectively, "Textron") respectfully submit this Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Amended Complaint filed December 24, 2019.

**INTRODUCTION**

In early 2017, Textron Specialized Vehicles Inc.—a wholly owned subsidiary of Textron and part of Textron's Industrial segment—acquired a recreational vehicles company named Arctic Cat. Textron Specialized Vehicles had a disappointing performance in the third quarter of 2018. Textron's share price fell by about 11%, and this lawsuit followed. Plaintiff alleges that during 2018 (in the period before the third quarter), Textron misled investors about Arctic Cat's health and prospects. According to Plaintiff, Textron exaggerated the progress it had made in reducing a backlog of Arctic Cat inventory that existed at the time of the acquisition, and misled investors about the extent to which Arctic Cat was "integrated" into Textron and poised to turn a profit.

These allegations fail, and the Complaint should be dismissed. Plaintiff cannot state a claim because it cannot identify any false or misleading statements made by Textron. In its effort to turn a disappointing quarter into a case of securities fraud, Plaintiff has staked one pillar of its case—its claim that Textron misled investors about Arctic Cat's inventory reductions—on a misquotation of a truthful, non-misleading statement Donnelly made during a quarterly earnings call. And the second pillar of Plaintiff's case—its claim that Textron misrepresented Arctic Cat's "integration"—collapses because it attacks statements that fall well within the bounds of non-actionable corporate optimism, because it ignores other relevant disclosures, and because it rests on a mistaken understanding of key terms in Textron's SEC filings, which no reasonable investor would have adopted. Because Textron misled no one, this suit should be dismissed in its entirety.

Plaintiff's theory is also flawed for the independent reason that Plaintiff cannot allege scienter, at least with respect to many of the alleged misrepresentations identified in the Complaint.

Even if the Complaint adequately pleaded that investors had been misled, this lawsuit would need to be narrowed substantially.

## BACKGROUND[1]

### A.    Factual Background

Textron is a global company that manufactures and distributes commercial and military aircrafts, recreational vehicles, and a variety of aerospace and defense products.  Its business is divided into five segments:  Textron Aviation, Bell Helicopter, Industrial, Textron Systems, and Finance.  (Compl. ¶ 38.)  This case concerns the Industrial segment, and Textron Specialized Vehicles in particular, which is one of two businesses within that segment.  (Compl. ¶ 39.)[2]

Textron's best-known brands include Cessna airplanes, Bell helicopters, and E-Z-Go golf cars.  Textron added to that lineup in March 2017, when it acquired a Minnesota company called Arctic Cat.  (Compl. ¶¶ 2-4, 40.)  Arctic Cat had been a publicly traded company that manufactured snowmobiles, all-terrain vehicles, and off-road vehicles—together known as "snow" and "dirt" vehicles, with names like Alpha One, Thundercat, Wildcat XX, and Havoc.  (Compl. ¶¶ 2, 43.)  Arctic Cat would distribute these vehicles to a global network of some 800 independent dealers, which in turn would sell them to consumers.  (Compl. ¶¶ 2, 41.)

Arctic Cat's business had long been suffering, as Textron told investors at the time of the acquisition (and as they knew from Arctic Cat's public filings).  (Compl. ¶¶ 4-5, 52-54.)  The

---

[1]  This brief draws on several sources that are attached as exhibits, which the Court may consider because they are "incorporated into the complaint by reference," are "legally required public disclosure documents filed with the SEC," or were "possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  These exhibits include a transcript of Textron's 2016 Q4 earnings call (Exhibit A to the accompanying Declaration of Kevin M. Neylan, Jr.); transcripts of Textron's 2017 Q1, Q2, Q3, and Q4 earnings calls (Exhibits B, C, D, and E, respectively); an audio recording of Textron's 2017 Q4 earnings call (Exhibit F); Textron's 2017 10-K (Exhibit G); a transcript of Textron's 2018 Q1 earnings call (Exhibit H); Textron's 2018 Q1 10-Q (Exhibit I); a transcript of Textron's 2018 Q2 earnings call (Exhibit J); Textron's 2018 Q2 10-Q (Exhibit K); a transcript of Textron's 2018 Q3 earnings call (Exhibit L); Textron's 2018 Q3 10-Q (Exhibit M); and Textron's Form 8-K filed December 6, 2018 (Exhibit N).

[2]  At the time Textron acquired Arctic Cat, a third business, Tools & Test Equipment, was part of the Industrial segment.  That business was sold at the end of the second quarter of 2018.  (Compl. ¶ 39.)

biggest problem was that years of sluggish sales had resulted in dealers' showrooms having lots of unsold Arctic Cat vehicles—more than $185 million worth at the time of the acquisition. (Compl. ¶¶ 4, 54.)  As Donnelly explained, Arctic Cat responded to this circumstance by offering consumers deep rebates and discounts, which boosted sales but hurt the company's profit margins. (Ex. A at 10.)  Nevertheless, Textron believed Arctic Cat had promise and could eventually add value to Textron Specialized Vehicles.  (Compl. ¶ 52.)  Textron's priority was to clear the older, excess inventory that was clogging Arctic Cat's distribution channel at the time of the acquisition. Accomplishing that goal would require continuing Arctic Cat's rebating strategy, which—Textron acknowledged to investors—would cause Arctic Cat to continue losing money for at least the rest of 2017.  (Compl. ¶¶ 5, 56-57; Ex. C at 12; Ex. B at 9.)  But once Textron made progress in clearing the existing buildup, it could introduce new models and sell them without similar rebates or discounts.  Textron hoped Arctic Cat would turn a profit at some point in 2018.  (Compl. ¶¶ 5, 57.)

Throughout 2017, Textron told investors that it was making progress in reducing Arctic Cat's balance of older inventory, and it was.  For example, on an April 19 earnings call, Donnelly explained that Textron was "very, very focused" on "cleaning up the inventory balance," and that "we're already getting pretty good traction."  (Ex. B at 9.)  Donnelly followed up on July 19, telling investors that "I think we've seen a lot of success" in "running programs to try to clear out a lot of the aged inventory that was out there in the channel."  (Ex. C at 12.)  Similarly, on October 19, Donnelly stated that "the inventory levels that we knew we needed to drive down in the dealer base are happening," although he noted that "[t]here are a lot of moving parts here," and later cautioned that "it's still early obviously.  It's a lot of work to go through and change . . . , but I think it's being well received and we feel good about where it's heading."  (Ex. D at 7, 17.) Plaintiff does not allege that any of those statements were false or misleading.

B.      **Textron's Alleged Misrepresentations**

Plaintiff alleges that Textron misled investors for the first time on January 31, 2018, during an earnings call to discuss Textron's results for the fourth quarter of 2017.  (Compl. ¶ 90.)  During that call—according to Plaintiff—Donnelly told investors that Arctic Cat had seen "improved demand in the snow retail channel, allowing dealers to clear *all their inventory* and drive 2018 model sales."  (Compl. ¶ 90 (emphasis altered).)  That statement was false, Plaintiff claims, because two confidential informants ("CIs") supposedly observed that, as of January 2018, there were still "thousands" of non-current vehicles in the Arctic Cat sales channel.  (Compl. ¶ 91.)

As explained in Section I.A.1 below, however, Plaintiff is wrong about what Donnelly said. In discussing the snow retail channel, he did not say that dealers had cleared "all their inventory"; he said they had cleared "*older* inventory."  (Ex. E at 4 (emphasis added); Ex. F at 3:32–3:38 (emphasis added).)  That remark is no different than what Donnelly had been telling investors throughout 2017—in statements Plaintiff does not allege were false or misleading—and it is fully consistent with the alleged observations of the two CIs cited in the Complaint.

All told, Plaintiff alleges that Textron misled investors on seven occasions in 2018:

- During the January 31, 2018 earnings call referenced above, when Donnelly said that dealers were able to "clear older [snow] inventory" and also that Textron had "successfully integrated the integration of Arctic Cat."  (Compl. ¶¶ 90-92; Ex. E at 4-5.)  Also during this call, Donnelly and Connor both answered "yes" when asked if they thought Arctic Cat was "going to hit the target of being accretive [*i.e.*, profitable] this year."  (Compl. ¶ 94; Ex. E at 27.)

- In Textron's 2017 10-K, filed February 15, 2018, which stated that a "restructuring plan" implemented in the first quarter of 2017 to "integrate" Arctic Cat was "substantially completed."  (Compl. ¶ 96; Ex. G at 62-63.)

- During an April 18, 2018 earnings call, when Donnelly repeated the message that Textron had achieved "significant reductions" in "dirt and snow inventory" during 2017.  (Compl. ¶ 100; Ex. H at 18-19.)

- In Textron's 2018 Q1 10-Q, filed April 25, 2018, which reiterated that the 2017 Arctic Cat integration plan was "substantially completed."  (Compl. ¶ 102; Ex. I at 17.)

4

- During a July 18, 2018 earnings call, when Donnelly again said that Textron "continue[d] to make progress" in reducing Arctic Cat inventory, and that "a lot of the stuff that was really older inventory has been moved off [dealers'] books." (Compl. ¶ 107; Ex. J at 15.) During this call, Donnelly also told investors, "I think we are seeing profit improvement at Arctic Cat and we would continue to expect to see incremental margins frankly overall in our Industrial segment improving as the year goes on," and that "I think the end market of all the data I see is positive here in the last couple months." (Compl. ¶ 109; Ex. J at 19.)

- In Textron's 2018 Q2 10-Q, filed July 26, 2018, which again said that the 2017 Arctic Cat integration plan was "substantially completed." (Compl. ¶ 111; Ex. K at 18.)

- During an October 18, 2018 earnings call, when Donnelly said that he did not think Arctic Cat's third quarter performance would result in "something like an impairment of goodwill or intangible or something of that nature." (Compl. ¶ 120; Ex. L at 21.)

As noted above, Plaintiff alleges that Textron's statements about inventory reductions were false or misleading because, according to CIs 1 and 2—both former Textron Specialized Vehicles employees of unspecified rank—"thousands" of older Arctic Cat vehicles were still in the dealer channel as of January 2018 and throughout the year. (Compl. ¶ 91.)

Plaintiff alleges that Textron's comments about "integration" were false or misleading because, according to five CIs—four former employees of unspecified rank, and one former Arctic Cat dealer—Arctic Cat experienced a number of disparate setbacks during 2018. (Compl. ¶ 97.) For example, Plaintiff alleges, CI 1 "observed" that "Arctic Cat and Textron's Specialized Vehicle business had not integrated departments for parts and service or computer systems, and operated separate customer relationship management software platforms" (Compl. ¶ 75); CI 3 "observed" that "[b]y January 2018 . . . there remained much debate among senior management of Textron Specialized Vehicles regarding reporting structure and product design" (Compl. ¶ 77); CI 4 "witnessed numerous engineering problems with the 2018 Arctic Cat Havoc and Wildcat XX models" (Compl. ¶ 82); CI 5, a former Arctic Cat dealer, experienced delays in having some of its orders fulfilled (Compl. ¶ 83); and CI 6 was told to review the Arctic Cat dealer network in April 2018 to assist Textron in "terminating unprofitable dealers" (Compl. ¶ 84).

Finally, Plaintiff claims Donnelly misled investors when he said he did not think the third quarter of 2018 would cause an impairment of goodwill or intangible assets.  (Compl. ¶ 121.)

C.     **The Third Quarter of 2018**

During the third quarter of 2018, the Industrial segment's profits were $1 million, down from $49 million in the third quarter of 2017.  (Ex. M at 19.)  Some of this decline was expected; as Donnelly told investors during the second quarter earnings call, he "expect[ed] to see some reduction in" the Industrial segment's "operating profit level" because Textron had just sold a subsidiary called Tools & Test, which was "a good margin business."  (Ex. J at 18.)  But Donnelly explained that the third quarter profit decline was "primarily due to unfavorable operating performance in Specialized Vehicles."  (Ex. L at 3.)  Again, some of this decline was expected— as Donnelly disclosed during the second quarter earnings call, the Wildcat XX launched "later than . . . expected" and Textron was "struggling to meet demand of producing them," and the Prowler Pro had only "just launched" as of late July as well.  (Ex. J at 19.)

In addition, Donnelly said, the decline revolved "around some of the consumer markets, and it's a recognition that we still have more work to do in terms of strengthening that channel."  (Ex. L at 7.)  Donnelly elaborated that "our team has been going through sort of a painful learning experience about how that channel is managed and how discounting is handled and how that plays out through the course of the year.  So it for sure has manifested itself in more discounting than we would like to continue to work that channel."  (Ex. L at 9.)  To be clear, Donnelly did *not* say that the third quarter suffered because Textron was forced to continue using rebates to clear the same older vehicles that were clogging the Arctic Cat channel back in 2017.  In other words, Donnelly said nothing inconsistent with his past statements about the progress Textron had made in reducing the stock of aged inventory inherited from Arctic Cat.  If anything, his comments suggested that Arctic Cat underperformed because it wound up applying more rebates than

6

expected to newer models Textron had introduced more recently, and also because—as he disclosed during the previous earnings call—some newer "dirt" vehicles were delayed in being released.  (*See* Ex. L at 9-10.)  Donnelly said that Textron's goal of making Arctic Cat profitable in 2018 would likely be delayed by a year, but he said he did not think the third quarter results would cause "something like an impairment of goodwill or intangible or something of that nature." (Ex. L at 13, 21.)  Textron's share price dropped 11.25%, from $64.78 to $57.49.  (Compl. ¶ 118.)

One week later, Textron stated that it was "reasonably possible that an impairment loss of certain long-lived assets could be recognized in the fourth quarter related to [Arctic Cat]."  (Ex. M at 32.)  On December 6, Textron announced that it had "approved a plan to restructure the Textron Specialized Vehicles businesses," which "will result in the impairment of intangible assets." (Ex. N at 2.)  Textron's share price then declined from $53.10 to $51.14.  (Compl. ¶ 124.)

### D.    This Lawsuit

This suit was filed on August 22, 2019.  Plaintiff filed the operative complaint on December 24, 2019.  (Dkt. 35.)  The Complaint asserts two counts under the Securities Exchange Act of 1934:  Count I alleges that Textron, Donnelly, and Connor violated § 10(b) and Rule 10b-5, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5 (Compl. ¶¶ 157-161); and Count II asserts that Donnelly and Connor are subject to control person liability under § 20(a), 15 U.S.C. § 78t(a) (Compl. ¶¶ 162-165).  The Class Period runs from January 31 to December 6, 2018.  (Compl. ¶ 1.)

### APPLICABLE LAW

"To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014).  This action is governed by the Private

Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, which imposes "[e]xacting pleading requirements" that "require[] plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  Also, "a complaint alleging securities fraud must satisfy Rule 9(b), which requires that 'the circumstances constituting fraud . . . shall be stated with particularity.'" *ATSI*, 493 F.3d at 99 (quoting Fed. R. Civ. P. 9(b)) (citation omitted).

## ARGUMENT

The Complaint should be dismissed in its entirety because it fails to allege any actionable misstatements or omissions.  Independently, the Complaint's scienter allegations are deficient, and cannot support the broad theory of liability Plaintiff advances.

## I. THE COMPLAINT FAILS TO ALLEGE THAT TEXTRON MADE FALSE OR MISLEADING STATEMENTS.

The PSLRA mandates dismissal of any complaint that fails to "specify" not only "each statement alleged to have been misleading," but also "the reason or reasons why the statement is misleading."  15 U.S.C. §§ 78u-4(b)(1), (3)(A).  Similarly, under Rule 9(b), "[a] securities fraud complaint based on misstatements must . . . specify the statements that the plaintiff contends were fraudulent," and "explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99.

Plaintiff identifies two broad categories of alleged misrepresentations Textron made during the Class Period:  statements about Arctic Cat's balance of non-current inventory; and statements about Arctic Cat's "integration" into Textron Specialized Vehicles.  Dismissal is required because the Complaint does not sufficiently allege that any of those statements were false or misleading.

### A. Textron's Inventory-Related Statements Were Not False or Misleading.

Plaintiff challenges a group of Textron statements related to Arctic Cat's inventory levels.  These statements fall into two categories:  factual statements about Textron's past progress in

reducing Arctic Cat's aged inventory, and forward-looking statements of opinion about Arctic Cat and Textron's future prospects. As a matter of law, none of these statements is actionable.

### 1.    Factual statements about past inventory reduction are not actionable.

Plaintiff alleges that on three occasions, Donnelly misled investors about the progress Textron had made in reducing the non-current inventory in Arctic Cat's sales channel. The first occurred during Textron's January 31, 2018 earnings call, when Donnelly supposedly said that during the fourth quarter of 2017, "[w]e saw improved demand in the snow retail channel, allowing dealers to clear *all their inventory* and drive 2018 model sales." (Compl. ¶ 90 (emphasis altered).) This supposed statement was false or misleading, Plaintiff alleges, because "as of January 2018, there were thousands of non-current snow and dirt products sitting at dealers." (Compl. ¶ 91.)

The most serious problem with this allegation is that it misquotes what Donnelly said. The transcript and audio file accompanying this motion make unmistakably clear that Donnelly said "[w]e saw improved demand in the snow retail channel, allowing dealers to clear *older inventory* and drive 2018 model sales." (Ex. E at 4 (emphasis added); Ex. F at 3:32–3:38.) In other words, Donnelly simply reaffirmed what he had been telling investors throughout 2017—that Textron was making progress in reducing the $185 million worth of Arctic Cat inventory that was clogging the channel at the time of the acquisition. That modest comment is worlds apart from the "representation . . . of mission accomplished" Plaintiff mistakenly claims it to be. (Compl. ¶ 66.)

As a matter of law, Donnelly's actual statement is not rendered false or misleading even assuming there remained a few thousand non-current dirt and snow vehicles still in the channel as of January 2018. No reasonable investor could have heard Donnelly's non-specific claim that Arctic Cat dealers were able to "clear older [snow] inventory" and concluded that the snow retail channel had been cleared completely, and no investor or analyst asked a follow-up question or otherwise requested more specific information. Because Donnelly did not create any

9

misimpression about the state of the snow retail channel, and because Plaintiff points to no law that imposed a duty to disclose more details about snow vehicles still in dealers' possession, Donnelly's failure to divulge such details is not actionable. *E.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). And Donnelly's statement says nothing at all about the dirt channel, so any allegations about leftover dirt vehicles are, as a matter of law, irrelevant. *See id.*

Moreover, as noted above, "plaintiffs asserting claims under Rule 10b-5 'must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so.'" *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)). To satisfy that heightened standard, Plaintiff would need to allege that unsold snow vehicles represented such a large fraction of the initial inventory glut that it contradicted, or materially undermined, Donnelly's claim that Textron had made some non-specific amount of progress in *reducing* that initial glut. Without such an allegation, the Complaint cannot be said to "specify . . . the reason or reasons why [Donnelly's] statement is misleading," or to "explain why [his] statements were fraudulent," as the PSLRA and Rule 9(b) require. But Plaintiff has not made that allegation or anything like it; nor has Plaintiff alleged any facts that would support such an inference. If anything, Plaintiff's allegations make such an inference implausible on its face. Recall that shortly before the acquisition, Arctic Cat's channel was clogged with $185 million worth of inventory, and that Arctic Cat had a dealer network of 800 dealers. (Compl. ¶¶ 4, 41.) Given the size of those figures, there is no plausible inconsistency between Donnelly's modest, non-specific claim that Arctic Cat dealers had been able to "clear older [snow] inventory" in 2017, and the allegation that a few thousand units remained as of January 2018. Plaintiff tacitly admits as much by declining to challenge any of Donnelly's 2017 statements that Textron was making progress in inventory

10

reduction, which are materially identical to the January 31, 2018 statement at issue here.  In short, Plaintiff's theory rests on a misquotation, and without that misquotation the theory falls apart.[3]

Plaintiff's remaining inventory-related allegations focus on Textron's next two earnings calls, but these allegations fare no better.  Plaintiff points to Textron's first quarter 2018 earnings call (Compl. ¶ 100), during which Donnelly explained that the first quarter is "a difficult quarter" because "January/February into March timeframe, you're done selling snow, but you haven't started selling dirt"—that is, the first quarter "tends to be a quarter where basically you have the cost of the business, but you don't have a lot of revenue."  (Ex. H at 18.)  But he reiterated that "if you look at both dirt and snow inventory reductions that happened *through the course of the year*, which was a big focus of ours, yielded a lot of result, so there's pretty significant reductions in that aged inventory."  (Ex. H at 18-19 (emphasis added).)  These statements are consistent with what Donnelly told investors previously.  Having explained that the first quarter of 2018 did not contribute "a lot of revenue" because Textron was "done selling snow" but had not "started selling dirt"—which necessarily meant it had done little to further reduce old or new Arctic Cat inventory levels—he repeated that Textron had made progress in reducing aged inventory during 2017.  For the reasons explained above, that statement is neither false nor misleading, even if there were "thousands" of non-current vehicles on dealer floors "throughout 2018," which Plaintiff again alleges as the sole basis for concluding that Donnelly's statement was fraudulent.  (Compl. ¶ 101.)

---

[3] Perhaps Plaintiff's error stems from its reliance on an inaccurate transcript prepared by some third party. But Textron does not draft, publish, or disseminate transcripts, as the Complaint appears to acknowledge. (*See* Compl. at 1 (stating that Plaintiff relied on "publicly available . . . transcripts" "*concerning* Textron," in contrast to "corporate press releases, disclosures and media reports *issued and disseminated by* Textron" (emphases added)).) It is axiomatic that Textron can be liable only for *making* or *disseminating* a false or misleading statement, and cannot be liable for false or misleading statements both made and disseminated by others. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011); *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100-01 (2019). Here, because Textron had no authority over the "content" of transcripts prepared by third parties, it cannot be deemed the "maker" of statements that appear in such transcripts. *Janus*, 564 U.S. at 142. And as noted, Textron plays no role in disseminating transcripts, either.  Textron therefore cannot be held liable for any inaccurate statements contained in any transcript.

Finally, Plaintiff highlights statements about inventory reduction that Donnelly made during Textron's second quarter 2018 earnings call, on July 18, 2018. (Compl. ¶ 107.) But these statements are the same as before. Responding to a question about "inventory levels with Arctic Cat," Donnelly said "I'm afraid I don't have those numbers at my fingertips here. But, I mean, we continue to make progress. . . . So, I mean, a lot of the stuff that was really older inventory has been moved off [dealers'] books. . . . I mean, last year was great in terms of burning down a lot of the inventory." (Ex. J at 14-15.) Once again, Donnelly simply repeated the point that Textron had made some non-specific amount of progress over the previous year in reducing the backlog of non-current inventory inherited from Arctic Cat. And once again, Plaintiff's only rejoinder is to allege that "as of January 2018, there were thousands of non-current snow and dirt products at dealers." (Compl. ¶ 108.) As explained, that allegation—even if true—is not sufficient to plead that Donnelly said anything false or misleading.

2.    **Textron's forward-looking opinion statements about Arctic Cat and Textron's future performance are not actionable.**

Plaintiff also challenges three statements Donnelly and Connor made about Arctic Cat and Textron's future prospects. The first occurred during the January 31, 2018 earnings call (Compl. ¶ 94), when Donnelly and Connor answered "yes" when asked if they believed Arctic Cat was "going to hit the target of being accretive this year." (Ex. E at 27.) The second comes from the July 18, 2018 earnings call. (Compl. ¶ 109.) Donnelly said:

> I think we are seeing profit improvement at Arctic Cat and we would continue to expect to see incremental margins frankly overall in our Industrial segment improving as the year goes on. . . . [W]e will certainly expect to see positive progression here through the balance of the year. . . . I think the end market of all the data I see is positive here in the last couple of months.

(Ex. J at 19.) Finally, during the October 18, 2018 earnings call, Donnelly said he did not expect Textron to incur an impairment of goodwill or intangible assets. (Compl. ¶ 120; Ex. L at 21.)

12

As a matter of law, all of these statements are statements of opinion. That is so either because "they express [Donnelly or Connor's] expectations for the future rather than presently existing, objective facts," *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015) (collecting cases), or because they are introduced by phrases like "I think" or "we expect," *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-84, 187 (2015). Because they are statements of opinion, they can be actionable only in three narrow circumstances, none of which applies here. *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

First, these opinion statements can be actionable if Donnelly or Connor did not subjectively believe them, *id.*, but Plaintiff does not allege that. Second, they can be actionable if they were made in conjunction with statements of "supporting fact" that "were untrue," *id.*, but that does not apply here, either, because—as explained above—every allegedly problematic aspect of these comments is a pure expression of opinion because it either states an expectation about the future or is introduced by a phrase like "I think" and "we expect." That means these opinion statements can be actionable only if Donnelly or Connor "omit[ted] information whose omission makes the statement[s] misleading to a reasonable investor." *Id.* The Supreme Court and the Second Circuit have both "emphasized that meeting [this] standard . . . 'is no small task.'" *Id.* (quoting *Omnicare*, 575 U.S. at 194). The Complaint cannot possibly meet the standard. The omissions Plaintiff alleges are (a) that there was still non-current inventory in the dealer channel, and (b) that in April 2018, Textron began terminating "unprofitable dealers." (Compl. ¶ 110.) The first of those omissions is inadequate because Donnelly never said that *all* aged inventory had been successfully cleared. And the second allegedly omitted fact—that Textron was beginning to cull Arctic Cat dealers—even if true, would *support* an opinion that Arctic Cat was moving in the direction of better performance by eliminating dealers that were not handling enough volume or were providing

13

poor customer service.  In all events, "[a] reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement," and thus "[a]n opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Omnicare*, 575 U.S. at 189-90.  Yet that is the most Plaintiff can allege here.

In addition to being non-misleading opinion statements, the above representations are non-actionable for the independent reason that they fall within the PSLRA's safe harbor for forward-looking statements.  That is because they were "forward-looking statement[s]" (and identified as such) and were "accompanied by meaningful cautionary statements."   15 U.S.C. § 78u-5(c)(1)(A)(i).  Every earnings call began by stating that Donnelly and Connor would be "discussing future estimates and expectations during our call today.  These forward-looking statements are subject to various risk factors which are detailed in our SEC filings and in today's press release." (Ex. E at 3; Ex. J at 3; Ex. L at 3.)  Those risk factors included "[d]ifficulty or unanticipated expenses in connection with integrating acquired businesses," as well as "[t]he risk that acquisitions do not perform as planned, including, for example, the risk that acquired businesses will not achieve revenues and profit projections."  (Ex. G at 10; Ex. K at 32; Ex. M at 33.)  Textron also provided a meaningful disclosure of the reasons why "[a]cquisitions involve risks and uncertainties that could result in our not achieving expected benefits."  (Ex. G at 12.)  Because Textron "directly acknowledged the very risks [Plaintiff] fault[s] for [its] losses," *Gissin v. Endres*, 739 F. Supp. 2d 488, 508 (S.D.N.Y. 2010), the safe harbor protects these comments from liability.

**B.      Textron's Integration-Related Statements Were Not False or Misleading.**

Plaintiff also challenges a number of statements Textron made about its progress in "integrating" Arctic Cat into Textron Specialized Vehicles.  Plaintiff begins with Donnelly's statement during the January 31, 2018 earnings call that "we've successfully integrated the integration of Arctic Cat." (Compl. ¶ 92; Ex. E at 5.)  Plaintiff alleges that this statement was false

14

or misleading because, according to certain of Plaintiff's purported CIs, as of January 2018 "Textron had failed to integrate departments for parts and service, computer systems, warranties, and technical assistance, and the Company's efforts to consolidate production facilities hindered new product development and caused engineering problems." (Compl. ¶ 93.)[4]

First of all, Plaintiff ignores that during this same call, Donnelly said "our integration of Arctic Cat continues," and also—referring to Textron Specialized Vehicles more generally—"there's obviously still work to do in finishing the integration." (Ex. E at 4, 21.)  So, once again, Donnelly's supposed "representation" of "mission accomplished" (Compl. ¶ 66) was anything but.

In addition, these statements are non-actionable puffery or permissible corporate optimism. The Second Circuit and this Court have long recognized that statements about "integration" cannot underpin a claim of securities fraud because integration as a concept is too vague to engender reasonable reliance, at least when—as here—the statements are not accompanied by concrete or specific benchmarks.  As Judge Rakoff has put it, "'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud." *In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, at *2 (S.D.N.Y. Sept. 21, 2001).  Notably, *Razorfish* involved no fewer than seven statements about "integration" that were more definitive than Donnelly's. *Id.* at *1-2.  Second Circuit decisions are in full accord.  In *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 392 (2d Cir. 2015), the Second Circuit held that "statements . . . including, for example, '[t]he integration of ABN AMRO is off to a promising start,' '[our] positive view . . . has been confirmed,' [and] 'we are happy we bought what we thought we bought,'" were "inactionable puffery.  Statements of general corporate

---

[4]  Plaintiff also alleges that Textron's integration-related comments were misleading because "excess non-current inventory" continued to be a problem.  (Compl. ¶ 93.)  This allegation conflates the integration of Arctic Cat with the reduction of Arctic Cat inventory.  Those objectives were distinct planks of the Arctic Cat turnaround plan. As such, alleged failures in inventory reduction do not undermine positive statements about integration, and vice versa.

15

optimism, such as these, do not give rise to securities violations," notwithstanding the plaintiff's allegation that "ABN AMRO was suffering significant losses and the acquisition was 'an unmitigated disaster for RBS.'"  Similarly, in *Rombach*, 355 F.3d at 172, 174, the Second Circuit held that "statements that the integration of Family Golf's new sites was 'well underway' and progressing smoothly" were non-actionable "expressions of puffery and corporate optimism [that] do not give rise to securities violations," because "[u]p to a point, companies must be permitted to operate with a hopeful outlook."  Donnelly's comments are not meaningfully different than any of those.  As Judge Sullivan put it recently, "the law is clear that statements which are 'too general to cause a reasonable investor to rely on them' are not actionable," and this principle applies to statements "that integration 'was smooth and seamless'" and that an acquisition "'was a big step towards our goal' and has 'been everything we hope for.'"  *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019). These statements, the court concluded, "are mostly rosy affirmations that do not contain guarantees, and are far too vague to be actionable." *Id.*  Just the same is true here.

The rest of Plaintiff's integration-related allegations fail for the same reasons and others. Plaintiff focuses on statements that appear in Textron's 2017 10-K, 2018 Q1 10-Q, and 2018 Q2 10-Q.  Plaintiff selectively edits the 10-K to present the following quotation:  "[W]e initiated a restructuring plan in the first quarter of 2017 to integrate [Arctic Cat] into our Textron Specialized Vehicles business within the Industrial segment and reduce operating redundancies and maximize efficiencies. . . .  [The] Arctic Cat plan [is] substantially completed."  (Compl. ¶ 96; *see also* Compl. ¶¶ 102, 111.)  Not true, Plaintiff alleges, because certain departments were not fully integrated, and some products experienced occasional engineering problems.  (Compl. ¶¶ 97, 103, 112.)

These allegations fail, first and foremost, because again Textron's highly general statements are puffery or permissible optimism, for all the reasons explained above. In addition, to the extent the terms "Arctic Cat plan" and "integrate" had any meaning that was concrete enough to engender reasonable reliance, they did *not* convey the loose or colloquial meaning Plaintiff suggests. Rather, as explained immediately below, if the 10-K and 10-Qs gave those terms any concrete meaning at all, it was a narrow and specific meaning: they referred to Textron's decision in the first quarter of 2017 to record a $40 million "Special Charge" related to Arctic Cat, and they described the "Arctic Cat plan" as "substantially completed" in the sense that Textron had nearly finished spending that $40 million by the time it filed the 10-K and 10-Qs in 2018.

The context Plaintiff omits makes this clear. For starters, the 10-K stated under the heading "Note 2" that Textron "recorded special charges of $40 million in 2017 related to the Arctic Cat acquisition, which included restructuring, integration and transaction costs." (Ex. G at 18.) Then, under the heading "Special Charges," the 10-K elaborated:

> In connection with the acquisition of Arctic Cat, as discussed in Note 2, we initiated a restructuring plan in the first quarter of 2017 to integrate this business into our Textron Specialized Vehicles business within the Industrial segment and reduce operating redundancies and maximize efficiencies. Under the Arctic Cat plan, we recorded restructuring charges of $28 million in 2017. . . . In addition, we recorded $12 million of acquisition-related integration and transaction costs in 2017. . . . [The] Arctic Cat plan [is] substantially completed with the majority of the remaining cash outlays . . . expected to be paid in the first half of 2018.

(Ex. G at 62-63.) Continuing the same theme, the 2018 Q1 10-Q stated—again under the heading "Special Charges"—that "[i]n the first quarter of 2017, special charges were related to . . . the Arctic Cat acquisition. . . . There were no special charges recorded in the first quarter of 2018," and the Arctic Cat plan was "substantially completed with the majority of the remaining cash outlays . . . expected to be paid in the remainder of 2018." (Ex. I at 17.) The 2018 Q2 10-Q includes nearly identical language. (Ex. K at 18.)

17

These quotations make clear that *if* the terms "Arctic Cat plan" and "integration" are not puffery, they at most were used narrowly to refer to Textron's decision to record a $40 million "Special Charge" in the first quarter of 2017, about which Plaintiff raises no objection. Thus, assuming a reasonable investor could have relied at all upon the statement that the "Arctic Cat plan" was "substantially completed," he or she could only have understood it to mean that Textron had finished spending most of the $40 million in "cash outlays" it had set aside and recorded as a special charge in early 2017. *See, e.g.*, *Omnicare*, 575 U.S. at 190 (explaining that a reasonable investor "reads each statement" in an SEC filing "in light of all its surrounding text"). Contrary to Plaintiff's suggestion, the representations in the 10-K and the 10-Qs did not signify an all-encompassing declaration that Arctic Cat and Textron were operating in perfect harmony. It was therefore in no way false or misleading for Textron to state that the "Arctic Cat plan" was "substantially completed," even assuming there were still some operational difficulties that needed to be resolved on the ground.

*     *     *

None of the statements Plaintiff challenges, whether relating to Arctic Cat's inventory levels, future prospects, or integration into Textron Specialized Vehicles, was actionably false or misleading. For that reason alone, the Complaint should be dismissed in its entirety. That includes the § 20(a) claim, which fails alongside the § 10(b) and Rule 10b-5 claims. *ATSI*, 493 F.3d at 108.

## II.    PLAINTIFF'S SCIENTER ALLEGATIONS ARE DEFICIENT.

Even if Textron made any false or misleading statements, the Complaint must also "state with particularity facts giving rise to a strong inference that [Textron] acted with the required state of mind," and it must do so "with respect to each act or omission alleged to violate" the Exchange Act. 15 U.S.C. § 78u-4(b)(2)(A). Because Textron "is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted

18

with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  That is, Plaintiff must adequately plead "that an agent of the corporation committed a culpable act with the requisite scienter." *Id.*  Here, the only "culpable acts" Plaintiff identifies are the alleged misrepresentations spoken (or allegedly approved) by Donnelly and Connor.  (*E.g.*, Compl. ¶ 128.)  Thus, Plaintiff must create a strong inference that either Donnelly or Connor possessed the requisite scienter at the time each statement was made.

This means Plaintiff must create a "strong inference" that Donnelly or Connor acted with "'intent to deceive, manipulate, or defraud,'" or engaged in "reckless conduct." *ATSI*, 493 F.3d at 99 n.3.  Plaintiff can do so "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 99.  "For an inference of scienter to be strong, 'a reasonable person must deem it cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323) (brackets omitted).  Moreover, although courts "'normally draw reasonable inferences in the non-movant's favor on a motion to dismiss,' the PSLRA 'establishes a more stringent rule for inferences involving scienter.'" *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quoting *Dynex*, 531 F.3d at 194).  Plaintiff tries to plead scienter by relying on both a motive-and-opportunity theory and a conscious-misbehavior theory.  Neither succeeds.

### A. The Complaint Fails to Plead Motive and Opportunity for Each of the Alleged Misrepresentations.

To plead that Textron had a "motive" to mislead investors, Plaintiff "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiff alleges that Donnelly and Connor sold Textron shares from April 27 to May 1, 2018, and on July 27, 2018.  (Compl. ¶¶ 106, 115.)  Even assuming those

19

allegations suffice to plead motive with respect to the alleged misrepresentations that occurred shortly before those trades—*i.e.*, during the April 18 and July 18 earnings calls, and in quarterly reports filed on April 25 and July 26—they do *not* establish motive with respect to the alleged misrepresentations that occurred well after the trades (on the October 18 earnings call) and significantly before the trades (on the January 31 earnings call and in the 2017 10-K filed on February 15), as the PSLRA requires.  15 U.S.C. § 78u-4(b)(2)(A) (requiring particularized scienter allegations "with respect to *each* act or omission alleged" (emphasis added)).

First, the stock sales cannot create a strong inference that Donnelly or Connor had a motive to defraud investors during the October 18 earnings call months later.  By then, any concrete and personal benefit had long been realized, and Plaintiff does not claim that either Defendant sold stock after October 18.  Nothing in the Complaint creates any inference (let alone a strong one) that Donnelly or Connor had a motive to defraud investors during the October 18 earnings call.

The same conclusion follows for the alleged misrepresentations in January and February. The question is whether stock sales at the end of April (and later) provide a strong basis to infer that Donnelly and Connor were motivated to commit fraud when they addressed investors back in January and February.  The answer is no—at least when, as here, there is no allegation that the stock sales were planned that far in advance.  The temporal gap between the alleged misrepresentations and the stock sales, coupled with the absence of any allegation that the sales were planned in early 2018, severely weakens the logical basis for inferring "that defendants misrepresented corporate performance to inflate stock prices *while they sold their own shares*." *Kalnit*, 264 F.3d at 139 (emphasis added).  And it also contradicts the requirement that the "benefit . . . resulting from the fraud" be "concrete."  *Id.*  In circumstances like these, it cannot be said that Plaintiff's allegations meet the test that an inference of scienter must be "more than merely

20

plausible or reasonable—it must be cogent and *at least as compelling* as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (emphasis added). In addition, accepting these allegations would greatly weaken the PSLRA's scienter pleading requirement. "As a matter of course, corporate insiders sell company stock." *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003). It follows that many corporate officers will be in the position of having sold company stock *at some point* after making a statement that some shareholder alleges was false or misleading. If a plaintiff can plead motive simply by pointing to this common occurrence—without alleging a temporal nexus or premeditation—it will circumvent the PSLRA and undermine the Second Circuit's repeated instruction that "[m]otives that are common to most corporate officers . . . do not constitute 'motive' for purposes of [the PSLRA's scienter] inquiry." *ECA*, 553 F.3d at 198.

### B. The Complaint Fails to Plead Conscious Misbehavior.

Given the above, Plaintiff can plead scienter for the alleged January, February, and October misrepresentations only by alleging that Donnelly or Connor acted with "conscious recklessness." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Conscious recklessness is "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 312 (2d Cir. 2000)). Thus, the Complaint can only plead scienter if it creates a strong inference that facts at odds with Textron's statements were "known to" Donnelly or Connor or were "so obvious" that they "must have been aware" of them. The Complaint cannot do so. Its failure to allege scienter under any theory with respect to the January, February, and October statements means this lawsuit would need to be narrowed substantially even if those statements were false or misleading.

21

1.   **Conscious recklessness cannot be inferred with respect to the alleged misstatements about inventory reduction and future performance.**

There are several reasons why the Complaint does not, and cannot, create a strong inference that Donnelly and Connor were "consciously reckless" when they made statements about inventory levels—which, as relevant here, occurred only on the January 31, 2018 earnings call. The first problem is a timing one.   Initially, the Complaint offers a vague allegation that "throughout early 2018, CI 2 sent inventory reports to Mottel and Collins that showed . . . unsold inventory of non-current dirt and snow products," but it then clarifies that "[a]ccording to CI 2, *in approximately April 2018*, the Company began reviewing inventory levels within their dealer network." (Compl. ¶¶ 73, 87 (emphasis added); *see also* Compl. ¶ 84 (alleging CI 6 began making inventory reports in "early April 2018").)  Before April 2018, all Plaintiff alleges is that CIs 1 and 2 "observed" non-current inventory at an unspecified number of Arctic Cat's 800 dealers. (Compl. ¶¶ 70, 73.)  Even if CIs 1 and 2 made those observations, the Complaint nowhere alleges that either of them shared what they knew with anyone before April 2018, and especially not with Donnelly, Connor, or anyone alleged to have communicated with them.  Nor does the Complaint allege any facts to suggest that Donnelly or Connor could or should have known about "vehicles sitting at dealer locations" in January 2018.  (Compl. ¶ 73.)  That hole in Plaintiff's theory defeats scienter because "[c]orporate officials . . . are only responsible for revealing those material facts reasonably available to them."  *Novak*, 216 F.3d at 309.

In all events, even assuming that CI 2—or some other unidentified employee—was sending inventory reports to Mottel and Collins in January 2018, that allegation would not support a strong inference that *Donnelly or Connor* knew or should have known what was in those reports.  Neither Mottel nor Collins reported to Donnelly or Connor (*see* Compl. ¶ 6), and the Complaint does not allege any contact, ever, among any of them.  In fact, the Complaint never alleges that Mottel or

22

Collins shared any inventory reports with anyone above them—not even Holleran, Collins's direct superior.  Courts routinely hold that scienter cannot be inferred from allegations that a confidential witness possessed material information when, as here, there is no allegation that such information was communicated to the relevant corporate officials.  *See generally Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589-90, 591 (S.D.N.Y. 2011) (collecting cases).  These CIs are evidently low-ranking employees, but "even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge." *Id.*  Plaintiff here alleges nothing of the sort.  Taking all of the Complaint's allegations together, they fall well short of making it "cogent and at least as compelling" to suppose that Textron's highest corporate officers knew or were consciously reckless about inventory levels among Arctic Cat's dealers in January 2018.  *Tellabs*, 551 U.S. at 314; *see also Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55, 59 (2d Cir. 2018) (affirming dismissal for lack of scienter where "several of the individual defendants 'were at the apex of Deutsche Bank's corporate hierarchy,' . . . and therefore were several layers removed from the illegal trading activities").[5]

Finally, Plaintiff cannot plead that Donnelly and Connor acted with scienter when they answered "yes" when asked, in January 2018, if they thought Arctic Cat was "going to hit the target of being accretive" at some point during the next twelve months.  (Compl. ¶ 94; Ex. E at 27.)  Plaintiffs are simply trying to plead "fraud by hindsight," *i.e.*, alleging that because Donnelly and Connor incorrectly predicted what would happen over the coming year, they must have been consciously reckless when they spoke.  *Novak*, 216 F.3d at 309.  This theory is impermissible.

---

[5]  CIs 2 and 6 also allege that Textron began terminating unprofitable Arctic Cat dealers "commencing in the summer of 2018."  (Compl. ¶ 87.)  The Complaint alleges that this initiative was not even conceived until April. (Compl. ¶ 84.)  Thus, assuming Donnelly or Connor eventually came to know about it (which the Complaint does not allege), it could not be used to infer anything about their mental state months earlier, in January or February.

"Corporate officials need not be clairvoyant . . .  Thus, allegations that defendants should have anticipated future events . . . do not suffice to make out a claim of securities fraud."  *Id.*

### 2. Conscious recklessness cannot be inferred with respect to the alleged misstatements about integration.

The Complaint is similarly deficient when it tries to plead that Donnelly and Connor were "consciously reckless" in making positive statements about the Arctic Cat's integration in January and February 2018.  The facts alleged in the Complaint are a hodgepodge of disconnected "observations" supposedly made by various CIs, but—with one exception discussed below—there is *no* allegation that any of these observations were shared with anyone even close to Donnelly or Connor, including Holleran.  That is fatal.  *Glaser*, 772 F. Supp. 2d at 589-91.  Moreover, these observations are not remotely the sorts of issues that represent "obvious signs of fraud," or that Donnelly or Connor's failure to know could be described as "an extreme departure from the standards of ordinary care."  *S. Cherry St.*, 573 F.3d at 109.  For instance, Plaintiff nowhere explains why Donnelly or Connor should have known—or suspected fraud—even if "at one point there were approximately 60 . . . 2018 Havoc units parked near or inside the Thief River Falls test lab that had experienced primary clutch alignment problems," or that certain Havoc and Wildcat XX vehicles "were continuing to have compliance evaluations conducted even while they were going out the door."  (Compl. ¶¶ 80, 82.)  These and the remaining observations are threadbare; they are plainly inadequate to create a "strong inference" of scienter at Textron's highest level.

The Complaint identifies only one allegedly adverse fact that was shared with Donnelly or Connor:  CI 5, a former Arctic Cat dealer, allegedly sent Donnelly "multiple voicemails and . . . text messages . . . looking for answers regarding . . . unfulfilled orders and [unspecified] engineering issues."  (Compl. ¶ 83.)  This allegation is not close to good enough.  First of all, "to adequately plead scienter, plaintiffs must plead facts showing that defendants knew an omission

24

was material," *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015), and there is no way to conclude that concerns expressed by a single dealer—one out of 800—would be material to a reasonable investor. *See ECA*, 553 F.3d at 197 (holding that materiality requires "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available"). Moreover, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak*, 216 F.3d at 309. Making positive statements about integration, notwithstanding complaints from one dealer out of 800, is entirely consistent with that principle.

**3.    Conscious recklessness cannot be inferred with respect to the alleged misrepresentation about impairment of goodwill or intangible assets.**

Plaintiff cannot allege that Donnelly acted with scienter when he said he did not think Textron's third quarter results would lead to an impairment of goodwill or intangible assets. (Compl. ¶ 120; Ex. L at 21.) This is another impermissible attempt to plead "fraud by hindsight." *Novak*, 216 F.3d at 309. Textron disclosed that it tests goodwill in the fourth quarter (Ex. G at 33), and the Second Circuit has recognized that "[e]stimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). It follows that Donnelly's prediction about the result of that upcoming evaluation is not actionable because, as noted above, "[c]orporate officials need not be clairvoyant," and "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak*, 216 F.3d at 309.

## CONCLUSION

The motion to dismiss should be granted.

25

Dated:  January 24, 2020

/s/ Sandra C. Goldstein

Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Kevin M. Neylan, Jr.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
kevin.neylan@kirkland.com

*Counsel for Defendants*

26