**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TEXTRON, INC. SECURITIES LITIGATION | 19cv7881 (DLC) <br><br> <u>CLASS ACTION</u> <br><br> <u>DEMAND FOR JURY TRIAL</u> |

**SECOND AMENDED COMPLAINT FOR**
**VIOLATION OF THE FEDERAL SECURITIES LAWS**

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Donald R. Hall
Jeffrey P. Campisi
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: ffox@kaplanfox.com
        dhall@kaplanfox.com
        jcampisi@kaplanfox.com

*Lead Counsel for Lead Plaintiff IWA*
*Forest Industry Pension Plan and the*
*Proposed Class*

February 14, 2020

## TABLE OF CONTENTS

Page(s)

I.    NATURE OF THE ACTION ................................................................ 1

II.   JURISDICTION AND VENUE ........................................................... 9

III.  PARTIES ....................................................................................... 10

IV.   BACKGROUND AND SUBSTANTIVE ALLEGATIONS ......................... 12

    A.    Background on Textron's Business .......................................... 12

    B.    Background on Arctic Cat's Products, Sales and Marketing Strategy, and Sales Channel ...................................................................... 13

    C.    Textron's Acquisition of Arctic Cat ........................................ 14

    D.    Defendants' Turnaround Plan and Integration Strategy for Arctic Cat ............... 15

    E.    Defendants Purportedly Reduce Arctic Cat Aged Inventory and Position Textron Specialized Vehicles for Earnings Growth in 2018 ............... 17

    F.    Defendants' Fraudulent Scheme .............................................. 21

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ......................................... 34

    A.    Textron's Financial Results for the Fourth Quarter and Year Ended December 31, 2017 ............................................................. 35

    B.    Textron's Financial Results for the Quarter Ended March 31, 2018 .............. 43

    C.    Textron's Financial Results for the Quarter Ended June 30, 2018 .............. 45

VI.   THE TRUTH BEGINS TO MATERIALIZE ......................................... 48

VII.  ADDITIONAL SCIENTER ALLEGATIONS ...................................... 54

VIII. PRESUMPTION OF RELIANCE ..................................................... 57

IX.   LOSS CAUSATION/ECONOMIC LOSS ......................................... 59

X.    NO SAFE HARBOR ...................................................................... 61

XI.   CLASS ACTION ALLEGATIONS .................................................. 61

XII.  CAUSES OF ACTION .................................................................. 62

i

COUNT I:   For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against
All Defendants ............................................................................................................62

COUNT II:  For Violations of Section 20(a) of the Exchange Act Against Defendants
Donnelly and Connor ..................................................................................................63

XIII.   PRAYER FOR RELIEF .................................................................................................. 65

XIV.   JURY DEMAND ............................................................................................................ 65

## CAST OF CHARACTERS

Scott Donnelly, Textron's Chairman, President and Chief Executive Officer, member of Textron's Executive Leadership Team

Frank Connor, Textron's Executive Vice President and Chief Financial Officer, member of Textron's Executive Leadership Team

Robert E. Lupone, Textron's General Counsel and Secretary, member of Textron's Executive Leadership Team

Scott Holleran, former President and Chief Executive Officer of Textron's Industrial segment, and former Director, President and Chief Executive Officer, Textron Specialized Vehicles Inc.

John Collins, Vice President, Consumer

Philip Jhant, Director of North American Sales; Director of Strategy and Product Management

Mike Webster, Director of Go-To-Market Strategy at Textron Specialized Vehicles; Director of North American Sales

Chris Spencer, Vice President of Engineering

Christel Mottel, Director, Sales Operations

Justin Brennan, Director, Director Channel Development; Director E-Z-Go Consumer Sales and Marketing

Lead Plaintiff IWA Forest Industry Pension Plan ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys. The investigation by counsel included, among other things: (i) review and analysis of the public filings with the U.S. Securities and Exchange Commission ("SEC") by Textron Inc. ("Textron" or the "Company"); (ii) review and analysis of corporate press releases, disclosures and media reports issued and disseminated by Textron; (iii) review of other publicly available information concerning Textron, including transcripts of public investor presentations and conference calls; (iv) consultation with economic loss, damages and accounting consultants; (v) information obtained from confidential informants (referred to throughout as "CI's); and (vi) review and analysis of the trading data relating to the price and volume of Textron common stock. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.     This is a securities class action on behalf of all investors who purchased or otherwise acquired Textron common stock between January 31, 2018 and December 6, 2018, inclusive (the "Class Period"). The action is brought against Textron; Scott Donnelly ("Donnelly"), the Company's Chairman, President, and Chief Executive Officer ("CEO"); and Frank Connor ("Connor"), Textron's Executive Vice President and Chief Financial Officer ("CFO"), for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.     Textron is a global manufacturer and distributor of small aircrafts and recreational vehicles. On March 6, 2017, Textron expanded its recreational vehicle business through a cash

tender offer for $18.50 per share, followed by a short-form merger, of Arctic Cat Inc. ("Arctic Cat"), for $316 million aggregate cash payment, including repayment of debt and net of cash acquired. Upon the completion of this transaction, Arctic Cat became an indirect wholly-owned subsidiary of Textron. At the time of its acquisition by Textron, Arctic Cat sold and marketed recreational off-highway vehicles ("ROV"), including all-terrain vehicles ("ATV")—called "dirt" vehicles—and snowmobiles—referred to as "snow" vehicles—through independent dealers. Defendants' acquisition of Arctic Cat would afford the Company the opportunity to sell Textron's existing line of dirt vehicles through Arctic Cat's network of approximately 800 dealers.

3.      When the deal closed in March 2017, Defendant Donnelly stated that the "addition of Arctic Cat to [the Company's] Textron Specialized Vehicles business instantly gives [Textron] a deeper product line for customers, greater potential for innovation, and introduces new sales opportunities for [its] worldwide dealer network."

4.      At the time of Defendants' acquisition of Arctic Cat, analysts and investors were concerned that in the years before Textron's acquisition, Arctic Cat's sales were sluggish, resulting in excess dealer inventory of aged, non-current snow and dirt products. Furthermore, Arctic Cat reported in its SEC filings over $185 million in inventory of dirt and snow vehicles, and parts and accessories as of December 31, 2016.

5.      Defendants acknowledged Arctic Cat's excess inventory of non-current snow and dirt vehicles and reassured investors with a plan to turn around Arctic Cat. Throughout 2017, although Arctic Cat would not be profitable, Defendants would integrate Arctic Cat into Textron's Specialized Vehicles (TSV or SV) division within its Industrial Segment and clear non-current inventory of snow and dirt products. Arctic Cat snowmobiles would continue to be marketed under the Arctic Cat brand, while Arctic Cat's dirt products would be integrated and sold under the Textron Off-Road brand. By 2018, Defendants would complete the integration and clear aged,

2

non-current inventory, and position the Arctic Cat acquisition to be accretive to Textron's Industrial Segment's earnings in 2018.

6.      The Arctic Cat turnaround plan was led by senior Textron executives within the Company's Industrial Segment, including: 1) Scott Holleran ("Holleran"), President and Chief Executive Officer of Textron's Industrial segment, and Director, President and Chief Executive Officer, Textron Specialized Vehicles Inc., who reported directly to Defendant Donnelly; 2) John Collins ("Collins"), Vice President, Consumer, who reported to Holleran; 3) Philip Jhant ("Jhant"), Director of North American Sales; Director of Strategy and Product Management; 4) Mike Webster ("Webster"), Director of North American Sales; Director of Go-To-Market Strategy at Textron Specialized Vehicles; 5) Chris Spencer ("Spencer"), Vice President of Engineering;  6) Christel Mottel ("Mottel"), Director, Sales Operations; and 7) Justin Brennan ("Brennan"), Director, Channel Development; Director E-Z-Go Consumer Sales and Marketing.  The Arctic Cat turnaround team monitored the progress of the plan on a regular basis by accessing Arctic Cat dealer sales and inventory data and reports.  Throughout 2017-18, Holleran and Collins met with Defendants Donnelly and Connor multiple times at the Company's Providence, Rhode Island headquarters.  Further, members of the Arctic Cat turnaround team monitored through regular meetings, including meetings with sales representatives or Arctic Cat dealers.

7.      Because Arctic Cat was no longer a publicly traded company subject to SEC disclosure requirements, investors were dependent on Defendants Donnelly and Connor for sufficient details about the progress of the Arctic Cat turnaround plan, including details about the Company's plan to reduce excess inventory of non-current snow and dirt products and the integration of Arctic Cat into Textron.

8.      In effect, Defendants placed Arctic Cat into a financial black box.  Before and during the Class Period, Defendants issued press releases that were filed with the SEC announcing

quarterly earnings conference calls to discuss Textron's financial results. Defendants provided investors and analysts with conference call information (time and telephone number) for the call in which anyone could participate. Accordingly, during Defendants' regular quarterly earnings conference calls with investors and analysts throughout 2017 and during the Class Period, investors and analysts asked Defendants Donnelly and Connor pointed questions about the progress of the Arctic Cat integration plan and Defendants' efforts to clear aged, non-current snow and dirt inventory.

9.      Throughout 2017, Defendants Donnelly and Connor represented that the Arctic Cat turnaround plan was on track and that excess non-current inventory levels were declining. By the beginning of the Class Period, Defendants represented that the Arctic Cat turnaround plan was complete—the integration was completed, non-current inventory levels had materially declined—including clearing older or aged snowmobile dealer inventory, and that Arctic Cat was positioned to be "accretive" or profitable in 2018.

10.      For example, on January 31, 2018, the start of the Class Period, during one of the Company's regular quarterly conference calls with analysts and investors to discuss the Company's financial results, Defendant Donnelly falsely represented "[w]e saw improved demand in the snow retail channel, allowing dealers to *clear older inventory and drive 2018 model sales*"[1], that "*we successfully integrated* the integration of Arctic Cat", and that Arctic Cat was going to "*hit the target*" of being accretive in 2018.[2]

---

[1] Unless otherwise stated, emphasis and alterations are added.

[2] A transcript of the Company's January 31, 2018 conference call, prepared by Thomson Reuters, quoted Defendant Donnelly as stating: "We saw improved demand in the snow retail channel, allowing dealers to clear ***all their inventory*** and drive 2018 model sales . . .". Separately, a transcript of the Company's January 31, 2018 conference call, prepared by FactSet CallStreet, LLC, quoted Defendant Donnelly as stating: "We saw improved demand in the snow retail channel, allowing dealers to clear ***older inventory*** and drive 2018 model sales . . .". ECF No. 38-

11.     However, according to numerous former Textron employees, by the beginning of the Class Period, the Arctic Cat integration was significantly behind plan and, at the beginning of the Class Period, dealer inventory levels of non-current snow and dirt products had remained elevated.  Indeed, at the start of the Class Period, according to several former Textron employees, approximately 22,000 non-current snow and dirt vehicles remained unsold at dealers, and the glut of aged snow and dirt inventory at dealerships that was clogging the sales channel was essentially unchanged since Textron acquired Arctic Cat in March 2017.

12.     Defendants' misrepresentations about clearing non-current inventory hid from investors Textron's continued dependence on large sales rebates and other significant discounting to incentivize sales of non-current dirt and snow inventory at deep discounts, which weighed negatively on revenue and profit margins during the Class Period.  Indeed, Textron continued rebating on non-current, aged snow and dirt units through the third quarter of 2018.  The massive unsold non-current inventory and continued dependence on rebating ultimately cost the Company $40-$50 million, resulting in a 98% decline in profit in the third quarter of 2018.  Ultimately, the Arctic Cat acquisition was not accretive in 2018.

13.     On April 18, 2018, Defendant Donnelly falsely represented to investors that in "terms of the inventory reduction, we're pleased with, if you look at both dirt and snow, inventory reductions that happened through the course of the year, which was a big focus of ours, yielded a lot of result, so there's pretty significant reductions in that aged inventory."  However, unknown to investors, inventory of non-current dirt and snow models had not been significantly reduced and Defendants would continue to offer increasing rebates through the third quarter of 2018 in an effort to clear aged snow and dirt inventory, resulting in a continued drag on the Industrial segment's

---

5.  Either interpretation is misleading because, as set forth below in ¶¶75-84, at that time, aged snow and dirt inventory at dealers had not been significantly reduced in a way to drive 2018 sales.

revenue and profitability throughout 2018.

14.     Soon after Defendant Donnelly's misrepresentations on April 18, 2018, Defendants Donnelly and Connor took advantage of Textron's artificially inflated stock price by selling millions of dollars in Textron stock.  Between April and July 2018, Defendants Donnelly and Connor sold approximately 363,047 Textron shares for net proceeds of over $12 million. Neither Defendant Donnelly nor Defendant Connor sold any Textron stock on the open market in 2017.

15.     On October 12, 2018, Textron disclosed that Holleran, who led the Arctic Cat turnaround team, was replaced as President and CEO of Textron's Industrial segment, and Director, President and CEO, Textron Specialized Vehicles Inc., and would leave the Company after 15 years.

16.     The truth about Arctic Cat's inventory problems and integration failures began to be revealed on October 18, 2018, when before the market opened, Textron reported its third quarter 2018 earnings and cut its full-year 2018 earnings forecast.  Textron's Industrial Segment's reported profit declined to $1 million, or by approximately 98%, down from $49 million reported for the third quarter of 2017.  Defendant Donnelly explained that the Industrial segment's performance was "unfavorable" due to a "painful" experience in managing the sales channel and discounting, and that the integration of dirt products was at least one-year behind schedule:

> . . . due to unfavorable operating performance in specialized vehicles. Specialized vehicles has undergone significant change over the past 2 years as we've expanded the product portfolio. . . our team has been going through sort of a painful learning experience about how that channel is managed and how discounting is handled and how that plays out through the course of the year. . . it, for sure, has manifested itself in more discounting than we would like to continue to work that channel.
>
> ***
>
> On the dirt side, we missed a better part of last year because some of the product that was sort of in the pipeline wasn't really ready to go. And we didn't want to release it till it was ready, ***so we're kind of maybe a year behind in terms of the new product feeding into that channel***. . .

17.     On this news, Textron's stock declined from a closing price on October 17, 2018 of $64.78 per share to close at $57.49 per share, a decline of $7.29 per share or approximately 11.25%, on heavier than usual volume of over 13.4 million shares.

18.     Analysts were surprised by Textron's disclosure and laid the blame for the decline in the Industrial Segment's profit to $1 million in the third quarter of 2018, down from $49 million in the third quarter of 2017, on the cost for rebates and incentives.  For example, on October 18, 2018, J.P. Morgan issued a research report titled "Textron, Off-Road Vehicles Run Over Q3" that stated, in part, the following:

> We are lowering our 2019-20 EPS estimates by 15-20 cents for Specialized Vehicles following a disappointing Q3 and we still seek confidence that mgmt can bring this business to sustained profitability. (See below for more.)  . . .
>
> **Specialized Vehicles has given dealers rebates for product that isn't selling.**[3] Management indicated that revenues in the Specialized Vehicles business are on-track for the year (~$1.75 bn) despite a large shortfall in the profitability of Arctic Cat. In addition, we don't see the market materially deteriorating, based on other players in the space (see Table 3). The reason that revenues can be on-track while profits disappoint without an operational miscue is due to rebates Textron must give dealers/distributors on previously sold vehicles to get them off the floor and make room for new products. ***We estimate these incentives cost $40-50 mn in Q3***, matching the reduction in operating cash flow guidance and presumably, they address the dealer inventory situation for a few quarters…and hopefully for good but we don't want to count our chickens…

19.     Also on October 18, 2018, *Bloomberg News* published an article titled "Textron Slumps as Planemaker Stumbles with All-Terrain Vehicles" that stated, in part, the following:

> Textron Inc. got scratched up by Arctic Cat, the snowmobile company the aircraft maker bought in 2017, pushing third-quarter earnings below Wall Street's estimates and sending the stock down the most in 20 months.
>
> Arctic Cat also makes all-terrain vehicles but Textron was slow to develop new products and missed about half this year's peak selling season, said Chief Executive Officer Scott Donnelly. Then Textron fumbled sales management and was forced to discount heavily. . . As a result of the Arctic Cat missteps, Textron's industrial unit posted third-quarter profit of $1 million, down from $49 million a year earlier.

---

[3] Emphasis in original.

The segment's CEO [Holleran] was replaced last week with the chief of Textron's marquee aviation operation. . .

20.      Also on October 18, 2018, Jefferies issued a research report titled "Rough Ride in Industrial . . . but 90% of Business Performing" that stated Textron Specialized Vehicles essentially had "no value" and stated, in part, the following:

> we arrive at today's share price which applies essentially no value to the S[pecialized] V[ehicles] unit. . . . Within the Specialized Vehicle business, the dirt piece from Arctic Cat has struggled. Late product introductions and the proper channels have been the biggest issues. There has been some inventory building up in the channel as product has struggled to reach the customer through the dealers. The focus is on improving distribution.

21.      Then, on December 6, 2018, after the market closed, just weeks after Defendant Donnelly denied that there were any asset impairments, Defendants caused Textron to file a report with the SEC on Form 8-K that disclosed "Material Impairments" relating to the Company's Specialized Vehicles business.  The December 6, 2018 8-K stated, in part, that Textron's "Board of Directors approved a plan to restructure the Textron Specialized Vehicles businesses within our Industrial segment. We expect to incur pre-tax charges in the range of $60 million to $85 million under this plan, which will be recorded in the fourth quarter of 2018."

22.      On December 7, 2018, Textron shares declined from a closing price on December 6, 2018 of $53.10 per share to close at $51.14 per share, a decline of $1.79 per share or approximately 3.3%, on heavier than usual volume of over 2.2 million shares.

23.      Also on December 7, 2018, Jefferies published a research report titled "Tough Turf: Restructuring Charges within Industrial" that stated, in part, the following:

**Key Takeaway**

. . . on Dec. 6th, TXT announced a plan to restructure the Specialized Vehicles business within the Industrial segment. The SPV segment accounts for ~$1.5BB in revenue.  The company plans to incur pre-tax charges of $60-85MM in Q4:18 largely related to the Arctic Cat Acquisition, which we estimate translates into a

8

GAAP EPS impact of $0.27 assuming a $80MM charge. Our 2018 Adjusted EPS estimate of $3.10 remains unchanged.

**TXT's Board Approved Plan to Restructure Arctic Cat**

Industrial accounts for 30% of sales with Specialized Vehicles as $1.6BB or 11% of total co. The issue in Q3 is primarily related to the channel for dirt/snow. Management is restructuring to improve production, channel and inventory.[4]

24.     On December 10, 2018, Cowen issued a research report titled "Consumer Vehicle Miscues Again" that stated, in part, the following:

We're paring 2018-19 estimates for TXT's disappointing second restructuring of its troubled consumer vehicle business.

**Second Consumer Vehicle Restructuring Reflects Ongoing Miscues**

TXT plans $60-85MM of restructuring charges in Q4. These will include $45-55MM in non-cash impairment charges that should produce $2-3MM in lower non-cash amortization in 2019. In addition, TXT plans $15-30MM in severance & facility shutdown charges to cut ~10% of the Specialized vehicles work force and close several locations. Up to $10MM of the $15-30MM in cash outlays are expected in Q4 with the remainder in 2019, resulting in a reduction in ongoing costs about equal to the restructuring outlays.[5]

25.     Textron's share price has not recovered, closing at $48.09 per share on February 14, 2020.

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

27.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to

---

[4] Emphasis in original.

[5] *Id.*

9

28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

28.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Textron transacts business in this Judicial District, and the Company's stock trades on the New York Stock Exchange ("NYSE"), located within this Judicial District.

29.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.   **PARTIES**

30.     Plaintiff IWA Forest Industry Pension Plan is a British Columbia, Canada-based pension plan with over 400 participating employers and more than 70,000 active, deferred and retired members.  As shown in the certification previously filed (ECF No. 53, at 58-59), Plaintiff purchased shares of Textron common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged in this action.

31.     Defendant Textron is a Delaware corporation with principal executive offices located at 40 Westminster Street, Providence, Rhode Island 02903.  The Company's stock is listed on the NYSE under the ticker symbol "TXT."

32.     Defendant Donnelly, at all relevant times, was the Company's Chairman, President and CEO.  Defendant Donnelly signed: 1) Textron's Annual Report for the year ended December 31, 2017 filed with the SEC on February 15, 2018 ("2017 10-K"); 2) Certifications pursuant to the

10

Sarbanes-Oxley Act of 2002 ("SOX Certifications") filed with the 2017 10-K; Textron's quarterly report for the period ended March 31, 2018 filed with the SEC on April 25, 2018 ("Q1 2018 10-Q"); and Textron's quarterly report for the period ended June 30, 2018 filed with the SEC on July 26, 2018 ("Q2 2018 10-Q"); and 3) made representations to investors in press releases and on conference calls with investors on January 31, April 18, July 18 and October 18, 2018.

33.     During the Class Period, Defendant Donnelly engaged in sales of Textron stock that were suspicious in timing and amounts.  In the 12 months before the start of the Class Period, Defendant Donnelly did not sell any Textron shares.  During the Class Period, Defendant Donnelly acquired 283,047 common shares through the exercise of options at prices of $5.65 or $47.84 per share, and sold all of these shares in multiple transactions at prices ranging from $61.33 to $67.94 per share, for net proceeds of approximately $8,132,166, including sales on April 27, 30, May 1 and July 27, 2018, representing the sale of approximately 13% of his Textron holdings.  During the Class Period, Defendant Donnelly did not purchase any Textron shares on the open market. In 2018, Defendant Donnelly was paid $1.236 million in cash.

34.     Defendant Connor, at all relevant times, was the Company's Executive Vice President and CFO.  Defendant Connor signed: 1) the 2017 10-K; 2) SOX Certifications filed with the 2017 10-K; Q1 2018 10-Q; and Q2 2018 10-Q; and 3) made representations to investors in press releases and on conference calls with investors on January 31, April 18, July 18 and October 18, 2018.

35.     During the Class Period, Defendant Connor engaged in sales of Textron stock that were suspicious in timing and amounts.  In the 12 months before the start of the Class Period, Defendant Connor did not sell any Textron shares.  On April 27, 2018, Defendant Connor acquired 80,000 Textron shares through the exercise of options at $14.34 per share, and sold all of these shares in multiple transactions at prices ranging from $62.57 to $63.25 per share, for net proceeds

11

of approximately $3,892,000, representing the sale of approximately 12% of his Textron holdings. During the Class Period, Defendant Connor did not purchase any Textron shares on the open market.  In 2018, Defendant Connor was paid $1 million in cash.

36.     Defendants Donnelly and Connor are referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Textron's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, including access to the Arctic Cat turnaround team and inventory reports, the Individual Defendants knew, or were at least reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

37.     Textron and the Individual Defendants are referred to herein, collectively, as "Defendants."

## IV.   BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.    Background on Textron's Business

38.     Defendant Textron is a global manufacturer and distributor of aircrafts, recreational vehicles, and other mechanical products.  The Company's five operating segments are: (1) Industrial; (2) Textron Aviation; (3) Bell Helicopter; (4) Textron Systems; and (5) Finance.

12

39.     The Industrial segment is subdivided into the following three businesses: (1) Textron Specialized Vehicles; (2) Fuel Systems and Functional Components; and (3) Tools and Test Equipment.  During the Class Period, Textron sold the Tools and Test Equipment business.

**B.      Background on Arctic Cat's Products, Sales and Marketing Strategy, and Sales Channel**

40.     As of January 2017, Arctic Cat designed, engineered, manufactured and marketed snowmobiles, ATVs, and ROVs or "side-by-sides", as well as related parts, garments and accessories ("PG&A") under the Arctic Cat and MotorFist brand names.

41.     Arctic Cat marketed its products through a network of approximately 800 independent dealers located throughout the United States, Canada, and Europe and through distributors representing dealers in Europe, Russia, South America, the Middle East, China, Asia and other international markets.

42.     For Arctic Cat's "snow" products, such as snowmobiles, orders by dealers and distributors for each year's production are placed in the spring following dealer and distributor meetings. Snowmobiles are built commencing in late spring and continuing through late autumn. Retail sales for most snowmobiles to retail customers begin in the early fall and continue during the winter.

43.     Retail sales of Arctic Cat's "dirt" products, such as ATVs and ROVs, occur throughout the year with seasonal highs occurring in the spring and fall.  Arctic Cat's side-by-sides and ATV brands include Alterra, Wildcat and Prowler products.

44.     Arctic Cat dealers enter into yearly contracts and are required to maintain status as an authorized dealer in order to continue selling its products. To obtain and maintain dealer status, dealers are expected to order a sufficient number of snowmobiles, and/or ATVs and ROVs to adequately service their respective market areas.  In addition, dealers must perform service on

13

these units and maintain satisfactory service performance levels, and their mechanics are expected to complete special training provided by Arctic Cat. Arctic Cat dealers are also expected to carry adequate levels of inventory of genuine Arctic Cat parts, garments and accessories.

### C.      Textron's Acquisition of Arctic Cat

45.      The acquisition of Arctic Cat was part of the Company's strategy to expand and further grow its Textron Specialized Vehicles business within the Company's Industrial segment.

46.      On January 25, 2017, Textron issued a press release disclosing its financial results for the quarter and year ended December 31, 2016 and disclosing the acquisition of Arctic Cat:

> Today, Textron announced that it has reached a definitive agreement to acquire Arctic Cat Inc. (NASDAQ: ACAT) in a cash transaction valued at approximately $247 million, plus the assumption of existing debt. . . Textron has agreed to make a cash tender offer for all outstanding shares of Arctic Cat common stock at a price of $18.50 per share. The tender offer is expected to commence no later than February 7, 2017. The completion of the acquisition is subject to customary conditions and regulatory approvals.

47.      At the time the acquisition was announced, Textron's Specialized Vehicles' product line included E-Z-GO golf cars and personal transportation vehicles; Cushman commercial utility vehicles; Textron Off Road side-by-sides; Dixie Chopper zero-turn mowers; Jacobsen professional turf-care equipment; and TUG, Douglas, Premier and Safeaero ground support equipment.

48.      On January 25, 2017, Defendant Donnelly stated during an earnings conference call that the Arctic Cat acquisition "will immediately broaden our product portfolio as we add a variety of outdoor recreational and utility vehicles to our lineup, as well as an established dealer network."

49.      After Textron acquired Arctic Cat, Defendants sought to integrate Arctic Cat's business into its Textron Specialized Vehicles business and Defendant Donnelly, in a Form 8-K filed with the SEC on January 25, 2017, described the acquisition as a "strategic fit" and a platform to grow Textron Specialized Vehicles' business:

"Arctic Cat is a superb strategic fit for Textron," said [Defendant] Donnelly. "With our recent product introductions in the outdoor recreational vehicle market under the Stampede name, we believe Arctic Cat, one of the most recognized brands in the industry, provides an excellent platform to expand our portfolio, increase our distribution and create growth within our Specialized Vehicles business."

50.     In February 2017, Arctic Cat hosted its annual dealer show in Minneapolis/St. Paul.

At this dealer show, Arctic Cat launched the Wildcat XX side-by-side for which orders would be

taken starting in the Fall of 2017.

51.     On March 6, 2017, Textron announced the closing of the Arctic Cat acquisition:

Textron Inc. (NYSE: TXT) announced today that it has completed the acquisition of Arctic Cat Inc. by means of a short-form merger under Minnesota law. As a result, Arctic Cat has become an indirect wholly owned subsidiary of Textron.

"The addition of Arctic Cat to our Textron Specialized Vehicles business instantly gives us a deeper product line for customers, greater potential for innovation, and introduces new sales opportunities for our combined worldwide dealer network."

Going forward, Arctic Cat will operate as a subsidiary of Textron Specialized Vehicles Inc. This business, based in Augusta, Ga., . . .

"Arctic Cat is an ideal fit with our growing range of off-road recreational vehicles," said Textron president and CEO Scott Donnelly. "The addition of Arctic Cat to our Textron Specialized Vehicles business instantly gives us a deeper product line for customers, greater potential for innovation, and introduces new sales opportunities for our combined worldwide dealer network."

Arctic Cat's operations will remain in Minnesota. The business will gain valuable new capabilities through its integration with Textron Specialized Vehicles and the global resources of Textron Inc.—a $13.8 billion multi-industry business with operations in more than 25 countries.

## D.     Defendants' Turnaround Plan and Integration Strategy for Arctic Cat

52.     At the time Textron acquired Arctic Cat, Defendant Donnelly represented that

Textron's acquisition provided the Company opportunities for growth and synergies with

Textron's existing products.  However, Defendants acknowledged that, while the acquisition of

Arctic Cat afforded Textron opportunities, Arctic Cat would require restructuring, consolidation

of operations, and integration in order to unlock synergies and add to Textron's bottom line

profitability.

53.     One immediate challenge that Defendants faced was excess inventory of non-current, aged Arctic Cat snow and dirt products, and difficulties managing the product sales channel.

54.     On January 25, 2017, Defendant Donnelly stated the following concerning Arctic Cat's excess inventory, and the acquisition's synergies in response to an analyst's question:

> [Citigroup Analyst]: Scott, Frank, I was wondering if you could just talk a little bit more about the acquisition and the potential accretion and synergies and the longer-term strategic view of this particular market segment.
>
> [Defendant Donnelly]: . . . The snow side of the business, obviously, had a couple of bad winters. On the dirt side they had just, again, as an industry, not unique to Arctic Cat, a lot of stuff built up in the channel. And I think it's a business that has tremendous opportunities going forward, but it's been in a bit of a tough time unwinding and managing their way through a lot of the inventory issues, and frankly, positioning themselves for future growth. . . .
>
> I think a lot of progress has been made with respect to the channel. That work will have to continue after we acquire it, I think, through the first year to really get that repositioned and ready to go.
>
> So I think long term, we see this as a mid-single-digit growth business. I think we get a lot of synergies and a lot of leverage in terms of the operations, as well as, again, just fortuitously where we were really investing and where they were investing are very, very highly complementary. So I think the combined entity will have a great product lineup, a great dealer network, and I think it's really poised to deliver some nice growth going forward.

55.     In addition to reducing aged snow and dirt inventory, Defendants represented that integration objectives included: 1) consolidating operations by combining Arctic Cat's and TSV's dirt vehicles production facilities; 2) enhancing the dealer network by combining Arctic Cat's approximately 800 dealers with TSV's dealers; and 3) charges of approximately $30-40 million in 2017.

56.     To address the excess inventory built up in the sales channel and other integration objectives, Defendants set forth a plan to turnaround Arctic Cat: 1) throughout 2017 "clear out"

non-current snow and dirt inventory and integrate Arctic Cat into Textron Specialized Vehicles, and 2) complete the integration of Arctic Cat by 2018, unlock the acquisition's "synergies", and position Textron Specialized Vehicles for earnings growth, or earnings "accretion."

57.     One of the ways in which Textron sought to "clean up" inventory was through rebates.  On an April 19, 2017 conference call, Defendant Donnelly, in response to an analyst's question, represented that the rebate programs were effective in clearing out non-current inventory, allowing for dealers to restock inventory:

> the challenge that we have on [Arctic Cat] as we acquired it was they frankly, they have too much inventory. And so the first step out of the gate here has been to put together these programs to help -- put rebating together to help the dealers move it out. I think that's been very well received, and as I said, we're already starting to see the impact of that.

### E.     Defendants Purportedly Reduce Arctic Cat Aged Inventory and Position Textron Specialized Vehicles for Earnings Growth in 2018

58.     As early as April 19, 2017, Defendant Donnelly represented that that Defendants had already made progress in clearing out old inventory and positioning Arctic Cat for profitability in 2018:

> [Wells Fargo Securities, LLC Analyst]: Could you talk a little bit more about Arctic Cat? Just help me understand, I guess, what should the Industrial segment look like this year now as you consolidate that and we look at the intangible amortization. And you talk about the $55 million of outflow this year. How should we think about, I guess, from an earnings benefit or even a cash impact into 2018 at this point?

> [Defendant Donnelly:] Well, look, most of the negative impact of the acquisition in terms of the 2017 financials is driven by solving the inventory issue, which has been out there for some time and which we knew about, obviously, and talked about as part of the deal. And that was clearly factored into our valuation of deal economics. So this issue of 2017 operating performance is really very highly correlated to those rebate programs associated with clearing out the older-model product, and that will have, obviously, the operating profit hit and, certainly, the cash hit. And we have factored that in. As you noticed, we did not change our cash forecast for the year. We think we have other opportunities in general in terms of working capital management that we can use to offset that $55 million of cash outflow associated with, in essence, cleaning up the inventory balance and the

dealers as we go through the balance of the year. We expect to clear the lion's share of that out. Frankly, we're already getting pretty good traction. The guys are very, very focused on resolving that issue. So we've already seen a fair bit, which is why we had some impact in the quarter, of coming out of the gate and we know we have to go clean up the dealer channel to get this thing back on a growth trajectory and then generating good profit. And that's certainly our expectation for 2018.

59.     Furthermore, Defendants planned to meet with dealers throughout the country to introduce new products and to promote restocking new products.  In or around April 25, 2017, senior Textron management, including Holleran and Collins, hosted an event for Arctic Cat dealers at an airplane hangar at Fort Worth, Texas's Alliance Airport.  Collins informed dealers that "moving forward, the company will transition all side-by-sides and ATV's to become a part of the Textron Off Road brand."  Further, Collins previewed new products with a Fall 2017 release date, including a new "crossover" vehicle, and certain details of the next-generation Wildcat sport side-by-side, the Wildcat XX, to be released in Spring 2018.

60.     During July through October 2017, Defendants represented that they were executing the Arctic Cat turnaround plan.  For example, on July 19, 2017, Defendant Donnelly represented that Defendants' plan to integrate Arctic Cat and reduce inventory was on track:

> [Defendant Donnelly:] We continue to make progress with the integration of Arctic Cat as we've begun consolidating operations and enhancing our dealer network . . .
>
>                     \*\*\*
>
> [Defendant Donnelly:] our focus there continues to be, as we talked about, really moving a lot of the older inventory out of the channel. That's gone well, frankly, and really, at this point, focused on getting new products and getting those launched and getting the dealer channel set up to take on a lot of that new product. And that will be our focus through the balance of the year. . .
>
>                     \*\*\*
>
> [Drexel Hamilton LLC analyst:] Yeah, hey, Scott, I wonder if you could go further on Arctic Cat integration in terms of how that's going and kind of give us a timeline for returning to profit there. . .
>
> [Defendant Donnelly:] I think the integration so far is going well. I think we're through that first critical few months, so we're getting the team through all the organizational changes and all the things that sort of go with a major acquisition. Everybody, I think, at this point is focused on their primary jobs and getting the

work done. Job one, as we talked about, was running programs to try to clear out a lot of the aged inventory that was out there in the channel. And we went at that pretty hard and I think we've seen a lot of success in doing that, and creating room for a floor plan for these guys as we bring out and start to launch new product. We'll have a lot of the integration and the launching of a lot of the new products here as we get into the latter part of August into September [2017].

61. Also on July 19, 2017, Defendant Donnelly discussed details of the integration of

Arctic Cat's brands of dirt products with Textron's brands of dirt products:

the dirt process is one where we're integrating across so that we really look like the same company across everything from the ATV through all the side-by-sides and up through the high-performance products.

So I think we're in fairly good shape. We did what we needed to do around organization. We've made all of our announcements in terms of what we're doing in terms of operational restructuring and aligning our production facilities, obviously, and as Frank [Connor] said, part of our plan here, it is losing money right now, which was part of our plan. We are running at low manufacturing rates, which, again, is consistent with our strategy to sort of bleed down a lot of that inventory that's out there and then start the reloading process with new product here as we get into the latter part of the year. So everything that we said we were going to go do is what we're in the process of doing, and I think we're fine. . .

62. On July 20, 2017, Morgan Stanley issued a research report concerning the Arctic

Cat integration plan:

**For Industrial, a flat quarter excluding Arctic Cat, as the business looks to integrate.** While on an absolute basis Industrial saw 11% revenue growth, over 10% of that is attributable to the Arctic Cat acquisition, which leaves organic growth more flattish. Arctic Cat has been the prime focus of leadership as they work to clear product channels, rationalize facilities, and integrate across the broader company. As we turn to 2018, management expects the deal to be accretive vs. the $0.10 dilution this year.[6]

63. Also on July 20, 2017, Stephens issued a research report that stated the following

concerning the Arctic Cat integration plan:

The Arctic Cat integration is tracking according to plan with no changes to the company's previous assumptions.  The company plans to begin launching MY [Model Year] 2018 products on the August/September time frame.

---

[6] Emphasis in original.

64.     On October 19, 2017, Defendant Donnelly reiterated that Textron was on track to integrate Arctic Cat by the beginning of 2018 and position Arctic Cat for growth: "[a]t Arctic Cat, we're continuing to execute to our integration plan and we remain on track for the business to be accretive in earnings in 2018." Donnelly further represented inventory reductions were happening:

[Melius Research LLC analyst:] Scott, I wondered if you could expand on the Industrial commentary. It looks like maybe the shortfall there was sort of $25 million relative to the plan. And I know you called out unfavorable volume and mix and then additional resources and people on the integration. How much should we think is each of those and how much of that is sort of temporary versus things we've got to watch out for in the future?

[Defendant Donnelly:] Well, I think on the resources piece of it, the piece specifically around Arctic Cat frankly is going to plan. We're very happy with how that's proceeding. The inventory levels that we knew we needed to drive down in the dealer base are happening. Retail sales are up considerably. There's obviously a lot of work going on and aligning the product lines and getting dealers up to speed on the full range of both what was in Arctic Cat as well as what was under development in the Textron vehicle business. So I think that's all progressing. The factories are up and running.

There are a lot of moving parts here, Carter. We decided to move our engine manufacturing facility from Germany into the St. Cloud facility, so we're kind of centralizing all of our engine manufacturing, which is also obviously much closer to the final assembly plant, Thief River. We did move all of our dirt manufacturing out of Augusta up to Thief River, which I think is already starting to pay dividends. So, these are all things I think bode well for the future of the business, but there were costs – a lot of work and distraction for the people to go pull that stuff off.

In terms of the core of the business, as I said, we got a little behind in terms of line rates and nothing particularly magical, just getting our production control and logistics programs running, we have a new facility now down in Augusta where we're consolidating all the Jacobsen things. So, there is just a lot of moving parts that had impacts really across the rest of the core business. As I said, I think those line rates as we watch them here going into the quarter are getting back to where they need to be. There's still some things to work on, but I think this is something we'll have behind us as we head into 2018 and clearly we expect the Arctic Cat deal itself to be accretive as we go into 2018.

***

[Wells Fargo Securities Analyst]: Okay. And then if I can just follow on last question up on in terms of the Arctic Cat and the integration. You talked about the distraction maybe impacting some of the production. But have you seen any success in moving your product into their distribution channel and anything from the going-forward side that's showing improvement?

20

[Defendant Donnelly:] Yes, I think we have, and the retail sales have been strong on a year-over-year basis. Some of that is clearing out a lot of the older inventory. But as we've been getting the dealers together and now being able to go into those dealers and bring not only what they may have had historically from Arctic Cat but adding some of the Textron Off-Road product, namely the Stampede. You may have seen, we just announced the Prowler EV. So we're obviously integrating the branding at the product level and some of the technology that we bring into the EV side. As those products are rolling out, they are doing well in the marketplace. And so we're seeing dealers pick these up, and we're seeing retail sell-through. So it's still early obviously. It's a lot of work to go through and change. And now the good news is it's a good change for them. It's a much broader product line. It's a stronger product line, but I think it's being well received and we feel good about where it's heading.

### F.  Defendants' Fraudulent Scheme

65.    By January 31, 2018, the beginning of the Class Period, Defendants represented to investors that the Arctic Cat turnaround plan had been accomplished.  Specifically, Defendants represented that their plan to integrate Arctic Cat into Textron's Specialized Vehicles business was successful, that inventory of non-current models of Arctic Cat snow products were "cleared" and non-current dirt inventory was reduced, that demand and sell-through for new Textron products was strong, and Arctic Cat revenues were growing—all of which positioned Arctic Cat to be profitable or "accretive" to the Company's earnings in 2018.

66.    For example, on January 31, 2018, during the Company's earnings conference call with analysts and investors to discuss the Company's financial results for 2017, Defendant Donnelly represented the following concerning the Company's Industrial segment:

> revenues were up 20% for the quarter, primarily reflecting the impact of Arctic Cat. *We saw improved demand in the snow retail channel, allowing dealers to clear older inventory and drive 2018 model sales*, including our new introductions in the youth and mountain categories . . . *we successfully integrated the integration of Arctic Cat*.  With these accomplishments behind us *and improving end markets*, we're well-positioned coming into 2018.

67.    With respect to profitability, an analyst asked Defendants Donnelly and Connor the following question: "[o]n Arctic Cat, did you say that it is going [to] hit the target of being accretive

this year?"  In response, Defendants Donnelly and Connor each responded unequivocally "Yes."

68.     Defendants Donnelly and Connor's representations convinced investors that Arctic

Cat's troubles in 2017 were resolved and in the past, and that Arctic Cat would be accretive to

earnings in 2018.  For example, on February 1, 2018, JP Morgan published a research report that

stated the following:

> **Industrial growth outlook is better than expected.** Industrial had a rough go of
> 2017, but the company spent ~$50-$100 mn restructuring operations and
> integrating the ACAT acquisition. For 2018, management expects fairly robust
> growth, and we see this as HSD organic (8%) while the timing of the ACAT
> acquisition adds another ~$100 mn for Q1. We expect the business to generate
> $4.8bn in sales at an 8% margin for 2018, and this is >100bps higher vs. 2017, as
> ACAT will be profitable in 2018 vs operating at a loss in 2017.[7]

69.     On February 4, 2018, Jefferies published a research report that stated the following:

> **Industrial Issues in 2017 Should Not Repeat in 2018**
> Overall we estimate Textron's Industrial segment to be about $4.6BB in revenue in
> 2018, increasing to $4.8BB in 2019. We estimate the Arctic CAT business
> contributes about $500MM to revenues this year. The Specialized Vehicles sub-
> segment experienced issues in 2017 as resources were shifted to address production
> issues which disrupted shipments. The company has largely addressed the issues
> and has harvested opportunities cross marketing Textron branded vehicles with the
> Arctic Cat Portfolio. . . Earnings should grow in 2018 as we estimate the Arctic Cat
> business losses of $55MM in 2017, return a $20MM profit in 2018. . . .[8]

70.     Just days later Defendants Donnelly and Connor embarked on in person meetings

with investors during which they repeated the false narrative that Arctic Cat's troubles were in the

past, that it would be profitable in 2018, and that the integration was going well.  For example, on

February 9, 2018, Cowen published a research report concerning its meeting with Defendant

Connor.  Cowen's reported stated as follows:

> Our interview of CFO Frank Connor provided "color" on . . . vehicle integration . .
> . **Vehicles Positioned For A Better 2018** . . . Integration of its recent ACAT
> acquisition is going well; and ACAT has cleared the channel oversupply of its dirt
> and snow vehicles in Q4 and gained market share with new products (Havoc &

---

[7] Emphasis in original.

[8] *Id.*

Wildcat). Moreover, TXT feels that the challenges of consolidating vehicle production into its Augusta plant are now behind it, positioning the business for better results in 2018.[9]

71.     In stark contrast to Defendants representations, unknown to investors, by at least the beginning of the Class Period, Defendants knew, or at least recklessly disregarded, that the integration of Arctic Cat was significantly behind plan and that the Arctic Cat turnaround plan was far from being accomplished.

72.     Specifically, the integration was at least one year behind schedule and tens of thousands of non-current dirt and snow inventory at dealers remained unsold, which caused Defendants to continue offering massive rebates and discounts throughout the Class Period that negatively affected revenue and profitability.  In other words, Defendant Donnelly and Connors representation at the start of the Class Period of mission accomplished and that Arctic Cat was "well positioned" to be profitable in 2018 was materially false and misleading.

73.     The true state of Textron's business, operations and prospects by the beginning of the Class Period is confirmed by former Textron employees and Textron dealers based on their observations and experiences after the Arctic Cat acquisition by Textron and throughout the Class Period.

74.     According to several CIs, Arctic Cat had approximately 22,000 non-current year vehicles at dealerships at all points following the acquisition of Arctic Cat in early 2017 through at least the summer of 2018.   This fact renders Defendants' statements that they had been successful in clearing out older inventory and that Arctic Cat would be accretive to earnings materially false and misleading.

---

[9] Emphasis in original.

75.     According to CI 1,[10] a former Textron Specialized Vehicles employee, CI 1 visited Arctic Cat's headquarters in Thief River Falls on at least two occasions in approximately mid-to-late 2017.  On each occasion, CI 1 observed that production lines were not running and older model ATVs and side-by-sides stacked up for miles at the facility.  The Company also utilized several offsite locations to house aged inventory of dirt vehicles that were not selling.

76.     According to CI 2,[11] a former Textron Specialized Vehicles employee, snow and dirt inventory buildup was routinely discussed during weekly sales calls led by Collins.  At least Jhant and Brennan were also regular participants on these calls.  Starting in late 2017, Collins, Jhant or Brennan were warned by CI 2 and other employees of the dangers of dealership inventory build-up, which went ignored.  A 2017 sales program cost approximately $15-20 million to dump aged inventory, however, Textron did not keep dealers clean, but instead filled them back up with more aged inventory from 2015-17, thus leading to terrible inventory positions in mid-to-late 2018.  By January 2018, the dealer stock of aged inventory from 2015-17 was continuing to flood dealer floors, while the Company released only a limited amount of 2018 model year vehicles.  CI 2 attended sales meeting during the Class Period during which inventory and sales reports were presented by Collins, Jhant and Brennan.

77.     According to CI 2, Arctic Cat had a steady number of 22-25,000 non-current year vehicles at dealerships at all points following the acquisition of Arctic Cat in early 2017 through at least the summer of 2018.  As of January 2018, there were approximately 15,000 non-current year dirt vehicles as well as approximately 10,000 non-current year snow vehicles sitting at Arctic

---

[10] CI 1 was a Textron Specialized Vehicles sales analyst since at least the time Textron acquired Arctic Cat through the end of 2017, and was responsible for providing support to territory sales managers, and communicating with employees involved in engineering, production and logistics to process orders.

[11] CI 2 was a Textron Specialized Vehicles regional sales director since at least 2017 and during the Class Period, and was responsible for regions covering several U.S. states.

Cat dealerships across the U.S.  According to CI 2, everything Defendants Donnelly and Connor had been telling analysts about reductions of aged inventory and profit margin improvements during the period from January through July 2018 was completely wrong.

78.     Similarly, according to CI 3,[12] a former Textron sales manager, by the start of 2018, the Company had over 22,000 dirt and snow vehicles model years 2015-17 sitting at dealer locations which prevented dealers from acquiring current year models.  Collins, Jhant and Webster often discussed this figure during weekly sales calls in 2018.

79.     The massive amount of aged snow and dirt inventory at the start of the Class Period was a major red flag indicating that there was little to no dealer demand for additional snow and dirt products, that the dealer channel had not been cleared of older aged inventory, that this material negative trend would persist throughout 2018, and that the Defendants' representations that they cleared older aged inventory was not true.  Aged snow inventory of approximately 10,000 units at Arctic Cat's dealers at the beginning of the Class Period represented approximately 55% of the Company's total snow unit sales in 2017.  Aged dirt inventory of approximately 12-15,000 units at Arctic Cat's dealers at the beginning of the Class Period represented approximately 15-23% of the Company's total dirt unit sales in 2017.[13]   Thus, given these inventory levels and the Company's historical sales, Defendants knew, or at least recklessly disregarded, that weak demand would persist well into 2018.

---

[12] CI 3 was a Textron Specialized Vehicles sales manager since at least 2017 and during the Class Period and was responsible for sales within several U.S. states.

[13] According to powersport industry data, in 2017 approximately 120,000 snow units were sold worldwide; and approximately 900,000 dirt units were sold worldwide.  In 2017, Textron's market share for snow units was approximately 15%, indicating Textron sold approximately 18,000 snow units; and market share for snow units was approximately 7%, indicating Textron sold approximately 63,000 dirt units.

80.     According to CI 4,[14] a former Textron Specialized Vehicles employee, since at least the beginning of the Class Period, excess non-current inventory was a chronic problem.  In or around January through March 2018, the Company was trying to move aged inventory by giving rebates causing such sales to be unprofitable.  Like CI 3, CI 4 observed that dealer showroom floors were ultimately backfilled with additional inventory.  According to CI 4, in addition to rebates that led to unprofitable sales, the Company offered Arctic Cat dealers floor plan financing through Wells Fargo Commercial Distribution ("Wells Fargo"), which offered dealers upfront discounts and credit.  Similarly CI 3 observed that Arctic Cat dirt and snow dealers maintained a Floor Plan financed through Wells Fargo which offered dealers flooring credit.  These plans were designed to incentivize dealers to take on more inventory and were forced to order so much new inventory to hit rebate programs on non-current models.  According to CIs 3 and 4, dealers obtained upfront discounts plus financing terms based on their respective tier.  For example, the Wells Fargo plan consisted of the following rebate tiers: 1) Silver (7% off MSRP and no interest payments for six months); 2) Gold (9% off MSRP and no interest payments for 240 days); 3) Platinum (11% off MSRP and no interest payments for 12 months); or 4) Diamond (13% off MSRP).

81.     According to CI 3, Textron senior management had real-time access to inventory levels through a Wells Fargo Account Executive team which was solely responsible for the Textron/Arctic Cat account.  The Customer Online Management System maintained by Wells Fargo provided all Textron account managers and dealerships real-time access and customizable reports to their respective vehicle inventories, order pipeline, financing, and aged inventory.

---

[14] CI 4 was a Textron Specialized Vehicles sales manager from 2017 through the third quarter of 2018 and was responsible for sales within several U.S. states.

82.     Defendants' inventory glut of non-current dirt and snow units was tracked on a daily basis and reported to senior management of Textron Specialized Vehicles, including Collins and Mottel.  According to CI 5,[15] a former Textron Specialized Vehicles employee before and during the Class Period, CI 5 prepared various spreadsheets which reflected real-time inventory levels at every Textron Specialized Vehicles dealer.  CI 5's reports were configured to reflect and track various data points, including all vehicles held in stock at authorized dealer locations.  These reports segmented everything including: model years, styles, and colors. CI 5's reports also tracked seasonality data (*i.e.*, snow products having a lull in sales during summer months).  According to CI 5, as each unit is sold by a dealer, the vehicle registration data is captured by Textron's customer relationship management ("CRM") system.   CI 5 communicated frequently with Mottel, and frequently traveled to the Textron Specialized Vehicles office in Augusta, Georgia throughout 2018 for meetings.  Further, CI 5 created and distributed reports daily to Mottel and Collins, including information on inventory level.  Other occasional recipients of CI 5's reports included Jhant and Webster.   In addition to regular reports to Mottel and Collins, Company sales representatives reviewed inventory tracked in reports.

83.     According to CI 5, throughout early 2018, CI 5 sent inventory reports to Mottel and Collins that showed the Company's unsold inventory of non-current dirt and snow products.  As observed by CI 5, in or around January 2018, the Company had approximately 22,000 non-current model year dirt and snow vehicles sitting at dealer locations.

84.     CI 5 observed that Jhant and Webster, who reported directly to Collins, oversaw rebating programs during 2017 and 2018.  During 2018, the Company allowed rebates on vehicles

---

[15] CI 5 was a Textron Specialized Vehicles employee during the Class Period who had access to dealer inventory numbers and prepared inventory reports during the Class Period.

that were previously ineligible.  Hundreds of exceptions to one of the rebate programs were made and approved by at least Webster and Jhant.  CI 5 tracked these rebate exceptions throughout 2018.

85.     In addition to failing to materially reduce aged inventory, at the beginning of the Class Period, Defendants were experiencing severe difficulties integrating Arctic Cat into Textron Specialized Vehicles.  According to CI 4, CI 4 observed material failures in Textron's integration of Arctic Cat that persisted throughout the Class Period.  For example, Arctic Cat and Textron's Specialized Vehicle business had not integrated departments for parts and service or computer systems, and operated separate customer relationship management software platforms, all of which caused delays and lost sales.

86.     CI 3 observed that following the acquisition of Arctic Cat by Textron and continuing throughout 2018, there were endless integration issues causing problems between the two companies including: separate departments responsible for ordering, warranties, parts/accessories, dealer support, and technical assistance to the customers.  Failing to immediately address these issues following the acquisition resulted in lost sales opportunities and customer defections.  CI 3 and other sales managers frequently raised these concerns to leadership including Collins and Jhant, which were not addressed.

87.     Similarly, CI 5 worked on the system integrations between Textron and Arctic Cat and observed that both Textron Specialized Vehicles and Arctic Cat used CRM platforms that were not fully integrated.  Reporting continued separately throughout the process of merging the two companies.  When Arctic Cat's platform was deactivated in approximately September 2018, only then were both companies able to utilize one system, and report out of one system.

88.     Like CI 5, CI 6[16] observed integration failures between Textron and Arctic Cat.

_____

[16] CI 6 was a Textron employee since before the start of the Class Period through the second quarter of 2018, and designed, developed and tested Arctic Cat snow and dirt products.

According to CI 6, a former Textron employee, CI 6 observed that there was much confusion regarding which products would continue to be tested and built in Augusta, Georgia by Textron Specialized Vehicles versus Arctic Cat in St. Cloud and/or Thief River Falls, Minnesota. By January 2018, CI 6 observed that there remained much debate among senior management of Textron Specialized Vehicles regarding reporting structure and product design, and that integration failures negatively affected the Company's supply chain for parts needed to build and repair new models.

89.     Further, CI 6 observed that the lag on integration of the two entities affected product development on future year models. As of November 2017, the Company had no idea on product pipeline or funding for 2020 dirt and snow vehicles, which was highly unusual. According to CI 6, by January 2018, the Company still had no idea on anything past the 2019 models and it was like they let the product pipeline dry up. CI 6 frequently spoke with Spencer, VP of Engineering, and other Engineering Directors and Managers regarding pipeline concerns of testing engineers, in which Spencer repeatedly delayed meetings, while providing no assurances of 2020 product lines. Spencer reported to Holleran.

90.     Throughout early 2018, CI 6 and CI 6's team witnessed numerous engineering problems with the 2018 Arctic Cat Havoc and Wildcat XX models. Specifically, the Havoc experienced a number of issues due to design flaws and quality concerns such as lower control arms being made from cast steel for the front suspension (*i.e.* naturally occurring inclusions (or defects) in cast steel can lead to premature fatigue failure). The control arm failure was primarily an engineering mistake by inexperienced Textron staffers based in Augusta, Georgia unfamiliar with good design practices for powersports vehicles.

91.     According to CI 6, a second example of engineering problems was that at one point there were approximately 60 other 2018 Havoc units parked near or inside the Thief River Falls

test lab that had experienced primary clutch alignment problems stemming from relocating production from St. Cloud to Thief River Falls, Minnesota. Clutch misalignment leads to premature drive belt failure. Engineers and technicians would often be flown to Minnesota from Augusta, Georgia to help rework these units at significant expense. The priority being to get these units out to dealers as soon as possible, no matter the cost. These engineering problems were directly related to the integration issues between the two companies.

92.     According to CI 6, by April 2018, the 2018 product pipeline for dirt and snow vehicles was dry. Anything coming off the assembly line was sent to big box customers (*i.e.,* Bass Pro Shops/Cabela's), which strained relations with independent Arctic Cat dealers also waiting on product.

93.     According to CI 7,[17] a former Textron Specialized Vehicles employee, throughout early 2018, CI 7 witnessed numerous engineering problems with the 2018 Arctic Cat Havoc and Wildcat XX dirt models, which continued to need changes even during production. CI 7 observed 2018 dirt vehicles were continuing to have compliance evaluations conducted even while they were going out the door, which was unusual. Just like CI 6, CI 7 observed that the lag on integration of the two entities also affected product development on future year models. As of November 2017, there was no pipeline or funding for 2020 dirt and snow vehicles. Throughout early 2018, CI 7 had numerous discussions directly with Spencer regarding pipeline concerns of the testing engineers, in which Spencer repeatedly delayed meetings, while providing no assurances of 2020 product lines.

94.     The integration and product delays were negatively affecting Textron sales and

---

[17] CI 7 was a Textron Specialized Vehicles employee since before the start of the Class Period through the third quarter of 2018, and worked with TSV dirt products.

alienating Textron dealers.   According to CI 8,[18] a former Arctic Cat dealer, following the acquisition of Arctic Cat by Textron, CI 8 had witnessed that several key Arctic Cat engineers left the Company which caused a significant decline in communications from Company representatives, and Textron failed to fulfill orders for 2018 and 2019 dirt products.   In the Fall of 2017, CI 8 ordered 75 Wildcat XX side-by-side vehicles.   By early 2018, Textron delivered just eight Wildcat XX side-by-side vehicles.   On multiple occasions starting in early 2018, CI 8 expressed his concerns about Textron failing to deliver on orders on the telephone with Holleran as well as Collins.   On each occasion, neither Holleran nor Collins provided any assurances that orders for 2018 vehicles would be fulfilled anytime soon. Further, throughout 2017-18, CI 8 left multiple voicemails and sent text messages to Defendant Donnelly looking for answers regarding the unfulfilled orders and engineering issues.   CI 8 did not recall Defendant Donnelly ever directly responding to CI 8's voicemails or texts messages, however, Collins, Jhant or other Arctic Cat contacts consistently reached back to CI 8 acknowledging CI 8's messages were received while accusing CI 8 of stirring the pot with Defendant Donnelly and Holleran.

95.      Similarly CI 9,[19] informed that Textron upset Arctic Cat dealers because the Company pitted too many dealers within a certain territory against each other and were offering no marketing assistance to Arctic Cat dealers.   Several Arctic Cat dealers informed CI 9 of their respective buildup of aged Arctic Cat inventory and subsequently giving away of units through rebates which had been a constant problem since the acquisition.

96.      In addition, CI 4 observed countless discussions with unhappy Arctic Cat dealers who were struggling to sell aged inventory, including dealers in Missouri, Iowa, Wisconsin and

---

[18] CI 8 was an Arctic Cat dealer during the Class Period who ranked among the largest sellers of Arctic Cat products selling millions of dollars annually.
[19] CI 9 is a snowmobile and powersports dealer in the Mid-West that has sold Arctic Cat snow products.

Michigan.

97.     In or around April 2018, Defendants recognized, or were at least reckless in failing to see information that was available to them, that their non-current inventory reduction plan was a failure, that the Arctic Cat integration was far from being completed, and that Textron was saddled with hundreds of unprofitable dealers. Defendants and the Arctic Cat turnaround team decided to terminate unprofitable dealers and began a strategic review of the dealer network.

98.     According to CI 10,[20] a former Textron Specialized Vehicle employee, all activity relevant to the dealer network was monitored through reports. In early April 2018, Mottel requested that CI 10 work on a bulk review project which involved pulling a report with dealers' names, open dates, and their inventory numbers. Mottel informed CI 10 that the purpose of this exercise was to assist Collins and Textron management in terminating unprofitable dealers relationships. CI 10 maintained account termination reports which reflected the names, dates, and reasons for all dealers relationships that were terminated.

99.     Like CI 5, CI 10 was able to track dealer inventory levels. According to CI 10, reports were configured to reflect and track various data points, including all vehicles held in stock at authorized dealer locations. These reports segmented everything including: model years, styles, and colors. Reports also trended seasonality data. CI 10 created and distributed reports daily to Mottel and Collins. Other occasional recipients of these reports included Jhant and Webster.

100.    CI 10 observed the dealer termination process firsthand for the district areas that CI 10 covered, and explained as follows: a termination letter is sent to the dealer by Textron/Arctic Cat (signed by respective regional manager); representatives within the Company's call center

_____

[20] CI 10 was Textron Specialized Vehicles employee during the Class Period who had access to dealer sales metrics, including inventory numbers and terminations, and tracked dealer inventory throughout the Class Period.

contact the respective dealer to inform them what products will be returned; representatives within the Company's finance team review the noted inventory log and inspect the materials upon return to the Company before issuing credit to lenders like GE or Wells Fargo; representatives within the Company's logistics team organize the trucks/pickup times, etc., and process the appropriate documentation.  Once the returned merchandise is returned to the Company's Thief River Falls, Minnesota location, Defendants would attempt to sell the inventory to other Arctic Cat dealers or to Textron employees at a discount.

101.    According to CI 5, in approximately April 2018, the Company began reviewing inventory levels within their dealer network, which was part of the criteria that was used to assist in determining which dealer relationships to terminate. According to CI 5, there were a few rounds of terminations commencing the summer of 2018.

102.    According to CI 3, in approximately late May/early June 2018, CI 3 attended a national sales meeting at the TSV corporate office in Augusta, Georgia which was headed by Collins and Jhant.  While reviewing dealer inventories and sell-through reports, Collins informed the attendees that he was preparing to make a presentation for Defendant Donnelly.  Webster was also present at the national sales meeting in Augusta.  Webster wrote every program for dealers which included bookings/rebates for the entire Arctic Cat sales team.  These excel spreadsheets focused heavily on inventory and dealer stock, included booking trackers and revenues (percent to goal).

103.    By early summer 2018, CI 2 learned that Collins and the leadership team realized the only way to reduce aged inventory at their dealers was to eliminate underperforming dealerships and write-off losses—a plan that ultimately resulted in a charge of approximately $50 million.  Collins and Brennan set parameters concerning dealer terminations, and designated dealers who sold fewer than 50 units per year, or were located close large retailers like Cabela's

or Bass Pro, for termination.  CI 2 witnesses the closure of at least 300 Arctic Cat dealerships, including dozens of closures in states for which CI 2 was responsible.  Most outgoing dealers signed mutual termination agreements and, in some cases, the dealer was compensated by Textron for interest protection previously offered to the dealerships.

104.    According to CIs 2, 5, and 10, information concerning dealer terminations was tracked for compliance with various state laws that governed the termination of dealer agreements. Among the 50 states, there are different provisions for notice of termination, waiting periods, and rules for handling and returning unsold inventory and other materials.  Certain states require unsold dealer inventory to be repurchased by Textron—so called buy-back states.  CI 10 utilized an internal document that provided guidance on various state rules and requirements as well as account termination reports that reflected the names, dates and reasons for dealer termination. According to CI 10, compliance with state law termination procedures was handled by Textron's legal department.[21]

105.    Defendants continued rebating on aged snow and dirt units through the third quarter of 2018, including rebates up to $1,500 on 2015-17 dirt units, and rebates up to $3,000 and 2.9% APR financing for 36 months on 2016-17 snow units.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

106.    During the Class Period, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and Defendants knew, or at least recklessly disregarded, that their representations were false and misleading at the time they made

---

[21] During the Class Period, Textron's legal department was led by Robert E. Lupone ("Lupone"), Textron's General Counsel and Secretary, and a member of Textron's Executive Leadership Team.

their representations, for the following reasons: (i) at the beginning of the Class Period, there were approximately 22,000 non-current year snow and dirt units sitting in dealer inventory and that the inventory of older aged snow and dirt vehicles had not materially declined since the Company acquired Arctic Cat and continued to be elevated throughout the Class Period (¶¶74-84); (ii) Defendants' integration of Arctic Cat was at least a year behind schedule at the beginning of the Class Period.  The integration was beset with problems, such as failure to integrate production lines, parts and service ordering, CRM systems, material product defects and part delays, and difficulties integrating Arctic Cat dealers, all of which resulted in delayed or lost sales and Textron's termination of hundreds of independent Arctic Cat dealers (¶¶85-104); (iii) these materially adverse conditions persisted throughout the Class Period (¶¶74-105); and (iv) as a result of excess aged inventory and integration problems that existed by, at least, the beginning of the Class Period, there was no reasonable basis for Defendants to assert that Arctic Cat was positioned to be accretive to earnings in 2018 or that the integration of Arctic Cat was completed or going well.

### A.     Textron's Financial Results for the Fourth Quarter and Year Ended December 31, 2017

107.    The Class Period starts on January 31, 2018, more than nine months after the acquisition of Arctic Cat was completed.  On that date, Defendants caused Textron to issue a press release announcing its financial results for the fourth quarter and year ended December 31, 2017, and disseminating dial-in information for a conference call with investors and analysts.  Also on January 31, 2018, during the Company's earnings conference call with analysts and investors, Defendants Donnelly and Connor represented the following concerning Arctic Cat's inventory and financial performance:

> [Defendant Donnelly:] Moving to Industrial, revenues were up 20% for the quarter, primarily reflecting the impact of Arctic Cat. ***We saw improved demand in the***

> *snow retail channel, allowing dealers to clear older inventory* and drive 2018 model sales, including our new introductions in the youth and mountain categories . . .
>
> ***
>
> [Defendant Connor:] Industrial revenues were $1.1 billion, up 20 percent largely related to Arctic Cat.  Segment profit was up $10 million from the fourth quarter of last year due to favorable performance. . .

108.    Defendants Donnelly and Connor's representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because, as alleged in ¶¶74-84, demand for Arctic Car snow products had not "improved", and dealers had not materially reduced aged snow and dirt inventory.  Contrary to what Defendant Donnelly represented he "saw" with respect to inventory and demand in the snow retail channel, in truth, demand for Arctic Cat snow products had not improved and Arctic Cat dealers had not cleared older inventory of non-current snow product.  According to CIs 2-5, as of January 2018, there were approximately 22,000 non-current snow and dirt products sitting at dealers, and inventory of aged snow and dirt vehicles had not materially declined since the Company acquired Arctic Cat in March 2017. As a result, Defendants continued to depend on rebates and discounts throughout the Class Period in an effort to clear non-current inventory, as observed by CIs 3-5.

109.    Also on the January 31, 2018 conference call, Defendant Donnelly represented that Arctic Cat was integrated into Textron: "we successfully integrated the integration of Arctic Cat. With these accomplishments behind us in improving end markets, we're well positioned coming into 2018."

110.    Defendant Donnelly's representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because, as alleged in ¶¶74-96, as of January 2018 Arctic Cat had not been integrated, Arctic Cat was not "well positioned" as of

36

January 31, 2018, and the end markets for Arctic Cat snow and dirt products had not improved. As alleged in ¶¶53-64, Defendants represented that three key objectives of the Arctic Cat integration were: 1) reducing aged snow and dirt inventory; 2) consolidating and combining Arctic Cat's and TSV's dirt vehicle production facilities; and 3) enhancing the dealer network by combining Arctic Cat's approximately 800 dealers with TSV's dealers.  However, by the beginning of the Class Period, the integration was experiencing numerous material setbacks and delays that put the integration at least one year behind schedule.  Specifically, according to CIs 1-10, Textron had failed to integrate departments for parts and service, computer systems, warranties, and technical assistance; the Company's efforts to consolidate production facilities hindered new product development and caused engineering problems, and product delays; and Defendants' combination of the TSV and Arctic Cat dealer networks was alienating Arctic Cat dealers and exacerbating the aged inventory glut.  Furthermore, as observed by CI 3-5, as of January 2018, excess non-current inventory of snow and dirt Arctic Cat models at dealers continued to be a problem and had not materially declined.  As a result, Defendants continued to depend on rebates and discounts in an effort to clear non-current inventory, as alleged in ¶¶75-96.  The excess non-current inventory clogging the sales channel depressed dealer demand and contradicted Defendant Donnelly's representation that end markets were improving.

111.   Also on the January 31, 2018 conference call Defendants Donnelly and Connor represented that Arctic Cat would be accretive, or add to Textron's 2018 revenues and earnings:

> [Citigroup Global Markets, Inc. analyst:]  .  .  .  where do you see some of the opportunities or risks, not just in '18 but really going forward? . . . Industrial margin used to be higher and obviously,  . . . On a long run basis, where do you want to see improvement in your segments?

> [Defendant Donnelly:] . . . Industrials probably, I mean a pretty solid guide I think you know. I mean there's – it gets Arctic Cat to where it's accretive, it's pretty solid performance. . .

*** 

**[Morgan Stanley Analyst:]** And a quick clarification on Arctic Cat, did you say that it is going -- hit the target of being accretive this year?

[Defendant Donnelly:] Yes.

[Defendant Connor:] Yes.

112.    Defendants Donnelly and Connor's representations that Arctic Cat's performance was solid and that it would be accretive to earnings in 2018 were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  As observed by CIs 2-5, Company dealers were saddled with approximately 22,000 unsold non-current dirt and snow units, and rebates and other discounts on snow and dirt products were causing Arctic Cat products to be sold at significant discounts throughout the Class Period.  As alleged in ¶¶75-96, as a consequence of: i) massive aged snow and dirt inventory glut at dealers; ii) Defendants' continued dependence on sales rebates and other discounting to incentivize sales to clear non-current inventory at deep discounts during the Class Period; and iii) other integration failures and delays of at least one year, there was no reasonable basis for Defendants to represent that Arctic Cat would be accretive in 2018 or that its performance had been "solid".  Accordingly, Defendants knowingly misled investors, or were at least reckless, when they represented that Arctic Cat would "hit the target" of being accretive in 2018.

113.    Defendants Donnelly and Connor's false representations on January 31, 2018 (alleged in ¶¶ 107, 109, and 111) concerning the present state of facts created the misimpression that Defendants had cleared Arctic Cat's aged inventory in the sales channel and that the inventory troubles in 2017 were resolved and in the past; that the integration plan—reducing aged inventory, consolidating production facilities and enhancing the dealer network—was going well; and as a

result, Arctic Cat was in a position to be accretive to earnings in 2018.  For example, on February

1, 2018, JP Morgan published a research report that stated the following:

> **Industrial growth outlook is better than expected.** Industrial had a rough go of
> 2017, but the company spent ~$50-$100 mn restructuring operations and
> integrating the ACAT acquisition. For 2018, management expects fairly robust
> growth, and we see this as HSD organic (8%) while the timing of the ACAT
> acquisition adds another ~$100 mn for Q1. We expect the business to generate
> $4.8bn in sales at an 8% margin for 2018, and this is >100bps higher vs. 2017, as
> ACAT will be profitable in 2018 vs operating at a loss in 2017.[22]

114.    On February 4, 2018, Jefferies published a research report that stated the following:

> **Industrial Issues in 2017 Should Not Repeat in 2018**
> Overall we estimate Textron's Industrial segment to be about $4.6BB in revenue in
> 2018, increasing to $4.8BB in 2019. We estimate the Arctic CAT business
> contributes about $500MM to revenues this year. The Specialized Vehicles sub-
> segment experienced issues in 2017 as resources were shifted to address production
> issues which disrupted shipments. The company has largely addressed the issues
> and has harvested opportunities cross marketing Textron branded vehicles with the
> Arctic Cat Portfolio. . . Earnings should grow in 2018 as we estimate the Arctic Cat
> business losses of $55MM in 2017, return a $20MM profit in 2018. . . .[23]

115.    Just days later Defendants Donnelly and Connor embarked on in person meetings

with investors during which they repeated the false narrative that Arctic Cat's troubles were in the

past, that it would be profitable in 2018, and that the integration was going well.  For example, on

February 9, 2018, Cowen published a research report concerning its meeting with Defendant

Connor.  Cowen's reported stated as follows:

> Our interview of CFO Frank Connor provided "color" on . . . vehicle integration . .
> . **Vehicles Positioned For A Better 2018** . . . Integration of its recent ACAT
> acquisition is going well; and ACAT has cleared the channel oversupply of its dirt
> and snow vehicles in Q4 and gained market share with new products (Havoc &
> Wildcat). Moreover, TXT feels that the challenges of consolidating vehicle
> production into its Augusta plant are now behind it, positioning the business for
> better results in 2018.[24]

---

[22] Emphasis in original.
[23] *Id.*
[24] *Id.*

116.    On February 15, 2018, Defendants caused Textron to file the 2017 10-K with the SEC.  The 2017 10-K was signed by Defendants Donnelly and Connor.  The 2017 10-K represented the following concerning Arctic Cat:

> In connection with the acquisition of Arctic Cat . . . we initiated a restructuring plan in the first quarter of 2017 to integrate this business into our Textron Specialized Vehicles business within the Industrial segment and reduce operating redundancies and maximize efficiencies. . . . *[the] Arctic Cat plan [is] substantially completed* . . . .

117.    Defendants' representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because, as alleged in ¶¶75-96, the 2017 restructuring plan had failed to materially reduce operating redundancies or increase efficiencies, and therefore, the Arctic Cat plan was not "substantially completed."  At the time Defendants signed the 2017 10-K, while Defendants may have substantially completed cash outlays that were announced in March 2017, Defendants failed to disclose that the Company had not substantially completed their represented integration objectives that Defendants identified before the Class Period, as alleged in ¶¶53-64.

118.    In truth, Defendants knew, or at least turned a blind eye, to the numerous material setbacks and delays that put the integration at least one year behind schedule.  Specifically, according to CIs 1-10, Textron had: i) failed to integrate departments for parts and service, computer systems, warranties, and technical assistance; ii) the Company's efforts to consolidate production facilities hindered new product development and caused engineering problems and other delays; and iii) as observed by CIs 3-5, as of January 2018, the integration of Arctic Cat dealers was experiencing material problems as a result of excess non-current inventory of snow and dirt Arctic Cat models at dealers, and as a result, Defendants continued to depend on rebates and discounts in an effort to clear non-current inventory.

119.    Further, the 2017 10-K included SOX Certifications that were signed by Defendants Donnelly and Connor that represented the following:

1.    I have reviewed this annual report on Form 10-K of Textron Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's

41

auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

120.    Defendants Donnelly and Connor's representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because, as alleged in ¶¶75-96, Defendants did not fairly present in all material respects the financial condition, results of operations, and cash flows of Textron's Industrial segment.  Specifically, according to CIs 1-10, Defendant's Arctic Cat business was floundering.  Defendants knew, or at least recklessly disregarded, but failed to disclose that as of January 2018, the Arctic Cat turnaround plan was significantly behind plan, and that the integration was beset with material difficulties and was at least one year behind schedule, and Arctic Cat dealers had approximately 22,000 unsold non-current snow and dirt vehicles in inventory causing Textron to continue to rely on discounts and rebates. As a result of these material problems that existed at least as of the start of the Class Period, Defendants had no reasonable basis to represent that Arctic Cat was positioned to be profitable in 2018.  Furthermore, as alleged in ¶¶116-18, the 2017 10-K did, in fact, contain false and misleading representations.

121.    The 2017 10-K purported to warn investors of potential, future risks that "could" cause actual results to differ materially from past and projected future results, including "[d]ifficulty or unanticipated expenses in connection with integrating acquired businesses" and the future risk "that acquisitions do not perform as planned, including, for example, the risk that

42

acquired businesses will not achieve revenues and profit projections."

122.    While Defendants purported to warn that these risks could occur in the future, Defendants failed to disclose that these potential risks had ***already*** materialized.  As alleged in ¶¶75-96, by at least the beginning of the Class Period, according to CIs 1-10, integration difficulties had already occurred and were negatively affecting Textron's business, and that as a result of the excess aged snow and dirt inventory and Textron's continued reliance rebating and discounts, by the beginning of and throughout the Class Period, Defendants knew or recklessly disregarded red flags (¶¶75-84) that showed Arctic Cat's prospects for profitability in 2018 were already doomed.  Defendants' failure to disclose these material negative facts and conditions that had already occurred and that were specific to Arctic Cat, rendered Textron's boilerplate disclosures of potential adverse events that could occur in the future and which applied to virtually any company materially misleading.

**B.    Textron's Financial Results for the Quarter Ended March 31, 2018**

123.    On April 18, 2018, Defendants caused Textron to issue a press release disclosing its financial results for the quarter ended March 31, 2018, and disseminating dial-in information for a conference call with investors and analysts.  Also on April 18, 2018, during the Company's earnings conference call with analysts and investors, Defendant Donnelly made the following representations in response to an analyst question concerning Arctic Cat:

> [Cowen and Company, LLC, Analyst]: Okay. And then at Industrial, maybe update us in terms of clearing the channel overstock at Arctic Cat in terms of how the move to Augusta is going. And given that very low first quarter, are the full year estimates still valid?
>
> [Defendant Donnelly] … In terms of the inventory reduction, we're pleased with— if you look at both dirt and snow inventory reductions that happened through the course of the year, which was a big focus of ours, yielded a lot of result. So there's pretty significant reductions in that aged inventory. And so I think combined between that and the fact that we have a lot of new product that we think the dealers are pretty excited about. When you look across both the dirt and the snow product

43

lines, you've got lower inventory of aged stuff and you've got a lot of exciting new stuff will be on the floors that dealers are pretty excited about. So we feel pretty good about where we are for the year.

124.    Defendant Donnelly's representations that "both dirt and snow inventory reductions" had happened, that there were "significant reductions in that aged inventory" and that there was "lower inventory of aged stuff" were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because Defendants had not materially lowered the amount of aged snow and dirt inventory at dealers.  According to CIs 2-5, Arctic Cat had a steady number of 22-25,000 non-current year vehicles at dealerships at all points following the acquisition of Arctic Cat in early 2017 through at least the summer of 2018, and continued to depend on rebates to sell aged snow and dirt products, as alleged in ¶¶75-84.

125.    On April 25, 2018, Defendants caused Textron to file the Q1 2018 10-Q with the SEC.  The Q1 2018 10-Q represented that "Arctic Cat provides a platform to expand our product portfolio and increase our distribution channel to support growth within our Textron Specialized Vehicles business in the Industrial segment" and repeated the representation set forth in the 2017 10-K that the Arctic Cat plan was "substantially completed."

126.    Defendant Donnelly and Connor's representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because the integration of Arctic Cat was not "substantially completed" for the reasons set forth in ¶116-18.  Furthermore, rather than increasing the Company's distribution channel to support growth, in early April 2018, as observed by CIs 5 and 10, Collins and Mottel were working on a bulk review project, the purpose of which was to terminate contracts with unprofitable Arctic Cat dealers and decrease the distribution channel, as alleged in ¶¶97-101, and Arctic Cat dealers were sitting on tens thousands

of unsold non-current dirt and snow products, as observed by CIs 2-5 (¶¶74-84), which hindered growth and dampened demand.

127.    The Q1 2018 10-Q included SOX Certifications signed by Defendants Donnelly and Connor that were substantially similar to the representations in ¶119.

128.    Defendant Donnelly and Connor's representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading for the reasons alleged in ¶120.

129.    In contrast to 2017, when Defendants Donnelly and Connor did not sell any Textron shares on the open market, on April 27, 2018, Defendants Donnelly and Connor began dumping Textron stock.

130.    On April 27, 2018, Connor acquired 80,000 Textron shares through the exercise of options at $14.34 per share, and sold all of these shares in multiple transactions at prices ranging from $62.57 to $63.25 per share for net proceeds of approximately $3,892,000.  On April 27 through May 1, 2018, Defendant Donnelly acquired 200,400 Textron shares through the exercise of options at $5.65 or $47.84 per share, and sold all of these shares in multiple transactions at prices ranging from $61.33 to $63.41 per share for net proceeds of approximately $3,047,577.

**C.    Textron's Financial Results for the Quarter Ended June 30, 2018**

131.    On July 18, 2018, before the market opened, Defendants caused Textron to issue a press release disclosing its financial results for the quarter ended June 30, 2018, and disseminating dial-in information for a conference call with investors and analysts.  During the July 18, 2018 conference call, Defendant Donnelly made the following representations in response to an analyst question concerning Arctic Cat inventory and dealer demand for Textron's products:

[Wells Fargo Securities Analyst]: Okay. And then can you talk a little bit about just the distribution inventory levels with Arctic Cat now that you've kind of ended the winter season, just where did you end up and how is that looking?

[Defendant Donnelly]: So Sam, I'm afraid I don't have those numbers at my fingertips here, but I mean, we continue to make progress. . . So I mean a lot of the stuff that was really *older inventory has been moved off their, their [dealers'] books*. I mean, obviously, these guys are taking restockings of current model year product. Probably not a lot of change in snow, I mean we're at that time of the year obviously, where we are producing all the snow product for next year. . .

I mean last year was great, in terms of burning down a lot of inventory . . . .

132.    Defendant Donnelly's representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because dealers had not moved older inventory off their books, and in 2017 Defendants had not materially burned down or reduced inventory.  At the beginning of the Class Period approximately 22,000 units of non-current, older inventory of Arctic Cat snow and dirt products had not been moved off dealers' books, aged inventory had not materially declined, and the glut of aged snow and dirt inventory and rebating continued through the third quarter of 2018, which materially hindered dealer restocking and depressed demand and margins.  Further, in April 2018, began the process of identifying Arctic Cat dealers to terminate with hundreds of dealers terminated by early summer of 2018, according to CIs 4-5 and 10, as alleged in ¶¶98-105.

133.    On the July 18, 2018 conference call, Defendant Donnelly made the following false representations in response to an analyst question concerning Arctic Cat's profitability and demand for Textron products:

[Stephens Inc. Analyst]: And then with Arctic Cat, can you talk about ORV and snow retail trends? I know April was tough with weather. It sounds like the ORV industry really rebounded in May and June. What are you seeing in terms of industry trends? And can you comment on kind of your market share and just the overall profit improvement at Arctic Cat?

[Defendant Donnelly]: Well, I think, *we are seeing profit improvement in Arctic Cat, and we would continue to expect to see incremental margins . . . So I think the end market of all the data I see is positive here in the last couple months . . .*

134.    Defendant Donnelly's representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading because all of the end market data that Defendant Donnelly was in a position to see was not positive, and there were no profit or margin improvements as a result of Defendants' continued dependence on rebates and discounts on aged snow and dirt inventory.  In truth, as a result of Defendants' rebates and discounts and termination of unprofitable dealers, and continued massive glut of aged inventory, Arctic Cat was not in a position to be profitable in 2018, as alleged in ¶¶74-105.

135.    Furthermore, when Defendant Donnelly represented "all" of the end market data was "positive", he misled investors about snow and dirt sales trends by concealing adverse conditions that were then negatively affecting the Company's sales.  In truth, dealer inventory of non-current dirt and snow products remained elevated, hundreds of Company dealers were unprofitable, Defendants continued to rely on rebates and discounts on aged inventory into the third quarter, and Defendants were terminating hundreds of dealer relationships.  Furthermore, as a result of integration failures and material production and planning problems, the Company was unable to adequately fulfil new dealer orders.

136.    On July 26, 2018, Defendants caused Textron to file the Q2 2018 10-Q with the SEC. The Q2 2018 10-Q repeated the representation set forth in the 2017 10-K that the Arctic Cat integration plan was "substantially completed."

137.    Defendant Donnelly and Connor's representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading for the reasons set forth in ¶117-18.

138.    The Q2 2018 10-Q included SOX Certifications signed by Defendants Donnelly and Connor that were substantially similar to the representations in ¶119.

139.    Defendant Donnelly and Connor's representations were untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading for the reasons set forth in ¶120.

140.    On July 27, 2018, Defendant Donnelly acquired 82,647 Textron shares through the exercise of options at $5.65 per share, and he sold all of these shares in multiple transactions at prices ranging from $66.84 to $67.94 per share for net proceeds of approximately $5,084,589.

141.    On July 30-31, 2018, Lupone, Textron's general counsel and a member of Textron's Executive Leadership Team, exercised 45,000 options at $27.76 per share and sold all of them at approximately $67.50 per share, for net proceeds of approximately $1,788,214.50, representing the sale of approximately 20% of his reported holdings of Textron stock.

## VI.    THE TRUTH BEGINS TO MATERIALIZE

142.    On October 18, 2018, before the market opened, Textron issued a press release that was filed with the SEC on Form 8-K announcing the Company's third quarter 2018 financial results, disclosing a surprise earnings miss, and disseminating dial-in information for a conference call with investors and analysts.  The press release stated, in relevant part, that Industrial "Segment profit was down $48 million from the third quarter of 2017, largely due to unfavorable pricing and performance . . . ".

143.    Also on October 18, 2018, Defendants conducted a conference call with analysts and investors.  During the call, Defendants Donnelly and Connor made the following statements:

[Defendant Donnelly]: Segment profit was down in the quarter largely due to lower profit in Industrial . . .  At Industrial, segment profit was breakeven, ***primarily due to unfavorable operating performance in specialized vehicles***. Specialized vehicles has undergone significant change over the past two years as we've expanded the product portfolio. While we've seen increasing revenue in the segment, we haven't seen the planned level of growth or delivered the operating leverage necessary to support expected returns. We've made progress on new product introductions and continue to be encouraged by the favorable trends in the powersports market, but we need to work on our go-to-market strategy and focus on cost performance. We're focused on driving improvements in this business and believe that we have a valuable part of our portfolio moving forward.

***

[Shapiro Research]: Okay. And then just one quick one. On Industrial, was there restructuring in that number, or kind of what's the plan going forward? I mean you didn't lower the guide that much for the year, so clearly the fourth quarter's got to look better.

[Defendant Donnelly]; Well, for sure. So look, George, I think what you're seeing in Industrial in the quarter is primarily, as we said, driven by the Specialized Vehicle business. And particularly, it's around some of the consumer markets, and ***it's a recognition that we still have more work to do in terms of strengthening that channel. And so we recognized a fair bit of that cost here in the quarter.***

***

[JP Morgan Chase & Co. Analyst]: Okay. And then the -- maybe as a follow-up, just in the Vehicle business, if you could talk a little bit more about what came -- sort of off the route this year relative to initial expectations?  I guess it seems like pricing is very tough. Why is pricing so tough? Do you still expect that business to do, I was thinking, maybe $1.75 billion of sales or so this year? And how long do you think it'll take to get back to -- or to get toward maybe a high single-digit level of profitability there?

[Defendant Donnelly]: . . . ***our team has been going through sort of a painful learning experience about how that channel is managed and how discounting is handled and how that plays out through the course of the year. So it for sure, has manifested itself in more discounting than we would like to continue to work that channel.*** I think the team will get better at that and it's things we're learning. . . .

On the dirt side, we missed a better part of last year because some of the product that was sort of in the pipeline wasn't really ready to go. And we didn't want to release it till it was ready.  ***So we're kind of maybe a year behind in terms of the new product feeding into that channel***. . .

***

49

[Melius Research LLC Analyst]: Just a couple of quick clarifications. So I'm just piecing this together, Scott, from your comments. It sounds like the Specialized Vehicle weakness was isolated to Arctic Cat, and I'm just wondering, the management change [of replacing Holleran as President and CEO of Industrial Segment] is all related to that as well, I would assume. So if you can just clarify that, it would be great. . . .

[Defendant Donnelly]: So Carter, I would say on TSV the most fundamental challenge in the business is around particularly the dirt side of the – the consumer side of that business and that's the area where we need the most work. But when you have something like that going on in the business, *it creates enough chaos that it drags down the operating performance in total*. . .

\*\*\*

[Vertical Research Partners, LLC Partner]: Scott, on the vehicle issues here, how long do you think it's going to take to sort this out? And do you think there's going to be some additional restructuring charges required?

[Defendant Donnelly]: Well, Robert, I think that *we're probably a year behind the schedule that we would like to have had, right. I mean, obviously, we went into this expecting to be able to generate accretion in year one. Obviously, that's not going to happen, as we've kind of realized these costs in the quarter. . . it's probably a one-year delay again*.

\*\*\*

[Jefferies LLC Analyst]: It's good Industrial is finally getting some airtime but not for good stuff, unfortunately, just one last one on it.  How do we think about specialized vehicles recovery? I think you mentioned to Rob's question it was a dirt product introduction that seems to be the issue. And how long will the product introductions take and how we think about that profitability recovery? Is it a year's time? Is it a few quarters?

[Defendant Donnelly]: Well, Sheila, I think that it's *probably in a year's time*. . . I think in general how we manage that channel is something that, frankly, we just haven't done as well as we should have. And our sales tools and how easy we make it for prospective customers to configure our product, have access to the dealers, have a natural way to help customers move to our product is just something we didn't do well. So some of that is -- there are some things that were problematic that I think can be fixed very quickly, but I think *this is a year process to get this thing to where we want it*. . .

\*\*\*

[Wells Fargo Securities Analyst]: Scott or Frank, is there any way to just look at the Industrial, this segment and tell us is there any sort of quantification of one-time costs? . . .

50

[Defendant Donnelly]: Sam, I wouldn't characterize it as one-time, right? This is not some special charge, but -- when we look at what we reserve and accrue around anticipated discounting programs and things like that, I mean, *we had to make adjustments to that given the nature of where we are and where the inventory is*. . . .

144.    On this news, Textron's stock declined from a closing price on October 17, 2018 of $64.78 per share, to close at $57.49 per share, a decline of $7.29 per share, or approximately 11.25%, on heavier than usual volume of over 13.4 million shares.

145.    Analysts were surprised by Textron's disclosure and laid the blame for the decline in the Industrial Segment's profit to $1 million in the third quarter of 2018 from $49 million in the third quarter of 2017 on the cost for rebates and incentives.  For example, on October 18, 2018, J.P. Morgan issued a research report titled "Textron, Off-Road Vehicles Run Over Q3" that stated, in part, the following "**Specialized Vehicles has given dealers rebates for product that isn't selling**[25]. . . *We estimate these incentives cost $40-50 mn in Q3*, matching the reduction in operating cash flow guidance and presumably, they address the dealer inventory situation for a few quarters . . . and hopefully for good but we don't want to count our chickens . . .".

146.    However, Textron's stock continued to trade at artificially inflated prices because on the October 18, 2018 conference call, Defendant Donnelly, in response to an analyst's question, misrepresented that the Company's reported goodwill and intangible assets acquired through the Arctic Cat acquisition were not impaired:

[Wells Fargo Securities Analyst]: . . . Is there an impairment or when do you do the next impairment test? Just trying to think about what's one-time to this quarter that's not part of ongoing.

[Defendant Donnelly]: . . . So there's some probably it's more in the quarter than we would expect, but it's not something like an impairment of goodwill or an intangible or something of that nature.

---

[25] Emphasis in original.

147.    Defendant Donnelly's representation that there was no impairment of goodwill or intangible assets was materially false and misleading because he knew of, or recklessly disregarded, the following red flags that indicated that there were, in fact, impairments of goodwill or intangibles in the Industrial segment: 1) in the third quarter of 2018, the Industrial segment profit was down 98%; 2) the Company had continued to use money losing rebating and discounting into the third quarter of 2018; 3) that the integration of dirt vehicles was at least one year behind; 4) that Arctic Cat dealers continued to be saddled with aged inventory, which depressed demand; 5) as a result of the Company's review of Arctic Cat dealers, the Company had and would continue to terminate hundreds of unprofitable dealers; 6) Textron management was assessing cost reductions; 7) Defendants' the planned level of growth expected returns had not materialized; and 8) Defendants were conducting a review and assessment of the Textron Off Road and Arctic Cat brands and other businesses within the product line.

148.    On October 25, 2018, Defendants caused Textron to file its quarterly report for the quarter ended September 30, 2018 that, contrary to Defendant Donnelly's representations on October 18, 2018 that there was no impairment of goodwill or intangible assets relating to the Industrial Segment, for the first time warned of the potential risk of asset impairments concerning Textron's Specialized Vehicles business:

**Goodwill and Other Intangible Assets**

At September 29, 2018, we have an aggregate of $86 million in intangible assets associated with the products sold under the Textron Off Road and Arctic Cat brands within the Specialized Vehicles product line of the Industrial segment. These assets include a tradename and the customer/dealer relationships and technology related to the March 6, 2017 Arctic Cat acquisition with a carrying value of $65 million, along with $21 million related to other acquired technology.

The Specialized Vehicles product line has undergone significant change recently as we have expanded the product portfolio and integrated manufacturing operations and retail distribution with the acquisition of Arctic Cat. In the third quarter of 2018, the operating results were significantly below our expectations given the new

products and dealer network in place as, among other operational factors, dealer sell-through lagged. Management is currently assessing the go-to-market strategy, along with improvements to the dealer network, cost reductions and the future financial outlook for this product line. Based on these factors, it is reasonably possible that an impairment loss of certain long-lived assets could be recognized in the fourth quarter related to this product line.

149.    Just weeks later, on December 6, 2018, Defendants caused Textron to file a report

with the SEC on Form 8-K that disclosed "Material Impairments" relating to the Company's

Specialized Vehicles business:

> On December 4, 2018, our Board of Directors approved a plan to restructure the Textron Specialized Vehicles businesses within our Industrial segment. We expect to incur pre-tax charges in the range of $60 million to $85 million under this plan, which will be recorded in the fourth quarter of 2018.
>
> Textron Specialized Vehicles has undergone significant changes since the acquisition of Arctic Cat as we have expanded the product portfolio and integrated manufacturing operations and retail distribution. As disclosed in our Form 10-Q filed for the third quarter of 2018, the operating results for these businesses were significantly below our expectations as dealer sell-through lagged despite the introduction of new products into our dealer network. ***Management conducted a strategic review of the Textron Specialized Vehicles businesses, which included an assessment of the acquired dealer network and go-to-market strategy for the Textron Off Road and Arctic Cat brands, as well as cost reduction initiatives throughout the Textron Specialized Vehicles businesses.*** The restructuring plan will result in the impairment of intangible assets, primarily related to product rationalization, the elimination of approximately 400 positions, representing approximately 10% of Textron Specialized Vehicles' workforce, and closure of several factory-direct turf-care branch locations and a manufacturing facility. The restructuring actions under this plan are expected to result in improved operating results for these businesses.
>
> Severance and related costs for this plan are estimated to be in the range of $10 million to $15 million. Contract termination and other facility closure charges are estimated to be in the range of $5 million to $15 million. Impairment charges are estimated to be in the range of $45 million to $55 million and largely relate to acquired intangible assets. Expected cash outlays in connection with this plan are estimated to be in the range of $15 million to $30 million, with up to $10 million in the fourth quarter of 2018 and the remainder in 2019. We anticipate that this plan will be substantially completed by the end of 2018.

150.    On December 7, 2018, Textron shares declined from a closing price on December 6, 2018 of $53.10 per share, to close at $51.14 per share, a decline of $1.79 per share or approximately 3.3% on heavier than usual volume of over 2.2 million shares.

151.    On February 14, 2019, Defendants caused Textron to file its annual report for the year ended December 31, 2018 with the SEC on Form 10-K in which Defendants disclosed "Special Charges" and a "Restructuring Plan" relating to Textron Specialized Vehicles:

> In the fourth quarter of 2018, we recorded $73 million in special charges in connection with a plan to restructure the Textron Specialized Vehicles businesses within our Industrial segment. These businesses have undergone significant changes since the acquisition of Arctic Cat as we have expanded the product portfolio and integrated manufacturing operations and retail distribution. In the third quarter of 2018, the operating results for these businesses were significantly below our expectations as dealer sell-through lagged despite the introduction of new products into our dealer network. Based on our review and assessment of the acquired dealer network and go-to-market strategy for the Textron Off Road and Arctic Cat brands in the fourth quarter of 2018, along with a review of the other businesses within the product line, we initiated a restructuring plan. This plan included product rationalization, closure of several factory-direct turf-care branch locations and a manufacturing facility and headcount reductions. Under this plan, we recorded asset impairment charges of $47 million, primarily intangible assets related to product rationalization, contract termination and other costs of $18 million and severance costs of $8 million. Headcount reductions totaled approximately 400 positions, representing 10% of Textron Specialized Vehicles' workforce. The actions taken under this plan were substantially completed at the end of 2018.

152.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

153.    During the Class Period, as alleged herein, Defendants acted with scienter in that the Individual Defendants knew, or were at least reckless, as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew, or were at least reckless, as to whether such statements or

54

documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

154.   The Individual Defendants caused Textron to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's common stock.

155.   As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Textron, their control over, receipt, and/or modification of Textron's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Textron, participated in the fraudulent scheme alleged herein.

156.   The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Textron common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Textron's business, operations, and management and the intrinsic value of Textron common stock and caused Plaintiff and members of the Class to purchase Textron common stock at artificially inflated prices.

157.   The Individual Defendants had motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Individual Defendants were the most senior officers of Textron, issued statements and press releases on behalf of Textron, and had access to internal Company inventory reports, and had the opportunity to commit the fraud alleged herein.

158.   As alleged above in ¶¶33, 35, 130, 140, during the Class Period Defendants Donnelly and Connor collectively sold approximately 363,047 Textron shares at artificially

inflated prices that were suspicious in timing and amounts. Indeed, Defendants Donnelly and Connor did not sell any Textron shares on the open market in 2017. Starting in April 2018, Defendants Donnelly and Connor starting dumping Textron stock for proceeds of over $12 million.

159. As alleged in ¶141, Lupone's sales were suspicious in timing and amounts. In the 12 months before the start of the Class Period, Lupone did not sell any Textron shares. During the Class Period, Lupone did not purchase any Textron shares on the open market. On July 30-31, 2018, Lupone, exercised 45,000 options at $27.76 per share and sold all of them at approximately $67.50 per share, for net proceeds of approximately $1,788,214.50 representing the sale of approximately 20% of his reported holdings of Textron stock.

160. Defendants Donnelly and Connor, and Lupone's sales do not appear to have been pursuant to 10b-5 trading plans.

161. The scienter of numerous senior executives and officers of Textron Specialized Vehicles and the Company's Industrial Segment, who acted within the scope of their authority and as agents of Textron during the Class Period, is imputed to Defendant Textron. For example, members of the Arctic Cat turnaround team monitored the progress of the Arctic Cat integration plan, and non-current inventory levels on a regular basis by accessing Arctic Cat dealer sales and inventory reports, and through regular meetings and communications, including meetings and communications with sales representatives or Arctic Cat dealers.

162. Specifically, the following senior Textron executives knew, or at least recklessly disregarded, the true facts about Textron's failure to integrate Arctic Cat and the inventory glut of non-current dirt and snow product and the impact of continued rebates and discounting on revenues and profitability, and/or dealer terminations:

     a. Defendant Donnelly, Textron's Chairman, President and CEO and member of Textron's Executive Leadership Team;

b.  Defendant Connor, Textron's Executive Vice President and CFO, and member of Textron's Executive Leadership Team;

c.  Lupone, Textron's General Counsel, and member of Textron's Executive Leadership Team;

d.  Holleran was President and CEO of Textron's Industrial segment, and Director, President and CEO, Textron Specialized Vehicles Inc., and Holleran reported directly to Defendant Donnelly;

e.  Collins was Vice President, Consumer and reported to Holleran and Donnelly; and

f.  Jhant was Director of North American Sales and Director of Strategy and Product Management; Webster was Director of North American Sales and Director of Go-to-Market Strategy at TSV; Mottel was Director of Sales Operations; and Brennan was Director, Channel Development, and Director, E-Z-Go Consumer Sales and Marketing—each of whom reported to Collins.

163.   Defendants Donnelly and Connor, as well as Holleran, Collins, Jhant, Webster, Mottel, and Lupone knew, or at least recklessly disregarded, the undisclosed facts concerning Arctic Cat's inventory and integration failures and acted as agents of Textron.  Accordingly, the state of mind of each of them is imputed to Defendant Textron.

## VIII.  <u>PRESUMPTION OF RELIANCE</u>

164.   Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period; the omissions and misrepresentations were material;

b.  Textron common stock traded in an efficient market;

57

c.   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Textron common stock; and

d.   Plaintiff and other members of the Class purchased Textron common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

165.   At all relevant times, the market for Textron common stock was efficient for the following reasons, among others:

a.   As a regulated issuer, Textron filed periodic public reports with the SEC;

b.   Textron regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

c.   Textron was followed by several securities analysts employed by major brokerage firms, including J.P. Morgan, Wells Fargo Securities, Morgan Stanley, Jefferies, Cowen and Company, and Stephens Inc., who wrote reports that were distributed to their respective sales forces and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

d.   Textron common stock is actively traded in an efficient market, namely the NYSE, under the ticker symbol "TXT."

166.   As a result of the foregoing, the market for Textron common stock promptly digested current information regarding Textron from publicly available sources and reflected such information in Textron's stock price.   Under these circumstances, all purchasers of Textron common stock during the Class Period suffered similar injury through their purchase of Textron common stock at artificially inflated prices and the presumption of reliance applies.

167.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## IX.    LOSS CAUSATION/ECONOMIC LOSS

168.    During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Textron common stock and operated as a fraud or deceit on Class Period purchasers of Textron common stock by misrepresenting the value of the Company's business and prospects as detailed herein.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Textron common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Textron common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

169.    On October 18, 2018, before the market opened, Textron issued a press release announcing third quarter 2018 financial results disclosing a surprise earnings miss in Textron's Industrial Segment, as alleged in ¶¶142-43.  The press release stated, in relevant part, that Industrial "Segment profit was down $48 million from the third quarter of 2017, largely due to unfavorable pricing and performance."  Textron's Industrial Segment reported profit of $1 million in the quarter ended September 30, 2018, compared to $49 million for the same quarter in 2017, a decline of approximately 98%.

170.    On this news, Textron's stock declined from a closing price on October 17, 2018 of $64.78 per share to close at $57.49 per share, a decline of $7.29 per share or approximately 11.25%, on heavier than usual volume of over 13.4 million shares.

171.    Analysts were surprised by Textron's disclosure and laid the blame for the decline in the Industrial Segment's profit to $1 million in the third quarter of 2018 from $49 million in the third quarter of 2017 on the cost for rebates and incentives.  For example, on October 18, 2018, J.P. Morgan issued a research report titled "Textron, Off-Road Vehicles Run Over Q3" that stated, in part, the following "**Specialized Vehicles has given dealers rebates for product that isn't selling**. . . ***We estimate these incentives cost $40-50 mn in Q3***, matching the reduction in operating cash flow guidance and presumably, they address the dealer inventory situation for a few quarters…and hopefully for good but we don't want to count our chickens…".

172.    Also on October 18, 2018, *Bloomberg News* published an article titled "Textron Slumps as Planemaker Stumbles with All-Terrain Vehicles".

173.    Also on October 18, 2018, *Bloomberg News* published an article titled "ATVs Drive Textron's Earnings Off a Cliff".

174.    Also on October 18, 2018, Jefferies issued a research report titled "Rough Ride in Industrial . . . but 90% of Business Performing."

175.    On December 6, 2018, after the market closed, Defendants caused Textron to file a report with the SEC on Form 8-K that disclosed "Material Impairments" relating to the Company's Specialized Vehicles business, as alleged in ¶149.  On December 7, 2018, Textron shares declined from a closing price on December 6, 2018 of $53.10 per share, to close at $51.14 per share, a decline of $1.79 per share or approximately 3.3% on heavier than usual volume of over 2.2 million shares.

176.    On December 7, 2018, Jefferies published a research report titled "Tough Turf: Restructuring Charges within Industrial."

177.    On December 10, 2018, Cowen issued a research report titled "Consumer Vehicle Miscues Again."

## X.    NO SAFE HARBOR

178.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

179.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Textron who knew that the statement was false when made.

## XI.    CLASS ACTION ALLEGATIONS

180.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or otherwise acquired Textron common stock during the Class Period (the "Class").   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

181.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of October 12, 2018, there were over 242 million shares of Textron

common stock outstanding.

182.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

183.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

184.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.   whether the Exchange Act was violated by Defendants as alleged herein;

        b.   whether statements made by Defendants misrepresented material facts about the business, operations and management of Textron; and

        c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

185.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XII.    CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Against All Defendants

186.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

187.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew, or were at least reckless in not knowing, were misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

188.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a.    Employed devices, schemes, and artifices to defraud;

b.    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Textron common stock during the Class Period.

189.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Textron common stock.  Plaintiff and the Class would not have purchased Textron common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

190.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Textron common stock during the Class Period.

## COUNT II
### For Violations of Section 20(a) of the Exchange Act Against
### Defendants Donnelly and Connor

191.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

192.    The Individual Defendants acted as controlling persons of Textron within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, participation in and awareness of the Company's operations, and knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

193.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to the Arctic Cat turnaround team and inventory reports, and therefore, are presumed to have had the power to control or influence the false representations and omissions giving rise to the securities violations as alleged herein, and exercised the same.

194.    As set forth above, Textron and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions, each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Textron's and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Textron common stock during the Class Period.

## XIII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XIV.  **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:  February 14, 2020                                 Respectfully submitted,

*/s/            Frederic S. Fox*
Frederic S. Fox
Donald R. Hall
Jeffrey P. Campisi
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: ffox@kaplanfox.com
           dhall@kaplanfox.com
           jcampisi@kaplanfox.com

*Lead Counsel for Lead Plaintiff IWA Forest Industry Pension Plan and the Proposed Class*