**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE TEXTRON, INC. SECURITIES
LITIGATION

Case No.: 19-cv-07881-DLC

ECF Case

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

**KIRKLAND & ELLIS LLP**
Sandra C. Goldstein, P.C.
Stefan Atkinson, P.C.
Kevin M. Neylan, Jr.
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
sandra.goldstein@kirkland.com
stefan.atkinson@kirkland.com
kevin.neylan@kirkland.com

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................. 1

BACKGROUND ............................................................................................................................. 2

      A.     Factual Background ................................................................................................. 2

      B.     Textron's Alleged Misrepresentations ................................................................... 3

      C.     The Third Quarter of 2018 ..................................................................................... 5

      D.     This Lawsuit ........................................................................................................... 6

APPLICABLE LAW ....................................................................................................................... 6

ARGUMENT .................................................................................................................................. 7

I.    THE COMPLAINT FAILS TO ALLEGE THAT TEXTRON MADE FALSE OR
    MISLEADING STATEMENTS. ........................................................................................... 7

      A.     Textron's Inventory-Related Statements Were Not False or Misleading. .............. 7

      B.     Textron's Forward-Looking Opinion Statements About Arctic Cat and
             Textron's Future Performance Are Not Actionable. ............................................. 12

      C.     Textron's Integration-Related Statements Were Not False or Misleading. .......... 14

      D.     Textron's SOX Certifications Are Not Actionable. .............................................. 19

II.   PLAINTIFF'S SCIENTER ALLEGATIONS ARE DEFICIENT. ..................................... 19

      A.     The Complaint Fails to Plead Motive and Opportunity for Each of the
             Alleged Misrepresentations. ................................................................................ 20

      B.     The Complaint Fails to Plead Conscious Misbehavior. ....................................... 22

          1.   Conscious recklessness cannot be inferred with respect to the alleged
              misstatements about inventory reduction and future performance. ................ 22

          2.   Conscious recklessness cannot be inferred with respect to the alleged
              misstatements about integration. ................................................................... 24

          3.   Conscious recklessness cannot be inferred with respect to the alleged
              misrepresentation about impairment of goodwill or intangible assets ............ 25

CONCLUSION ............................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Express Co. Sec. Litig.*,
  2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008)................................................................22, 23, 24

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................2, 7, 11, 19, 20

*In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*,
  2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ........................................................10

*Bond Opportunity Fund v. Unilab Corp.*,
  87 F. App'x 772 (2d Cir. 2004) ..............................................................................10

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)....................................................................................10

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..............................................................................22, 25

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)....................................................................................25

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
  2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ........................................................16

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010).....................................................................14

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)...............................................................23, 24

*Guttman v. Huang*,
  823 A.2d 492 (Del. Ch. 2003)..................................................................................21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)...................................................................................................7

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
  2019 WL 4601644 (S.D.N.Y. Sept. 23, 2019)................................................22, 23, 24

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., PLC*,
  783 F.3d 383 (2d Cir. 2015).....................................................................................15

*In re IBM Corp. Sec. Litig.*,
 163 F.3d 102 (2d Cir. 1998)......................................................................................12

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001)..................................................................................20, 21

*Lenart v. Coach Inc.*,
 131 F. Supp. 3d 61 (S.D.N.Y. 2015).............................................................................11

*Lucescu v. Zafirovski*,
 2018 WL 1773134, (S.D.N.Y. Apr. 11, 2018)...............................................................9

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)...............................................................................22, 24, 25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
 575 U.S. 175 (2015)...............................................................................................13, 18

*In re Razorfish, Inc. Sec. Litig.*,
 2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001).............................................................15

*Ret. Sys. v. CBS Corp.*,
 679 F.3d 64 (2d Cir. 2012)......................................................................................25

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004)..........................................................................10, 12, 15

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
 573 F.3d 98 (2d Cir. 2009).......................................................................................22, 24

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris
 Companies, Inc.*,
 75 F.3d 801, 813 (2d Cir. 1996)...............................................................................10

*In re Sanofi Sec. Litig.*,
 155 F. Supp. 3d 386 (S.D.N.Y. 2016)..........................................................................19

*In re Sanofi Sec. Litig.*,
 87 F. Supp. 3d 510 (S.D.N.Y. 2015)............................................................................12

*SEC v. Toomey*,
 866 F. Supp. 719 (S.D.N.Y. 1992) ..............................................................................10

*Stratte-McClure v. Morgan Stanley*,
 776 F.3d 94 (2d Cir. 2015)......................................................................................25

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
 531 F.3d 190 (2d Cir. 2008)...................................................................................19, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)..................................................................................................7, 20, 21

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)...................................................................................................13

**Statutes**

15 U.S.C. § 78j..................................................................................................................6

15 U.S.C. § 78t..................................................................................................................6

15 U.S.C. § 78u-4 .......................................................................................................7, 19, 21

15 U.S.C. § 78u-5..............................................................................................................13

**Rules**

Fed. R. Civ. P. 9..................................................................................................................7

**Regulations**

17 C.F.R. § 240.10b-5..........................................................................................................6

Defendant Textron Inc. and the individual Defendants, Textron's CEO Scott C. Donnelly and CFO Frank T. Connor, (collectively, "Textron") respectfully submit this Memorandum of Law in Support of their Motion to Dismiss Plaintiff's Second Amended Complaint ("SAC") (Dkt. 39).

## INTRODUCTION

In early 2017, Textron Specialized Vehicles Inc.—a wholly owned subsidiary of Textron and part of Textron's Industrial segment—acquired a recreational vehicles company named Arctic Cat. Textron Specialized Vehicles had a disappointing performance in the third quarter of 2018. Textron's share price fell by about 11%, and this lawsuit followed. Plaintiff alleges that during 2018 (in the period before the third quarter), Textron misled investors about Arctic Cat's health and prospects. According to Plaintiff, Textron exaggerated the progress it had made in reducing a backlog of older Arctic Cat inventory that persisted before the acquisition, and misled investors about the extent to which Arctic Cat was "integrated" into Textron and poised to turn a profit.

Plaintiff's effort to turn a disappointing quarter into a case of securities fraud fails, and the Complaint should be dismissed in its entirety. Plaintiff cannot state a claim because it cannot identify any false or misleading statements made by Textron. Plaintiff has staked one pillar of its case—the claim that Textron misled investors about its progress toward resolving Arctic Cat's inventory issue—on a clear misunderstanding of Donnelly's statements about the nature of that problem, which no reasonable investor would have shared. Simply put, there is no inconsistency between the facts Plaintiff alleges and the representations Donnelly made. And the second pillar of Plaintiff's case—its claim that Textron misrepresented Arctic Cat's "integration"—collapses because it attacks statements that fall well within the bounds of non-actionable corporate optimism, because it ignores other relevant disclosures, and because it rests on a mistaken understanding of key terms in Textron's disclosures, which again no reasonable investor would have adopted. Because Textron misled nobody, the Complaint should be dismissed.

Plaintiff's theory is flawed for the independent reason that Plaintiff cannot allege scienter, at least for many of the statements challenged in the Complaint. Even if the Complaint adequately pleaded that investors had been misled, this lawsuit would need to be narrowed substantially.

## BACKGROUND[1]

### A.    Factual Background

Textron is a global company that manufactures and distributes commercial and military aircrafts, aerospace and defense products, and recreational vehicles. Its business is divided into five segments: Textron Aviation, Bell Helicopter, Industrial, Textron Systems, and Finance. (SAC ¶ 38.) This case concerns the Industrial segment, and Textron Specialized Vehicles in particular, which is one of two businesses within that segment. (SAC ¶ 39.)

Textron's best-known brands include Cessna airplanes, Bell helicopters, and E-Z-Go golf cars. Textron added to that lineup in March 2017, when it acquired a Minnesota company called Arctic Cat. (SAC ¶¶ 2, 51.) Arctic Cat had been a publicly traded company that manufactured snowmobiles, all-terrain vehicles, and off-road vehicles—together known as "snow" and "dirt" vehicles, with names like Alpha One, Thundercat, Wildcat XX, and Havoc. (SAC ¶¶ 2, 42-43.) Arctic Cat would distribute these vehicles to a global network of some 800 independent dealers, which in turn would sell them to consumers. (SAC ¶¶ 2, 41.)

Arctic Cat's business had long been struggling, as Textron told investors before the acquisition. (SAC ¶¶ 4-5.) Donnelly identified the main problem in January 2017: years of

---

[1] This brief draws on several sources that are attached as exhibits, which the Court may consider because they are "incorporated into the complaint by reference," are "legally required public disclosure documents filed with the SEC," or were "possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). These exhibits include a transcript of Textron's 2016 Q4 earnings call (Exhibit A to the accompanying Declaration of Kevin M. Neylan, Jr.); transcripts of Textron's 2017 Q1, Q2, Q3, and Q4 earnings calls (Exhibits B, C, D, and E); Textron's 2017 10-K (Exhibit F); a transcript of Textron's 2018 Q1 earnings call (Exhibit G); Textron's 2018 Q1 10-Q (Exhibit H); a transcript of Textron's 2018 Q2 earnings call (Exhibit I); Textron's 2018 Q2 10-Q (Exhibit J); a transcript of Textron's 2018 Q3 earnings call (Exhibit K); Textron's 2018 Q3 10-Q (Exhibit L); and Textron's Form 8-K filed December 6, 2018 (Exhibit M).

sluggish sales had left Arctic Cat's distribution channel clogged with "older product," *i.e.*, vehicles that were not the current model year but instead were model years 2016 ("MY 2016") and older. (Ex. A at 10.)  Donnelly explained that Arctic Cat had used "rebating" to try to sell these older products, which "put a lot of pressure on their margins." (*Id.*)  Donnelly said he "expect[ed] to see that continue through the balance of this year once we pick up the company." (*Id.*)  In April 2017, after the acquisition had closed, Donnelly reiterated that "solving the inventory issue" would require continuing "those rebate programs associated with clearing out the older model product," but added, "[w]e expect to clear the lion's share of that out" by the end of the year. (Ex. B at 9.)  His hope was that rebating would help clear enough of the "older model product" so that Textron could sell current vehicles (MY 2017) and future vehicles (MY 2018 and beyond) without similar rebates or discounts. (*See id.*)  He expected Arctic Cat to turn a profit at some point in 2018. (*Id.*)

When Donnelly next updated investors, in July 2017, he reported that Textron had "seen a lot of success" in "clear[ing] out a lot of the aged inventory" that came with the acquisition. (Ex. C at 12.)  Donnelly said that clearing out these inherited vehicles would permit Textron to "start to launch new product"—*i.e.*, MY 2018 vehicles—by "the latter part of August into September." (*Id.*)  He added that current-year "snow product," which launched "right before we completed the acquisition," was selling well. (*Id.*)  In October 2017, Donnelly again reported that Textron had made progress in "clearing out a lot of the older inventory," which allowed Textron to begin "rolling out" new products that were "doing well in the marketplace." (Ex. D at 17.)  Plaintiff does not allege that any of the statements recounted here were false or misleading.

### B.    Textron's Alleged Misrepresentations

Plaintiff alleges that Textron misled investors on seven occasions, all in 2018:

1. During a January 31, 2018 earnings call, when Donnelly said that during the fourth quarter of 2017, Textron "saw improved demand in the snow retail channel, allowing dealers to clear older inventory," and had "successfully integrated the integration of

3

Arctic Cat." (SAC ¶¶ 107, 109; Ex. E at 4-5.) Also during this call, Donnelly and Connor both answered "yes" when asked if they thought Arctic Cat was "going to hit the target of being accretive [*i.e.*, profitable] this year." (SAC ¶ 111; Ex. E at 27.)

2. In Textron's 2017 10-K, filed February 15, 2018, which stated that a "restructuring plan" implemented in the first quarter of 2017 to "integrate" Arctic Cat was "substantially completed." (SAC ¶ 116; Ex. F at 62-63.)

3. During an April 18, 2018 earnings call, when Donnelly repeated that during 2017 Textron had achieved "pretty significant reductions in that aged inventory." (SAC ¶ 123; Ex. G at 18-19.)

4. In Textron's 2018 Q1 10-Q, filed April 25, 2018, which reiterated that the 2017 Arctic Cat integration plan was "substantially completed." (SAC ¶ 125; Ex. H at 17.)

5. During a July 18, 2018 earnings call, when Donnelly said that Textron "continue[d] to make progress" in reducing the older inventory inherited from Arctic Cat, and that "a lot of the stuff that was really older inventory has been moved off [dealers'] books." (SAC ¶ 131; Ex. I at 15.) Donnelly also told investors, "I think we are seeing profit improvement at Arctic Cat," and that "I think the end market of all the data I see is positive here in the last couple months." (SAC ¶ 133; Ex. I at 19.)

6. In Textron's 2018 Q2 10-Q, filed July 26, 2018, which again said that the 2017 Arctic Cat integration plan was "substantially completed." (SAC ¶ 136; Ex. J at 18.)

7. During an October 18, 2018 earnings call, when Donnelly said that he did not think Arctic Cat's third quarter performance would result in "something like an impairment of goodwill or intangible or something of that nature." (SAC ¶ 146; Ex. K at 21.)

Plaintiff challenges these statements on several bases. First, Plaintiff alleges that Textron misled investors about its progress in reducing the older inventory inherited from Arctic Cat, because three purported confidential informants ("CIs") allege that "by the start of 2018, [Textron] had over 22,000 dirt and snow vehicles model years 2015-17 sitting at dealer locations." (SAC ¶ 78; *id.* ¶¶ 76-77, 83.) Second, Plaintiff alleges that Donnelly and Connor misled the market when they predicted that Arctic Cat would be profitable in 2018, and when Donnelly said he did not think Textron would suffer an impairment during the third quarter. (SAC ¶¶ 111, 147.) Third, Plaintiff alleges that Textron's comments about "integration" were false or misleading because, according to certain purported CIs, Arctic Cat experienced setbacks following the acquisition

4

(SAC ¶¶ 75-96), including delays in integrating "departments for parts and service or computer systems" (SAC ¶ 85), "numerous engineering problems with the 2018 Arctic Cat Havoc and Wildcat XX" models (SAC ¶¶ 90, 93), and—according to one alleged dealer—delays in filling orders (SAC ¶ 94). Finally, Plaintiff takes aim at Donnelly and Connor's certifications, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications"), stating that they did not know of any material misrepresentations in Textron's SEC filings. (SAC ¶¶ 119-120, 127-128, 138-139.)

### C.      The Third Quarter of 2018

During the third quarter of 2018, the Industrial segment's profits were $1 million, down from $49 million in the third quarter of 2017. (Ex. L at 19.) Some of this decline was expected; as Donnelly told investors during the second quarter earnings call, he "expect[ed] to see some reduction in" the Industrial segment's "operating profit level" because Textron had just sold a subsidiary called Tools & Test, which was "a good margin business." (Ex. I at 18.) But Donnelly explained that the third quarter profit decline was "primarily due to unfavorable operating performance in Specialized Vehicles." (Ex. K at 3.) Again, some of this decline was expected— as Donnelly disclosed during the second quarter earnings call, the Wildcat XX launched "later than . . . expected" and Textron was "struggling to meet demand of producing them," and the Prowler Pro had only "just launched" as of late July as well. (Ex. I at 19.)

In addition, Donnelly said, the decline revolved "around some of the consumer markets, and it's a recognition that we still have more work to do in terms of strengthening that channel." (Ex. K at 7.) Donnelly elaborated that "our team has been going through sort of a painful learning experience about how that channel is managed and how discounting is handled and how that plays out through the course of the year. So it for sure has manifested itself in more discounting than we would like." (*Id.* at 9.) To be clear, Donnelly did *not* say that the third quarter suffered because Textron was forced to continue using rebates to clear the same older model vehicles he identified

as problematic in early 2017, *i.e.*, the MY 2016 and older vehicles that had remained in Arctic Cat's channel in the years before the acquisition. In other words, Donnelly said nothing inconsistent with his past statements about the progress Textron had made in reducing the stock of "older model product" inherited from Arctic Cat. If anything, his comments suggested that Arctic Cat underperformed because it wound up applying more rebates than expected to newer models that had been introduced more recently, and also because—as Donnelly disclosed during the previous earnings call—some newer "dirt" vehicles were delayed in being released. (*See id.* at 9-10.) Donnelly said that Textron's goal of making Arctic Cat profitable in 2018 would likely be delayed by a year, but he said he did not think the third quarter results would cause "something like an impairment of goodwill or intangible or something of that nature." (*Id.* at 13, 21.) Textron's share price dropped 11.25%, from $64.78 to $57.49. (SAC ¶ 144.)

One week later, Textron stated that it was "reasonably possible that an impairment loss of certain long-lived assets could be recognized in the fourth quarter related to [Arctic Cat]." (Ex. L at 32.) On December 6, Textron announced that there would be such an impairment. (Ex. M at 2.) Textron's share price then fell from $53.10 to $51.14. (SAC ¶ 150.)

### D.    This Lawsuit

This suit was filed on August 22, 2019, and the SAC was filed on February 14, 2020. Count I alleges that Textron, Donnelly, and Connor violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, 15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5 (SAC ¶¶ 186-190); Count II asserts that Donnelly and Connor are liable as control persons under § 20(a), 15 U.S.C. § 78t(a) (SAC ¶¶ 191-194). The Class Period runs from January 31 to December 6, 2018. (SAC ¶ 1.)

### APPLICABLE LAW

"To recover damages for violations of section 10(b) and Rule 10b-5, a plaintiff must prove '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

6

between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014). This action is governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, which imposes "[e]xacting pleading requirements" that "require[] plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Also, "a complaint alleging securities fraud must satisfy Rule 9(b), which requires that 'the circumstances constituting fraud . . . shall be stated with particularity.'" *ATSI*, 493 F.3d at 99 (quoting Fed. R. Civ. P. 9(b)) (citation omitted).

## ARGUMENT

The Complaint should be dismissed in its entirety because it fails to allege any actionable misstatements or omissions. Independently, the Complaint's scienter allegations are deficient, and cannot support the broad theory of liability Plaintiff advances.

**I.    THE COMPLAINT FAILS TO ALLEGE THAT TEXTRON MADE FALSE OR MISLEADING STATEMENTS.**

The PSLRA mandates dismissal of any complaint that fails to "specify" not only "each statement alleged to have been misleading," but also "the reason or reasons why the statement is misleading." 15 U.S.C. §§ 78u-4(b)(1), (3)(A). Similarly, under Rule 9(b), "[a] securities fraud complaint based on misstatements must . . . specify the statements that the plaintiff contends were fraudulent," and "explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. Plaintiff has not carried that burden for any of the statements it challenges.

**A.    Textron's Inventory-Related Statements Were Not False or Misleading.**

Plaintiff alleges that on three earnings calls, Donnelly exaggerated Textron's progress in reducing the number of older model vehicles it had inherited from Arctic Cat. The first challenged

7

statement occurred on January 31, 2018, when Donnelly said that during the fourth quarter of 2017, Textron "saw improved demand in the snow retail channel, allowing dealers to clear older inventory." (SAC ¶ 107; Ex. E at 4.)  The second occurred on April 18, 2018, when Donnelly said that thus far in 2018, Textron "basically" had not sold any snow or dirt vehicles of any vintage, but "if you look at both dirt and snow inventory reductions that happened through the course of the year [*i.e.*, 2017], which was a big focus of ours, yielded a lot of result, so there's pretty significant reductions in that aged inventory." (SAC ¶ 123; Ex. G at 18-19.)  The final statement occurred on July 18, 2018, when Donnelly responded to a question about "inventory levels with Arctic Cat" by saying "I'm afraid I don't have those numbers at my fingertips here," but "a lot of the stuff that was really older inventory has been moved off [dealers'] books. . . .  I mean, last year was great in terms of burning down a lot of the inventory." (SAC ¶ 131; Ex. I at 14-15.)  Plaintiff alleges that those statements were false or misleading, because—according to three purported CIs (CIs 2, 3, and 5)—"by the start of 2018, the Company had over 22,000 dirt and snow vehicles model years 2015-17 sitting at dealer locations." (SAC ¶ 78; *id.* ¶¶ 77, 83.)

As a matter of law, this allegation fails to show that Donnelly's inventory-related statements were false or misleading, because Donnelly never said that Textron had cleared "dirt and snow vehicles model years 2015-17."  Recall the context in which Donnelly told investors about the nature of Arctic Cat's inventory problem.  He first did so in January 2017, and he described the problem as a backlog of "older product in the channel." (Ex. A at 10.)  Every reasonable investor would have understood "older product" to signify vehicles that were "older" as of that time, and thus were not the current model year but (at the very least) were MY 2016 or older.  Likewise, in April 2017, when Donnelly said that "solving the inventory issue" would require "clearing out the older model product" (Ex. B at 9), every reasonable investor again would

8

have understood him to be referring to vehicles that, at a minimum, were older than the current (2017) model year. The same goes for July 2017, when Donnelly said Textron had been able to "clear out a lot of the aged inventory that was out there in the channel," and contrasted that problematic "aged inventory" with more recent products that launched in early 2017, "right before we completed the acquisition," and with "new products" that were set to launch in the fall of 2017. (Ex. C at 12.) Donnelly conveyed the same meaning in October 2017, when he again described "clearing out a lot of the older inventory." (Ex. D at 17.) Thus, by the time the Class Period began, investors were well aware that the problem Textron was trying to solve was a stockpile of Arctic Cat vehicles that, at the least, were MY 2016 and older. Donnelly "had no obligation to remind investors of information that was already publicly disclosed." *Lucescu v. Zafirovski*, 2018 WL 1773134, at *11 (S.D.N.Y. Apr. 11, 2018) (Cote, J.). But in all events, his statements during the Class Period never deviated from that benchmark, for at no point did he suggest that the universe of problematic vehicles had expanded to include newer vehicles, including MY 2017 or later models. In fact, as recounted above, each of Donnelly's challenged Class Period statements describes progress Textron had made clearing "older inventory" or "aged inventory" *during 2017*.

This is a problem for Plaintiff, because every time Plaintiff alleges there were 22,000 older vehicles in the channel during the Class Period, that figure includes vehicles from model years 2015, 2016, *and 2017*. (SAC ¶¶ 76, 78.) But as just described, Donnelly said Textron had made progress in reducing a backlog of inventory that was "older" when Arctic Cat was acquired in 2017, which would encompass (at most) vehicles that were MY 2016 and older. Plaintiff cannot plead securities fraud by alleging that, as of 2018, there were 22,000 vehicles MY 2015-17—at least not without specifying how many of those 22,000 were MY 2016 and 2015. But Plaintiff has made no effort to do so. Nor has Plaintiff alleged any facts from which the Court could infer even

9

what rough proportion of those alleged 22,000 vehicles were MY 2016 and older. To fill in this critical gap in Plaintiff's theory would require no less than speculation, but "mere speculation is insufficient to satisfy the PSLRA pleading standard," *Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004), and likewise, "Rule 9(b) does not allow speculation to be the basis of an action for fraud," *SEC v. Toomey*, 866 F. Supp. 719, 726 (S.D.N.Y. 1992). As it stands, Plaintiff is simply talking past what Donnelly said. Plaintiff's failure to make allegations about MY 2016 and older vehicles is fatal, because the Second Circuit and this Court have often and correctly held that a plaintiff cannot state a claim of securities fraud when—as here—the facts alleged in the complaint simply do not contradict what the defendant actually said.[2]

In addition, Plaintiff's allegations fail to render Donnelly's statements false or misleading because Donnelly never said Textron had cleared *all* of the aged inventory it had inherited from Arctic Cat; instead, he said Textron had made some non-specific amount of progress in *reducing* such inventory. Plaintiff's alleged 22,000-vehicle figure does not undermine that claim. Plaintiff would need to allege that those 22,000 vehicles represented a sufficiently large *fraction* of the aged inventory that Textron inherited from Arctic Cat, which would require an allegation comparing the number of aged vehicles inherited in the acquisition with the number of such vehicles at the start of the Class Period. Absent that allegation, the Complaint cannot be said to "specify . . . the

---

[2] *E.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) ("Based upon the SEC filings referenced in the complaint, Barclays does not appear to have made representations that it had established internal controls for LIBOR, but only that it had established controls for other areas of its business. Plaintiffs fail, therefore, to demonstrate with specificity that Barclays's minimum control statements were false or misleading."); *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("We agree with the district court that there is nothing in the complaint that links the actual and projected revenues of these four facilities to plaintiffs' claim that the financial projections contained in the slide are false or misleading. Plaintiffs therefore do not plead fraud with the requisite particularity."); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 813 (2d Cir. 1996) ("[P]laintiffs make a false comparison between the figures, because the 8.3 percent decline was a decrease in wholesale shipments, not retail sales, and thus should have been compared to the previously reported 5.6 percent decline in wholesale shipments for 1992, not the 2.5 percent decline in retail sales."); *In re Austl. & N.Z. Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *14 (S.D.N.Y. Dec. 14, 2009) (Cote, J.) (holding statements not false or misleading where the "[alleged] fraud consisted of ANZ's misrepresentation of its 'equity finance practices'" but "[t]hose practices . . . are not the subject of the representations cited in the Complaint").

reason or reasons why [Donnelly's] statement is misleading," or to "explain why [his] statements were fraudulent," as the PSLRA and Rule 9(b) demand. Plaintiff fails to do this because Plaintiff nowhere alleges how many of the vehicles Textron inherited were "older" as of early 2017.

The closest Plaintiff comes is to allege that the "number" of "non-current year vehicles" remained "steady" at "22-25,000" from "early 2017 through at least the summer of 2018." (SAC ¶ 77; *id.* ¶¶ 74, 124.) CI 2 is the only purported CI whose alleged observations support that assertion; no other CI alleges anything about inventory levels before January 2018. But CI 2 does not help Plaintiff, because CI 2's tally includes MY 2017 vehicles, which were not the problematic vehicles Donnelly said were diminishing. Moreover, insofar as CI 2 suggests that Textron made *no* progress reducing inventory, CI 2's allegations are internally contradictory, and thus the Court need not (and should not) assume them to be true. *E.g.*, *Lenart v. Coach Inc.*, 131 F. Supp. 3d 61, 67 (S.D.N.Y. 2015). CI 2 alleges that Textron ran "[a] 2017 sales program," which cost "$15-20 million," and which apparently *succeeded* in "dump[ing] aged inventory," but that rather than "keep dealers clean," Textron—at some unspecified future date—"filled them back up with more aged inventory from 2015-17, thus leading to terrible inventory positions in mid-to-late 2018." (SAC ¶ 76.) These allegations are consistent with Donnelly's representation that during 2017 Textron was making progress in reducing the stock of aged inventory inherited from Arctic Cat. CI 2's criticism that Textron undermined its own progress at some later date cannot support a fraud claim, not only because it includes MY 2017 vehicles (which are not relevant here), but also because it does not say *when* Textron allegedly did so, and thus does not provide a basis to conclude that any of Donnelly's statements were false "when made." *ATSI*, 493 F.3d at 105.

Finally, Plaintiff's inventory-related allegations fail to state a claim because Donnelly's challenged statements are non-actionable puffery. What Donnelly said was that dealers were able

11

to clear some unspecified amount of "older [snow] inventory" during the fourth quarter of 2017 (Ex. E at 4), that Textron's efforts "yielded a lot of result" and "pretty significant reductions" during 2017 (Ex. G at 18-19), and that 2017 "was great in terms of burning down a lot of the inventory," although Donnelly did not "have those numbers at my fingertips here" (Ex. I at 15). The Second Circuit has often repeated that "[u]p to a point, companies must be permitted to operate with a hopeful outlook," and that therefore "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174. Donnelly's statements respect that principle. Each one is "plainly an expression of optimism that is too indefinite to be actionable under the securities laws." *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998).

### B.    Textron's Forward-Looking Opinion Statements About Arctic Cat and Textron's Future Performance Are Not Actionable.

Plaintiff challenges three statements Donnelly and Connor made about Arctic Cat and Textron's future prospects. The first occurred during the January 31, 2018 earnings call (SAC ¶ 111), when Donnelly and Connor answered "yes" when asked if they believed Arctic Cat was "going to hit the target of being accretive this year." (Ex. E at 27.) The second comes from the July 18, 2018 earnings call. (SAC ¶ 133.) Donnelly said:

> I think we are seeing profit improvement at Arctic Cat and we would continue to expect to see incremental margins frankly overall in our Industrial segment improving as the year goes on. . . . [W]e will certainly expect to see positive progression here through the balance of the year. . . . I think the end market of all the data I see is positive here in the last couple of months.

(Ex. I at 19.) Finally, during the October 18, 2018 earnings call, Donnelly said he did not expect Textron to incur an impairment of goodwill or intangible assets. (SAC ¶ 146; Ex. K at 21.)

As a matter of law, all of these statements are statements of opinion. That is so either because "they express [Donnelly or Connor's] expectations for the future rather than presently existing, objective facts," *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015)

12

(collecting cases), or because they are introduced by phrases like "I think" or "we expect," *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-84, 187 (2015).  Because they are statements of opinion, they can be actionable only in three narrow circumstances, none of which applies here.  *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016).

First, these opinion statements can be actionable if Donnelly or Connor did not subjectively believe them, *id.*, which Plaintiff does not allege.  Second, they can be actionable if they were made in conjunction with statements of "supporting fact" that "were untrue," *id.*, but that does not apply here, either, because—as explained above—every allegedly problematic aspect of these comments is a pure expression of opinion because it either states an expectation about the future or is introduced by a phrase like "I think" or "we expect."  That means these opinion statements can be actionable only if Donnelly or Connor omitted material "facts about how [they] formed [their] opinion[s]."  *Omnicare*, 575 U.S. at 188.  Plaintiff alleges nothing on this score—for instance, nothing suggesting Donnelly or Connor failed to consult with relevant personnel, or otherwise ventured opinions without the preparation that a reasonable investor would have expected.  All Plaintiff alleges is that Donnelly's and Connor's opinions may have been contrary to some of the facts.  (SAC ¶¶ 134-135.)  But that does not suffice, because "[a] reasonable investor does not expect that *every* fact known to an issuer supports its opinion statement," and thus "[a]n opinion statement . . . is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Omnicare*, 575 U.S. at 189-90.

In addition to being non-misleading opinion statements, the above representations are non-actionable for the independent reason that they fall within the PSLRA's safe harbor.  That is because they were "forward-looking statement[s]" (and identified as such) and were "accompanied by meaningful cautionary statements."  15 U.S.C. § 78u-5(c)(1)(A)(i).  Every earnings call began

13

by stating that Donnelly and Connor would be "discussing future estimates and expectations during our call today. These forward-looking statements are subject to various risk factors which are detailed in our SEC filings and in today's press release." (Ex. E at 3; Ex. I at 3; Ex. K at 3.) Those risk factors included "[d]ifficulty or unanticipated expenses in connection with integrating acquired businesses," as well as "[t]he risk that acquisitions do not perform as planned, including, for example, the risk that acquired businesses will not achieve revenues and profit projections." (Ex. F at 10; Ex. J at 32; Ex. L at 33.) Textron also provided a meaningful disclosure of the reasons why "[a]cquisitions involve risks and uncertainties that could result in our not achieving expected benefits." (Ex. F at 12.) Because Textron "directly acknowledged the very risks [Plaintiff] fault[s] for [its] losses," *Gissin v. Endres*, 739 F. Supp. 2d 488, 508 (S.D.N.Y. 2010), the safe harbor protects these comments from liability.

## C.    Textron's Integration-Related Statements Were Not False or Misleading.

Plaintiff challenges certain statements Textron made about its progress "integrating" Arctic Cat into Textron Specialized Vehicles. Plaintiff begins with Donnelly's statement on the January 31, 2018 earnings call that "we've successfully integrated the integration of Arctic Cat." (SAC ¶ 109; Ex. E at 5.) Plaintiff alleges that this statement was false or misleading because, "according to CIs 1-10, Textron had failed to integrate departments for parts and service, computer systems, warranties, and technical assistance; the Company's efforts to consolidate production facilities hindered new product development and caused engineering problems, and product delays; and Defendants' combination of the TSV and Arctic Cat dealer networks was alienating Arctic Cat dealers and exacerbating the aged inventory glut." (SAC ¶ 110.)

There are many problems with this allegation. For starters, Plaintiff ignores that during this same call, Donnelly said "our integration of Arctic Cat continues," and also—referring to Textron Specialized Vehicles more generally—"there's obviously still work to do in finishing the

14

integration." (Ex. E at 4, 21.) So Donnelly in no way said or implied "mission accomplished." (SAC ¶ 72). This alone means Plaintiff's objections cannot support a claim of securities fraud.

Beyond that, Donnelly's statement is a classic example of non-actionable puffery or permissible corporate optimism. The Second Circuit and this Court have long recognized that statements about "integration" cannot underpin a claim of securities fraud because integration as a concept is too vague to engender reasonable reliance, at least when—as here—the statements are not accompanied by concrete or specific benchmarks. As Judge Rakoff has explained, "'integration' is far too loose and uncertain a term on which to premise a claim of securities fraud." *In re Razorfish, Inc. Sec. Litig.*, 2001 WL 1111502, at *2 (S.D.N.Y. Sept. 21, 2001). Notably, *Razorfish* involved no fewer than seven statements about "integration" that were more definitive than Donnelly's. *Id.* at *1-2. Second Circuit decisions are in full accord. In *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 392 (2d Cir. 2015), the Second Circuit held that "statements . . . including, for example, '[t]he integration of ABN AMRO is off to a promising start,' '[our] positive view . . . has been confirmed,' [and] 'we are happy we bought what we thought we bought,'" were "inactionable puffery. Statements of general corporate optimism, such as these, do not give rise to securities violations," notwithstanding the plaintiff's allegation that "ABN AMRO was suffering significant losses and the acquisition was 'an unmitigated disaster for RBS.'" Similarly, in *Rombach*, 355 F.3d at 172, 174, the Second Circuit held that "statements that the integration of Family Golf's new sites was 'well underway' and progressing smoothly" were non-actionable "expressions of puffery and corporate optimism [that] do not give rise to securities violations," because "[u]p to a point, companies must be permitted to operate with a hopeful outlook." Donnelly's comments are no different than any of those. As Judge Sullivan put it recently, "the law is clear that statements

15

which are 'too general to cause a reasonable investor to rely on them' are not actionable," and this principle applies to statements "that integration 'was smooth and seamless'" and that an acquisition "'was a big step towards our goal' and has 'been everything we hope for.'" *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *12 (S.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019). These statements, the court concluded, "are mostly rosy affirmations that do not contain guarantees, and are far too vague to be actionable." *Id.* The same is true here.

Presumably trying to make Donnelly's statement into something other than non-actionable puffery, Plaintiff asserts that before the Class Period, "Defendants represented that integration objectives included: 1) consolidating operations by combining Arctic Cat's and TSV's dirt vehicles production facilities; 2) enhancing the dealer network by combining Arctic Cat's approximately 800 dealers with TSV's dealers; and 3) charges of approximately $30-40 million in 2017." (SAC ¶¶ 55, 110.) Far from helping Plaintiff, however, this assertion sinks its theory, because if "integration" referred to these three goals, then Textron undoubtedly misled nobody, because it is clear on the face of the Complaint that each of these alleged goals was accomplished.

The first of the supposed integration objectives—combining dirt vehicle production facilities—was never clearly articulated by Textron. So far as the Complaint indicates, the closest Donnelly came was saying, in October 2017, that "[w]e did move all of our dirt manufacturing out of Augusta up to Thief River." (SAC ¶ 64.) Plaintiff does not allege that this representation was false. And in any event, none of Plaintiff's alleged CIs says that dirt vehicle production facilities were *not* combined; at most, CI 4 alleges that "departments for parts and service or computer systems" had not been "integrated" (SAC ¶ 85), an allegation that is not about production facilities and is not specific to dirt vehicles. The second alleged integration goal—combining Arctic Cat and Textron dealer networks—indisputably did happen. To be sure, Plaintiff alleges that "[i]n or

16

around April 2018," Textron realized that some Arctic Cat dealers were "unprofitable," and thus "began a strategic review of the dealer network" that resulted in "a few rounds of terminations commencing the summer of 2018."  (SAC ¶¶ 97, 101.)  But there is nothing inconsistent about combining dealer networks and culling unprofitable dealers.  To the contrary, each pursues the same goal:  building a larger, stronger dealer network.  As for the third alleged integration goal— investing "charges of approximately $30-40 million" that Textron announced in 2017—Plaintiff acknowledges that Textron did, in fact, complete that objective.  (SAC ¶ 117.)  In short, if Plaintiff is right about what "integration" meant, then Plaintiff itself has shown why Textron could not have misled anyone about the progress of the Arctic Cat integration.

Finally, Plaintiff tries to grab hold of a line that appears in Textron's 2017 10-K, 2018 Q1 10-Q, and 2018 Q2 10-Q, namely, that "we initiated a restructuring plan in the first quarter of 2017 to integrate [Arctic Cat] into our Textron Specialized Vehicles business," and "[the] Arctic Cat plan [is] substantially completed."  (SAC ¶¶ 116, 125, 136.)  But this language cannot support a claim of securities fraud either, for two independent reasons.  First, these positive comments about a "restructuring plan" whose objective was "integrat[ion]" represent non-actionable puffery or permissible optimism, for all the reasons explained above.  Second, to the extent the terms "Arctic Cat plan" and "integrate" had any meaning that was concrete enough to engender reasonable reliance, they did *not* convey the loose or colloquial meaning Plaintiff suggests.  Rather, as explained immediately below, if the 10-K and 10-Qs gave those terms any concrete meaning at all, it was a narrow and specific meaning:  they referred to Textron's decision in the first quarter of 2017 to record a $40 million "Special Charge" related to Arctic Cat, and they described the "Arctic Cat plan" as "substantially completed" in the sense that Textron had nearly finished spending that $40 million by the time it filed the 10-K and 10-Qs in 2018.

17

The context Plaintiff omits makes this clear.  For starters, the 10-K stated that Textron "recorded special charges of $40 million in 2017 related to the Arctic Cat acquisition, which included restructuring, integration and transaction costs." (Ex. F at 18.)  It then elaborated:

> In connection with the acquisition of Arctic Cat, . . .we initiated a restructuring plan in the first quarter of 2017 to integrate this business into our Textron Specialized Vehicles business within the Industrial segment and reduce operating redundancies and maximize efficiencies.  Under the Arctic Cat plan, we recorded restructuring charges of $28 million in 2017. . . .  In addition, we recorded $12 million of acquisition-related integration and transaction costs in 2017. . . .  [The] Arctic Cat plan [is] substantially completed with the majority of the remaining cash outlays . . . expected to be paid in the first half of 2018.

(*Id.* at 62-63.)  Continuing the same theme, the 2018 Q1 10-Q stated—again under the heading "Special Charges"—that "[i]n the first quarter of 2017, special charges were related to . . . the Arctic Cat acquisition. . . .  There were no special charges recorded in the first quarter of 2018," and the Arctic Cat plan was "substantially completed with the majority of the remaining cash outlays . . . expected to be paid in the remainder of 2018." (Ex. H at 17.)  The 2018 Q2 10-Q includes nearly identical language. (Ex. J at 18.)

These quotations make clear that *if* the terms "Arctic Cat plan" and "integration" are not puffery, they at most were used narrowly to refer to Textron's decision to record a $40 million "Special Charge" in the first quarter of 2017, which Plaintiff concedes happened as stated.  (SAC ¶ 117.)  Thus, assuming a reasonable investor could have relied at all upon the statement that the "Arctic Cat plan" was "substantially completed," he or she could only have understood it to mean that Textron had finished spending most of the $40 million in "cash outlays" it had set aside and recorded as a special charge in early 2017.  *See, e.g.*, *Omnicare*, 575 U.S. at 190 (explaining that a reasonable investor "reads each statement" in an SEC filing "in light of all its surrounding text").  Contrary to Plaintiff's suggestion, nothing in the 10-K and the 10-Qs suggested that Arctic Cat and Textron were operating in perfect harmony.  It was therefore in no way false or misleading for

18

Textron to state that the "Arctic Cat plan" was "substantially completed," even assuming there were still some operational difficulties that needed to be resolved on the ground.

### D.    Textron's SOX Certifications Are Not Actionable.

Plaintiff alleges that investors were misled by Textron's 2017 10-K, 2018 Q1 10-Q, and 2018 Q2 10-Q, because they all contained SOX Certifications, in which Donnelly and Connor stated that "[b]ased on my knowledge," none of the filings contained a material misrepresentation, and each "fairly present[ed]" Textron's "financial condition, results of operations and cash flows." (SAC ¶¶ 119-120, 127-128, 138-139.)  This allegation fails because those filings did not contain any material misrepresentation—for the reasons already discussed—and also because Plaintiff has "failed to allege any facts showing that [Donnelly or Connor] did not believe what [they] said," and has not properly alleged that Donnelly or Connor had actual knowledge of any material misrepresentations.  *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016).

*    *    *

Not one of the statements Plaintiff challenges was false or misleading.  For that reason alone, the Complaint should be dismissed in its entirety.  That includes the § 20(a) claim, which fails alongside the § 10(b) and Rule 10b-5 claims.  *ATSI*, 493 F.3d at 108.

## II.    PLAINTIFF'S SCIENTER ALLEGATIONS ARE DEFICIENT.

Even if Textron made any false or misleading statements, the Complaint must also "state with particularity facts giving rise to a strong inference that [Textron] acted with the required state of mind," and it must do so "with respect to each act or omission alleged to violate" the Exchange Act.  15 U.S.C. § 78u-4(b)(2)(A).  Because Textron "is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).  That is, Plaintiff must adequately plead "that an agent of

19

the corporation committed a culpable act with the requisite scienter." *Id.* Here, the only "culpable acts" Plaintiff identifies are the alleged misrepresentations spoken (or allegedly approved) by Donnelly and Connor. (*E.g.*, Compl. ¶ 128.) Thus, Plaintiff must create a strong inference that either Donnelly or Connor possessed the requisite scienter at the time each statement was made.

This means Plaintiff must create a "strong inference" that Donnelly or Connor acted with "'intent to deceive, manipulate, or defraud,'" or engaged in "reckless conduct." *ATSI*, 493 F.3d at 99 n.3. Plaintiff can do so "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 99. "For an inference of scienter to be strong, 'a reasonable person must deem it cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs*, 551 U.S. at 323) (brackets omitted). Plaintiff invokes both a motive-and-opportunity and a conscious-misbehavior theory. Neither succeeds.

## A.      The Complaint Fails to Plead Motive and Opportunity for Each of the Alleged Misrepresentations.

To plead that Textron had a "motive" to mislead investors, Plaintiff "must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiff alleges that Donnelly and Connor sold Textron shares from April 27 to May 1, 2018, and on July 27, 2018. (SAC ¶¶ 130, 140.) Even assuming those allegations suffice to plead motive with respect to the alleged misrepresentations that occurred shortly before those trades—*i.e.*, during the April 18 and July 18 earnings calls, and in quarterly reports filed on April 25 and July 26—they do *not* establish motive with respect to the alleged misrepresentations that occurred well after the trades (on the October 18 earnings call) and significantly before the trades (on the January 31 earnings call and in the 2017 10-K filed on

20

February 15), as the PSLRA requires.   15 U.S.C. § 78u-4(b)(2)(A) (requiring particularized scienter allegations "with respect to *each* act or omission alleged" (emphasis added)).

First, these trades do not create any inference that Donnelly or Connor had a motive to defraud investors on the October 18 earnings call, months later.  By then, any personal benefit would have long been realized, and Plaintiff does not allege any trades after October 18.

The same conclusion follows for the alleged misrepresentations in January and February. The question is whether stock sales at the end of April (and later) provide a strong basis to infer that Donnelly or Connor was motivated to commit fraud when they addressed investors back in January and February.  The answer is no—at least when, as here, there is no allegation that the stock sales were planned that far in advance.   The temporal gap between the alleged misrepresentations and the stock sales, coupled with the absence of any allegation that the sales were planned in early 2018, severely weakens the logical basis for inferring "that defendants misrepresented corporate performance to inflate stock prices *while they sold their own shares*." *Kalnit*, 264 F.3d at 139 (emphasis added).  In circumstances like these, it cannot be said that Plaintiff's allegations meet the test that an inference of scienter must be "more than merely plausible or reasonable—it must be cogent and *at least as compelling* as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314 (emphasis added).  In addition, accepting these allegations would greatly weaken the PSLRA's scienter pleading requirement.  "As a matter of course, corporate insiders sell company stock." *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003).  It follows that many corporate officers will be in the position of having sold company stock *at some point* after making a statement that some shareholder alleges was false or misleading.  If a plaintiff can plead motive simply by pointing to this common occurrence—without alleging a temporal nexus or premeditation—it will circumvent the PSLRA and undermine the Second

21

Circuit's repeated instruction that "[m]otives that are common to most corporate officers . . . do not constitute 'motive' for purposes of [the PSLRA's scienter] inquiry." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

### B.      The Complaint Fails to Plead Conscious Misbehavior.

Plaintiff can plead scienter for the challenged January, February, and October statements only by alleging that Donnelly or Connor acted with "conscious recklessness—*i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 312 (2d Cir. 2000)).  Plaintiff tries to do so by relying on its alleged CIs.  But as Judge Nathan recently explained, in order to plead scienter by relying on CIs, it is not enough to allege what was known to the CIs; "[a]dditionally, a plaintiff must also allege that 'the confidential sources would have known what information was communicated to senior executives.'"  *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 2019 WL 4601644, at *17 (S.D.N.Y. Sept. 23, 2019) (quoting *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008)).  The Complaint falls well short of that high bar.  Its failure to allege scienter under any theory with respect to the January, February, and October statements means this lawsuit would need to be narrowed substantially even if those statements were false or misleading.

### 1.      Conscious recklessness cannot be inferred with respect to the alleged misstatements about inventory reduction and future performance.

There are several reasons why the Complaint fails to create a strong inference that Donnelly or Connor was "consciously reckless" when they made statements about inventory levels and future performance—which, as relevant here, occurred only on the January 31, 2018 earnings call.

Just four purported CIs—CIs 2, 3, 5, and 10—claim to have been privy to their superiors' knowledge about inventory.  But none of these CIs alleges any contact with Donnelly or Connor,

22

or anyone close to them, and certainly not in January 2018. CIs 2, 3, and 5 all allege that inventory was discussed during sales calls and meetings, or in circulated reports, but collectively the only recipients or participants these CIs can identify are Collins, Jhant, Brennan, Webster, and Mottel (*see* SAC ¶¶ 76, 78, 82-83), none of whom even reported to Donnelly or Connor (*see* SAC ¶ 6). The Complaint does not allege that these individuals discussed inventory with anyone above them during this time period—not even Holleran, Collins's direct superior. And these allegations are temporally vague: CI 2 does not say when these calls or meetings began (SAC ¶ 76), CI 3 says sales calls occurred "in 2018" (SAC ¶ 78), and CI 5 claims to have circulated reports only in "early 2018" (SAC ¶ 83). These allegations are therefore doubly flawed. They imply nothing about what was known to Donnelly or Connor, and they are not temporally specific enough to create an inference that Donnelly or Connor acted with scienter in January 2018. And CI 10 alleges to have communicated about inventory only with Mottel, and only starting in April 2018. (SAC ¶ 98.)

Scienter cannot be inferred from allegations that CIs possessed material information when, as here, there is no allegation that such information was communicated to the relevant corporate officials. *See AMC Entm't*, 2019 WL 4601644, at *18; *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589-90, 591 (S.D.N.Y. 2011) (collecting cases). Plaintiff's alleged CIs are evidently low-ranking employees, but "even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants claimed against in the case, or else that the witness was privy to the individual defendants' knowledge." *Glaser*, 772 F. Supp. 2d at 589-90. Plaintiff alleges nothing close, and so cannot allege scienter. *Id.*; *AMC Entm't*, 2019 WL 4601644, at *18; *Am. Express Co.*, 2008 WL 4501928, at *8.

Finally, Plaintiff cannot plead that Donnelly and Connor acted with scienter when, in January 2018, they said they expected Arctic Cat "to hit the target of being accretive" that year.

23

(SAC ¶ 111; Ex. E at 27.)  Plaintiff is trying to plead "fraud by hindsight," *i.e.*, alleging that solely because Donnelly and Connor incorrectly predicted what would happen, they must have committed fraud.  *Novak*, 216 F.3d at 309.  This theory is unsupported, and impermissible.  *Id.*

### 2.    Conscious recklessness cannot be inferred with respect to the alleged misstatements about integration.

The Complaint is similarly deficient when it tries to plead that Donnelly and Connor were "consciously reckless" in making positive statements about Arctic Cat's integration in January and February 2018.  The Complaint alleges a hodgepodge of disconnected "observations" supposedly made by various CIs, but—with one exception discussed below—there is *no* allegation that any of these observations was shared with anyone close to Donnelly or Connor, including Holleran, and none of these observations is alleged with any temporal specificity.  That is fatal.  *Glaser*, 772 F. Supp. 2d at 589-91; *AMC Entm't*, 2019 WL 4601644, at *18; *Am. Express Co.*, 2008 WL 4501928, at *8.  Moreover, these observations are not remotely the sorts of issues that represent "obvious signs of fraud," or that Donnelly or Connor's failure to know could be described as "an extreme departure from the standards of ordinary care."  *S. Cherry St.*, 573 F.3d at 109.  For instance, Plaintiff nowhere explains why Donnelly or Connor should have known—or suspected fraud— even if "approximately 60 . . . 2018 Havoc units . . . experienced primary clutch alignment problems," or two dirt vehicles had "compliance evaluations conducted even while they were going out the door."  (SAC ¶¶ 91, 93.)  These and the other observations are routine operational issues and plainly inadequate to create a "strong inference" of scienter at Textron's highest level.

The Complaint identifies only one allegedly adverse fact that was shared with Donnelly or Connor:  CI 5, a former Arctic Cat dealer, allegedly sent Donnelly "multiple voicemails and . . . text messages . . . looking for answers regarding . . . unfulfilled orders and [unspecified] engineering issues."  (SAC ¶ 94.)  But "to adequately plead scienter, plaintiffs must plead facts

24

showing that defendants knew an omission was material," *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015), and there is no way that concerns expressed by a single dealer—one out of 800—would be material to a reasonable investor. *See ECA*, 553 F.3d at 197. Moreover, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak*, 216 F.3d at 309. Making positive statements about integration, notwithstanding complaints from one dealer out of 800, fully aligns with that principle.

3. **Conscious recklessness cannot be inferred with respect to the alleged misrepresentation about impairment of goodwill or intangible assets.**

Plaintiff cannot allege that Donnelly acted with scienter when he said he did not think Textron's third quarter results would lead to an impairment of goodwill or intangible assets. (SAC ¶ 146; Ex. K at 21.) This is another impermissible attempt to plead "fraud by hindsight." *Novak*, 216 F.3d at 309. It is well established that "[e]stimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). It follows that Donnelly's prediction about the result of that upcoming evaluation is not actionable. And "even if the second amended complaint did plausibly plead that defendants were aware of facts that should have led them to begin interim impairment testing earlier, such pleading alone would not suffice to state a securities fraud claim after *Fait*. Plaintiff['s] second amended complaint is devoid even of conclusory allegations that defendants did not believe in their statements of opinion regarding [Textron's] goodwill at the time they made them." *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012). That holding applies here to the letter.

## CONCLUSION

The motion to dismiss should be granted.

25

Dated:  New York, New York          /s/ Sandra C. Goldstein
        March 6, 2020               _____

                                    Sandra C. Goldstein, P.C.
                                    Stefan Atkinson, P.C.
                                    Kevin M. Neylan, Jr.
                                    KIRKLAND & ELLIS LLP
                                    601 Lexington Avenue
                                    New York, New York 10022
                                    Telephone:  (212) 446-4800
                                    Facsimile:  (212) 446-4900
                                    sandra.goldstein@kirkland.com
                                    stefan.atkinson@kirkland.com
                                    kevin.neylan@kirkland.com

                                    *Counsel for Defendants*

26