**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE TEXTRON, INC. SECURITIES
LITIGATION

No. 19-cv-7881 (DLC)

**LEAD PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox
Donald R. Hall
Jeffrey P. Campisi
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: ffox@kaplanfox.com
        dhall@kaplanfox.com
        jcampisi@kaplanfox.com

*Lead Counsel for Lead Plaintiff IWA
Forest Industry Pension Plan and the
Proposed Class*

March 27, 2020

**TABLE OF CONTENTS**

**Page(s)**

Table of Authorities ........................................................................................................ iii

I.  PRELIMINARY STATEMENT ............................................................................. 1

II.  FACTS AND DEFENDANTS' SCHEME TO DEFRAUD INVESTORS ........................... 2

    A.  Defendants' Plan to Turn Around and Integrate Arctic Cat ...........................................3

    B.  Defendants' Misrepresentations Created the False Impression that Arctic Cat's Aged Inventory was Significantly Reduced, that the Integration was Going Well, and that Arctic Cat Was Positioned to Be Profitable in 2018 .................4

        1.  Defendants Misled Investors About Reduction of Non-Current Snow and Dirt Vehicles ...................................................................................... 5

        2.  Defendants Misled Investors About the Purported Success of Arctic Cat's Integration.......................................................................................... 6

        3.  By April 2018, the Glut of Aged Inventory Had Not Abated, and Defendants Planned to Jettison the Acquired Arctic Cat Dealer Network ............. 7

        4.  By June 2018, Defendants Began Terminating Dealers ......................................... 7

    C.  The Truth Begins to Be Revealed ................................................................................8

III.  ARGUMENT ............................................................................................. 9

    A.  Legal Standard .........................................................................................................9

    B.  The Complaint Alleges Facts Supporting a Cogent and Compelling Inference of Scienter ...............................................................................................................10

        1.  The Complaint Pleads a Strong Inference of Scienter for the Individual Defendants ............................................................................................. 11

        2.  The Complaint Pleads a Strong Inference of Corporate Scienter ......................... 14

    C.  The Complaint Alleges Defendants Made Material Misrepresentations and Failed to Disclose Material Information .....................................................................15

        1.  The Alleged Inventory-Related Misrepresentations are Actionable..................... 17

        2.  The Alleged Misrepresentations About Arctic Cat's and Textron's Performance are Actionable......................................................................... 19

3.  The Alleged Misrepresentations About Arctic Cat Integration are
    Actionable ........................................................................................................... 22

IV.  CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ark. Teacher Ret. Sys. v. Bankrate, Inc.*,
  18 F. Supp. 3d 482 (S.D.N.Y. 2014) .................................................................................. 19

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) .................................................................................................... 9

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................................ 9

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) ............................................................................ 12

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ................................................................ 21

*Cromer Fin. Ltd. v. Berger*,
  137 F. Supp. 2d 452 (S.D.N.Y. 2001) ............................................................................ 10

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................................... 16, 19

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018) ...................................................................... 14, 23

*Ho v. Duoyon Global Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) ............................................................................ 15

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v.*
  *Royal Bank of Scotland Grp., PLC*,
  783 F.3d 383 (2d Cir. 2015) ........................................................................................... 23

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ............................................................................. 23

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ............................................................................ 21

*In re Barrick Gold Sec. Litig.*,
  2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015) .................................................................. 14

*In re Computer Assocs. Class Action Secs. Litig.*,
  75 F. Supp. 2d 68 (E.D.N.Y. 1999) ............................................................................... 20

*In re Cooper Sec. Litig.*,
  691 F. Supp. 2d 1105 (C.D. Cal. 2010) .................................................................. 23

*In re Fairway Grp. Holding Corp. Sec. Litig.*,
  2015 WL 249508 (S.D.N.Y. Jan. 20, 2015) ........................................................... 15

*In re MGM Mirage Sec. Litig.*,
  2013 WL 5435832 (D. Nev. Sept. 26, 2013) .......................................................... 21

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) ..................................................................... 15

*In re Nash Finch Co.*,
  502 F. Supp. 2d 861 (D. Minn. 2007) ..................................................................... 23

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014) ....................................................................... 15

*In re Oxford Health Plans, Inc.*,
  187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................. 20

*In re Pall Corp.*,
  2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009) ........................................................ 10

*In re Razorfish, Inc. Sec. Litig.*,
  2001 WL 1111502 (S.D.N.Y. Sept. 21, 2001) ........................................................ 23

*In re Refco, Inc Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007) ..................................................................... 13

*In re Salix Pharm., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .......................................................... 14

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ............................................................................... 10, 14

*In re Scottish Re Grp. Sec. Litig.*,
  524 F. Supp. 2d 370 (S.D.N.Y. 2007) ..................................................................... 14

*In re Van der Moolen Holding N.V. Sec. Litig.*,
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) ............................................................... 10, 21

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) .................................................................................... 21

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) .................................................................................... 25

*Manavazian v. Atec Grp., Inc.*,
  160 F. Supp. 2d 468 (E.D.N.Y. 2001) ................................................................................. 19

*Meyer v. Jinkosolar Holdings Co., Ltd*.,
  761 F.3d 245 (2d Cir. 2014)................................................................................................ 21

*Novak v. Kasaks*,
  216 F.3d 300, 315 (2d Cir. 2000)................................................................................. 10, 19

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)............................................................................................................ 20

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*,
  595 F.3d 86 (2d Cir. 2010).................................................................................................. 16

*P. Stolz Family P'ship L.P. v. Daum*,
  355 F.3d 92 (2d Cir. 2004).................................................................................................. 21

*Pearlstein v. Blackberry Ltd.*,
  2018 WL 1444401 (S.D.N.Y. Mar. 19, 2018) .................................................................... 20

*Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012)................................................................................. 15

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015)............................................................................. 14, 15

*Rescuecom Corp. v. Google Inc.*,
  562 F.3d 123 (2d Cir. 2009).............................................................................................. 9, 25

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)........................................................................................... 21, 23

*Rothman v. Gregor*,
  220 F.3d 81 (2d Cir. 2000).................................................................................................. 14

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999).................................................................................................. 12

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)................................................................................................ 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd*.,
  551 U.S. 308 (2007)......................................................................................................... 9, 10

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016)................................................................................................ 20

*Van Dongen v. CNinsure Inc.*,
    951 F. Supp. 2d 457 (S.D.N.Y. 2013)................................................................. 12, 15

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991)................................................................................................. 19

## **Statutes**

15 U.S.C. § 78j.................................................................................................................. 10

15 U.S.C. § 78u-4 ........................................................................................................... 10

15 U.S.C. § 78u-4(b)(1) .................................................................................................. 16

## **Rules**

Fed. R. Civ. R. 9(b).................................................................................................... 9, 10

Fed. R. Civ. R. 12(b)(6) ............................................................................................. 9, 16

Court-appointed Lead Plaintiff, IWA Forest Industry Pension Plan ("Plaintiff") respectfully submits this opposition to Defendants' motion to dismiss ("MTD") (ECF No. 41) the Second Amended Complaint ("Complaint") (ECF No. 39).

## I.    PRELIMINARY STATEMENT

This case concerns Defendants' acquisition of a company, Arctic Cat, Inc. ("Arctic Cat"), with a known problem—a substantial inventory of aged snowmobiles ("snow" products) and recreational or all-terrain vehicles ("dirt" products). At the time of acquisition in early 2017, Defendants announced their plan to clear out the aged inventory, improve the dealer network, and complete integration of Arctic Cat into Textron's Specialized Vehicles ("TSV") subsidiary by 2018 to make Arctic Cat accretive to earnings in 2018. At all points through 2017, Defendants indicated that the plan was on schedule. For example, in July 2017, they said they "continue to make progress with the integration of Arctic Cat as we've begun consolidating operations and enhancing our dealer network." Late in the year, they assured investors that "we're continuing to execute to our integration plan and we remain on track for the business to be accretive in earnings in 2018," that "[t]he inventory levels that we knew we needed to drive down in the dealer base are happening" and that "[r]etail sales are up considerably."

Finally, at the start of the Class Period on January 31, 2018, Defendants said they had successfully integrated Arctic Cat and "[w]ith these accomplishments behind us and improving end markets, we're well-positioned coming into 2018." Throughout the Class Period, Defendants continued to assert that Arctic Cat was on track to be accretive in 2018 based on these achievements—until October 18, 2018, when Defendants shocked the market (after they had already sold millions of their own stock) by disclosing that the Industrial segment's profit declined by 98% due to continued heavy discounting in TSV and delays in releasing new dirt products,

sending Textron share prices tumbling.

In their motion to dismiss, Defendants ask the Court to believe that none of their Class Period statements were materially false or misleading—that Plaintiff (and all of the analysts quoted in the Complaint) simply misunderstood what they meant about clearing "older" inventory and integrating Arctic Cat—and that Arctic Cat was, in fact, on track to turn a profit in 2018 until the third quarter, when profit abruptly dropped ***by 98%*** compared to the previous-year third quarter and Arctic Cat fell an ***entire year behind the schedule*** to get new dirt products in the sales channel and reach profitability. They ask the Court to find that Defendants did not know about the inventory, discounting, dealer, and integration problems before the third quarter, despite the fact that Defendants Donnelly and Connor sold hundreds of thousands of shares of Textron stock for millions of dollars in profits right after assuring investors in April and July 2018 that "we are seeing profit improvement in Arctic Cat[.]" Because they cannot offer innocent explanations for these sales, Defendants ***concede*** that there is adequate motive evidence for their statements in April and July 2018, but ask the Court to reject the Complaint's detailed and deeply-sourced allegations of recklessness as to their January, February, and October 2018 alleged misrepresentations, including information provided by ***ten*** former TSV managers and employees and Arctic Cat dealers with direct knowledge of the inventory, integration, and dealer problems that TSV management was dealing with throughout the Class Period. But on a motion to dismiss, Defendants are not entitled to these inferences, and this matter is not, as Defendants suggest, a case of fraud by hindsight. It is fraud, and their motion should be denied.

## II.   FACTS AND DEFENDANTS' SCHEME TO DEFRAUD INVESTORS

Textron is a manufacturer and distributor of small aircrafts and recreational vehicles. ¶38.[1]

---

[1] Citations to "¶ _" refer to paragraphs of the Complaint.

On March 6, 2017, Textron expanded its recreational vehicle business by acquiring Arctic Cat, which provided an opportunity to sell Textron's existing line of dirt vehicles through Arctic Cat's network of 800 dealers. ¶¶41, 45-47, 51.

### A. Defendants' Plan to Turn Around and Integrate Arctic Cat

One immediate challenge Defendants faced after acquiring Arctic Cat was the excess inventory of non-current snow and dirt products, creating difficulties managing the product sales channel. ¶¶4-5, 53-54. As Defendant Donnelly stated, clearing out aged inventory was "job one." ¶60. In addition, Defendants represented that the other integration objectives were: 1) consolidating operations by combining Arctic Cat's and TSV's planning and production systems and facilities; 2) enhancing the dealer network by combining Arctic Cat's approximately 800 dealers with TSV's dealers; and 3) taking charges of approximately $30-40 million in 2017 for acquisition-related restructuring and transaction costs. ¶55. To address the excess inventory built up in the sales channel and other integration objectives, Defendants set forth a plan to turnaround Arctic Cat: 1) throughout 2017 "clear out" non-current snow and dirt inventory and integrate Arctic Cat and TSV's planning and production facilities, and 2) complete the integration of Arctic Cat by 2018, to unlock the acquisition's "synergies", and position TSV for earnings growth, or "accretion." ¶56.

The Arctic Cat turnaround plan was led by senior Textron executives within the Company's Industrial segment, including Kevin Holleran ("Holleran"),[2] President and CEO of Textron's Industrial segment, and Director, President and CEO of TSV, who reported directly to Defendant Donnelly; 2) John Collins ("Collins"), TSV Vice President, Consumer, who reported to Holleran; 3) Philip Jhant ("Jhant"), TSV Director of North American Sales and Director of Strategy and

---

[2] The Complaint erroneously refers to him as Scott Holleran (*e.g.,* ¶6).

Product Management; and 4) Christel Mottel ("Mottel"), Director, TSV Sales Operations. ¶6. The Arctic Cat turnaround team monitored the progress of the plan on a regular basis by accessing Arctic Cat dealer sales and inventory data and reports (*e.g.,* ¶¶81-83, 98-99); and through regular meetings, including meetings and communications with sales representatives or Arctic Cat dealers (*e.g.,* ¶¶76, 78, 94). The Arctic Cat turnaround team leaders, Holleran and Collins, met with Defendants Donnelly and Connor multiple times at the Company's Providence, Rhode Island headquarters before and during the Class Period. ¶6.

One of the ways in which Textron sought to "clean up" inventory was through rebates. Throughout 2017 Defendant Donnelly represented that the rebate programs were effective in clearing out non-current inventory. Furthermore, Defendants represented that the Arctic Cat turnaround plan was on track, including consolidation of dirt vehicle planning and production systems and facilities, positioning Arctic Cat to be accretive to earnings in 2018. ¶¶57-64.

### B. Defendants' Misrepresentations Created the False Impression that Arctic Cat's Aged Inventory was Significantly Reduced, that the Integration was Going Well, and that Arctic Cat Was Positioned to Be Profitable in 2018

Prior to Textron's acquisition of Artic Cat, Artic Cat was a public company, and investors could discern information about its financial condition, including its inventory levels, from its public filings. But after it was acquired, Textron did not report Artic Cat's financials separately, instead including them as part of Textron's Industrial segment. Thus, investors could no longer tell from Textron's financial statements how Artic Cat was performing, which heightened the importance of any statements made by Defendants regarding Artic Cat. By January 31, 2018, the start of the Class Period, Defendants represented that the Arctic Cat turnaround plan was successful, that the integration objectives had been achieved, and that Arctic Cat was positioned to be profitable in 2018. ¶¶65-67, 107-12. Defendant Donnelly said, "we saw improved demand in the snow retail channel, allowing dealers to clear older inventory and drive 2018 model sales,"

that "we successfully integrated" Arctic Cat, that end markets were improving and Arctic Cat was "well positioned." ¶¶107, 109. He added that, with "these accomplishments behind" Textron, Arctic Cat would be accretive to earnings in 2018. ¶111.

### 1. Defendants Misled Investors About Reduction of Non-Current Snow and Dirt Vehicles

Defendants' representations convinced sophisticated research analysts, who participated in Textron's regular conference calls, that Arctic Cat's inventory troubles were resolved, and that the integration plan—reducing aged inventory, consolidating production facilities, and enhancing the dealer network—was going well, all of which positioned Arctic Cat to be profitable in 2018. ¶¶68-70, 113-15. However, according to numerous former Textron employees and Arctic Cat dealers, the true state of the Arctic Cat business and end markets was dramatically different. ¶¶71-91.

By January 2018, according to several confidential informants ("CIs"), Arctic Cat dealers were sitting on a glut of approximately 22-25,000 non-current snow and dirt vehicles, reflecting weak end-market demand and that the problems plaguing the Arctic Cat sales channel had not, in fact, been cleaned up. ¶¶75, 77-79, 83. This was a highly significant inventory level, as the 10,000 snow units represented approximately 55% of the Company's total 2017 snow sales and the 15,000 dirt units equaled roughly 15-23% of total 2017 dirt sales. ¶79. Members of Arctic Cat's turnaround team, including Collins and Mottel, were well aware of the aged snow and dirt inventory glut through their regular receipt of inventory reports during the Class Period, through their meetings with sales representatives and weekly sales calls in 2018, and through access to internal inventory reports or external reports from Wells Fargo. ¶¶78, 81-83. Several CIs warned Collins, Jhant, and other members of the Arctic Cat turnaround team about the aged inventory problems weighing on dealers. ¶¶76, 83.

Contrary to Defendants' representations, the level of aged snow and dirt inventory at Arctic

Cat dealers had not significantly declined since the Arctic Cat acquisition. ¶76. According to several CIs, any reduction in non-current snow and dirt products held by dealers in 2017 was only temporary because Defendants continually refilled dealers with more aged inventory from 2015-17. ¶¶76, 80. By the beginning of the Class Period, rather than being positioned for profitability, the aged inventory overhang at Arctic Cat dealers indicated that end markets had not significantly improved. ¶¶79-80.

## 2. Defendants Misled Investors About the Purported Success of Arctic Cat's Integration

In addition to failing to substantially reduce non-current snow and dirt inventory, Defendants' other integration objectives—combining the Arctic Cat and TSV dealer networks, as well as the dirt planning and production facilities and systems —had been derailed since at least the beginning of the Class Period. ¶¶85-96. Defendants' efforts to combine Arctic Cat and Textron's dirt production facilities and operations across at least three locations (St. Cloud and Thief River Falls, Minnesota, and Augusta, Georgia), were at least a year behind schedule, as Defendant Donnelly later admitted. ¶143. At the beginning of the Class Period, senior TSV management was still debating reporting structure and product design and production, there were no plans for production and funding future-year models, and engineering problems were plaguing dirt vehicle production. ¶¶88-93. Furthermore, Arctic Cat and TSV had not integrated departments for parts and service. ¶¶85-87. Another pillar of the Arctic Cat turnaround plan—the combination of TSV dealers with Arctic Cat's network of 800 dealers—was a disaster because Textron's effort to cross-sell products through the combined network put too many dealers within certain territories in competition against each other, making it harder for dealers to reduce the glut of aged inventory and damaging dealer profitability. ¶¶95-96.

According to CIs, these integration challenges caused production delays and lost sales, and

the Arctic Cat turnaround team, including Collins, Holleran, and Jhant, as well as Defendant Donnelly, were aware of these difficulties and their effects on Arctic Cat dealers. ¶¶85-86, 88, 94.

### 3. By April 2018, the Glut of Aged Inventory Had Not Abated, and Defendants Planned to Jettison the Acquired Arctic Cat Dealer Network

By the second quarter of 2018, as a result of the continued glut of thousands of non-current aged snow and dirt units and other integration failures, Arctic Cat's end market had deteriorated so much that the Arctic Cat turnaround team began a plan to jettison the crown jewel of the acquisition—the network of approximately 800 dealers. ¶¶98-101. In sharp contrast to what numerous CIs observed, on April 18, 2018, Defendant Donnelly falsely represented to investors that "both dirt and snow inventory reductions" had happened, that there were "significant reductions in that aged inventory" and that there was "lower inventory of aged stuff." ¶123. On April 25, 2018, Defendants Donnelly and Connor represented in an SEC filing that the Arctic Cat plan was "substantially completed." ¶125.

Within two days, starting on April 27, 2018, Defendants Donnelly and Connor began to behave in a manner that was inconsistent was their past conduct through suspiciously-timed sales of millions of dollars of Textron stock. ¶¶33, 35, 130, 158. In the nearly 14 months since the Arctic Cat acquisition, neither Individual Defendant sold any stock. *Id*. Between April 27 and May 1, 2018, Defendants Donnelly and Connor sold Textron shares for net proceeds of $3 million, and $3.9 million, respectively. ¶130.

### 4. By June 2018, Defendants Began Terminating Dealers

In or around late May/early June 2018, the Arctic Cat turnaround team conducted a national sales meeting at the TSV corporate office in Augusta, Georgia which was headed by Collins and Jhant. ¶102. While reviewing dealer inventories and sell-through reports, Collins informed the attendees that he was preparing to make a presentation for Defendant Donnelly. ¶102. Based on

the inventory reports Collins received on a regular basis showing that the overstock of non-current snow and dirt inventory had not substantially declined, Defendant Donnelly was likely informed by Collins that the number of aged snow and dirt units at dealers had not substantially declined since March 2017, that the integration was off track, and the end market for Arctic Cat products was floundering.

By early summer 2018, following up on the dealer termination plan initiated in April, Collins and the Arctic Cat turnaround team began eliminating underperforming dealerships and writing-off losses—a plan that ultimately resulted in a charge of approximately $50 million. ¶¶102-03. According to a CI, at least 300, or approximately 38%, of the 800 dealers acquired by Textron were slated for termination. ¶103. **On the July 18, 2018 analyst call, in the face of all the negative facts he knew or at least recklessly disregarded, Defendant Donnelly falsely represented that "we are seeing profit improvement in Arctic Cat, and we would continue to expect to see incremental margins. . . So I think the end market of all the data I see is positive here in the last couple months. . ." ¶¶133-35.**

Within a few days of Defendant Donnelly's repeated assurances, on July 27, 2018, he sold 82,647 Textron shares for net proceeds of approximately $5,084,589. ¶140. Likewise, on July 30-31, 2018, Robert E. Lupone, the head of Textron's legal department, which oversaw dealer terminations, and a member of Textron's Executive Leadership Team, sold 45,000 Textron shares for net proceeds of approximately $1,788,214.50. ¶141.

### C.  The Truth Begins to Be Revealed

On October 18, 2018, before the market opened, Textron disclosed a surprise earnings miss, and that the Industrial "Segment profit was down $48 million from the third quarter of 2017, largely due to unfavorable pricing and performance . . . ". ¶¶16, 142. On the analyst call that day, Defendant Donnelly explained that the Industrial segment's performance was due to a "painful"

experience in managing the sales channel and discounting, and that the integration of dirt products was at least one-year behind schedule. ¶¶16, 143. On this news, Textron's stock declined by $7.29 per share or approximately 11.25%, to close at $57.49 per share, on heavier than usual volume of over 13.4 million shares. ¶¶20, 144, 169-70.

However, Textron's stock continued to trade at artificially inflated prices because Defendant Donnelly—ignoring multiple red flags—falsely represented on the October 18, 2018 call that the Company's goodwill and intangible assets were not impaired. ¶¶146-47. Just weeks later, on December 6, 2018, Defendants finally disclosed that the Industrial segment's assets were, in fact, impaired. ¶149. On December 7, 2018, Textron shares declined to close at $51.14 per share, a decline of $1.79 or approximately 3.3% on heavier than usual volume. ¶150.

## III.   ARGUMENT

### A.   Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009). Furthermore, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). A court may not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

The PSLRA and Federal Rule of Civil Procedure 9(b) require that allegations of fraud be

pled with particularity. 15 U.S.C. § 78u-4; Fed. R. Civ. P. 9(b). However, Rule 9(b) does "not require the pleading of detailed evidentiary matters in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Indeed, "the application of Rule 9(b) ... must not abrogate the concept of notice pleading." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 397 (S.D.N.Y. 2005). As set forth below, the Complaint satisfies all applicable pleading standards and should be upheld.[3]

### B. The Complaint Alleges Facts Supporting a Cogent and Compelling Inference of Scienter

In evaluating scienter, "[t]he inquiry is…whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322-23. A plaintiff may establish scienter by alleging facts showing that defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 194 (2d Cir. 2008); *In re Pall Corp.*, 2009 WL 3111777, at *6 (E.D.N.Y. Sept. 21, 2009).[4] The inference of scienter need not be more likely than any plausible opposing inference; a tie goes to the plaintiff. *Tellabs,* 551 U.S. at 324.

In accordance with these standards, the Complaint alleges ample evidence establishing a strong inference of scienter through both motive and opportunity allegations, based on the

---

[3] Defendants' motion to dismiss does not contest the adequacy of any elements of the Section 10(b) claim other than scienter and material misrepresentations. 15 U.S.C. § 78j. Additionally, Defendant's only argument against Plaintiff's claim of control person liability is that Plaintiff has insufficiently alleged primary liability under Section 10(b). MTD 19. As described herein, Plaintiff has properly alleged primary liability for securities fraud. Therefore, the control person claims should be upheld. *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 483–84 (S.D.N.Y. 2001) (Cote, J.) (describing test for prima facie case of control person liability and upholding claims).

[4] Moreover, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." *Novak*, 216 F.3d at 308 (citations omitted).

Individual Defendants' substantial and suspiciously-timed stock sales (¶158), and through allegations that Defendants knew or recklessly disregarded extensive evidence contradicting their statements that the integration was completed, that non-current inventory levels had materially declined, and that Arctic Cat was positioned to be profitable in 2018, as discussed further below.

### 1. The Complaint Pleads a Strong Inference of Scienter for the Individual Defendants

The extensive allegations of information known or recklessly disregarded by Defendants Donnelly and Connor contradicting their statements about the Arctic Cat integration and inventory, and their substantial, suspiciously-timed stock sales, support a strong inference of scienter.

First, the Complaint alleges a cogent and compelling inference that the Individual Defendants were personally financially motivated to defraud investors during the Class Period. As detailed in the Complaint, even as Defendants were assuring investors that the Arctic Cat integration was substantially completed and was on track to achieve a profit in 2018, they were selling massive quantities of their own stock at artificially inflated prices. Specifically, between April 27 and May 1, 2018, Defendant Donnelly sold 200,400 shares of Textron stock for net proceeds of more than $3.047 million, and on July 27, 2018, he sold an additional 82,647 shares for net proceeds of more than $5.084 million. ¶¶ 130, 140. Similarly, on April 27, 2018, Defendant Connor sold 80,000 shares of Textron stock for net proceeds of $3.892 million. ¶ 130. These sales are particularly striking and suspicious because neither Individual Defendant had sold *any* shares on the open market in 2017. ¶ 158.

Defendants *concede* that these allegations suffice to plead motive for the majority of the alleged misrepresentations—those made on April 18, April 25, July 18, and July 26, 2018 (MTD 20)—but argue that they do not establish motive for their statements on January 31, February 15, and October 18, 2018 because the sales are too remote in time from these statements (MTD 21).

However, Defendants do not cite a single case in support of the proposition that insider stock sales must be *less than three months* before or after an alleged misrepresentation to support motive allegations. To the contrary, the applicable caselaw undercuts Defendants' argument. *See, e.g., Stevelman v. Alias Research Inc.,* 174 F.3d 79, 86 (2d Cir. 1999) (finding a strong inference of scienter where "[s]ome of the sales occurred after the representations were made" and further finding that "the statements that continued to be made after the sales that followed the earlier statements could well be probative of an intent to keep the stock price high in order to avoid detection of the alleged fraud"); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474-75 (S.D.N.Y. 2013) (motive sufficiently alleged where there was a four-month gap between transaction and alleged misstatements).[5]

Likewise, Defendants' argument that motive for the January 31st and February 15th statements is lacking because there is no allegation that the Individual Defendants "planned" their April stock sales also fails. As a practical matter, keeping up the appearance of a Company that was on-track to profit in 2018 from the Arctic Cat acquisition was important for maintaining Textron's share price, and hence, to selling their shares for a substantial profit. Thus, the alleged misrepresentations on January 31 and February 15 were consistent with the Individual Defendants' motive of dumping their shares before the market learned of Arctic Cat's problems.

Second, adding to these compelling motive allegations, the Complaint alleges ample evidence that the Individual Defendants knew or recklessly disregarded information which belied their statements. "[W]hen contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company." *City of Pontiac Gen.*

---

[5] The Complaint primarily alleges scienter for the October 18, 2018 statement based on recklessness (*see* ¶147), nonetheless, *Stevelman*, quoted above, supports finding sufficient motive allegations here as well.

*Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 371 (S.D.N.Y. 2012) (quotation omitted). Thus, "scienter may be found where there are 'specific allegations of various reasonably available facts, or 'red flags,' that should have put the officers on notice' that the public statements were false." *In re Refco*, *Inc Sec. Litig.*, 503 F. Supp. 2d 611, 649 (S.D.N.Y. 2007).

Here, the Complaint alleges numerous "red flags" that should have alerted the Individual Defendants to the falsity of their statements. The Arctic Cat turnaround team monitored the progress of the Arctic Cat integration on a regular basis by accessing dealer sales and inventory data and reports, [6] and regularly meeting and communicating with sales representatives and dealers. [7] These reports and meetings indicated non-current snow and dirt inventory of 22,000-25,000 units throughout the Class Period, which represented a massive glut based on the Company's historical sales data. ¶79. The Arctic Cat turnaround team leaders, Holleran and Collins, met with Defendants Donnelly and Connor multiple times at Company headquarters during the Class Period. ¶6. Additionally, Collins and Jhant received multiple complaints from sales managers that a failure to integrate departments for ordering, warranties, parts/accessories, dealer support, and technical assistance to customers throughout the Class Period caused customer defections and lost sales opportunities. ¶86. Likewise, problems with the integration of dirt vehicle engineering and manufacturing caused delays and unavailability of 2018 model year ("MY") dirt products, and one of the largest Arctic Cat dealers complained repeatedly about the problems to Holleran, Collins, and Defendant Donnelly. ¶¶89-94. Moreover, team leaders' failure to begin terminating redundant or poorly-performing dealers until the summer of 2018 further contributed to the problems with overstocked non-current inventory and deep discounting to incentivize sales.

---

[6] Specifically, the Complaint alleges internal, daily reports that tracked real-time inventory levels at all TSV dealers and were circulated to at least Collins and Mottel. ¶¶82-83, 98-99.
[7] *See, e.g.,* ¶¶76, 78, 94, 102.

¶¶95, 97, 100-03.

These allegations support a strong inference of *at least* recklessness. *See Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300-301 (S.D.N.Y. 2018) (allegations sufficient where specific reports were circulated and individual defendants attended meetings in which problems were discussed); *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (recklessness adequately alleged based on allegations "of specific reports and statements showing that Defendants . . . could access [the company]'s true wholesale inventory levels"); *In re Barrick Gold Sec. Litig.,* No. 13 CIV 3851 SAS, 2015 WL 1514597, at *11 (S.D.N.Y. Apr. 1, 2015) (allegations sufficient where "defendants had access to information in the form of monthly progress reports and statements from the Project Manager").

Additionally, the magnitude of the earnings miss here—with Industrial profits down by $48 million, or *approximately 98%*, from the third quarter of 2017 (¶16)—and the fact that the integration of Arctic Cat was *a full year behind schedule*, supports a strong inference of scienter. *See In re Scholastic,* 252 F.3d at 77 (holding $24 million in charges "undermines, at the pleading stage, the argument that the defendants were unaware" of any increase in merchandise returns).[8]

### 2.   The Complaint Pleads a Strong Inference of Corporate Scienter

The Complaint's allegations are more than sufficient to establish a strong inference of corporate scienter through the scienter of Defendants Donnelly and Connor, discussed above, which may be imputed to Textron. Moreover, even if scienter were not adequately alleged for the Individual Defendants, corporate scienter would nonetheless be established by the knowledge of

---

[8] *See also, Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir. 2000) ("magnitude" of write-off is significant in determining scienter); *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015) (finding restated earnings decreases of 17%, 22%, and 1600% were "large enough to render less credible the defendants' arguments that they had no notice of any of the accounting improprieties that led to the Restatement"); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("[T]he fact that there was a large, $112 million 'surprise' valuation that allegedly wiped out a year's worth of the Company's earnings also provides some circumstantial evidence of scienter.").

the Arctic Cat turnaround team, who occupied senior management positions and are alleged to have personal knowledge of the inventory and integration problems. *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (corporate scienter alleged based on knowledge of senior managers and vice presidents who were not named defendants); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009) ("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants.").

Corporate scienter is further supported by the termination of a key Textron executive, Holleran. As the President and CEO of the Industrial segment and the Director, President, and CEO of TSV, Holleran was responsible for Arctic Cat integration and performance, and reported directly to Defendant Donnelly. Holleran's termination was announced on October 12, 2018 (¶15), just days before the Company's October 18, 2018 financial release revealing the failure to integrate Arctic Cat and poor performance in TSV (¶16). Numerous courts have found terminations or resignations of key individuals such as this support a strong inference of scienter.[9]

For these reasons, scienter is amply alleged as to all Defendants.

### C.  The Complaint Alleges Defendants Made Material Misrepresentations and Failed to Disclose Material Information

A securities fraud complaint adequately pleads a false or misleading statement by "specify[ing] each statement alleged to have been misleading, [and] the reason or reasons why the

---

[9] *See In re Fairway Grp. Holding Corp. Sec. Litig.*, No. 14 CIV. 0950 LAK, 2015 WL 249508, at *16 (S.D.N.Y. Jan. 20, 2015) (executive's "resignation, announced concurrently with the . . . announcement of Fairway's reduced earnings outlook . . . supports an inference of scienter"); *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015) (resignations of two executives shortly before announcement of delayed financial release supported scienter); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 n. 84 (S.D.N.Y. 2014) (terminations connected to alleged fraud by timing and circumstances "suggest[] a higher level of wrongdoing approaching recklessness or even conscious malfeasance"); *Van Dongen,* 951 F. Supp. 2d at 474; *Ho v. Duoyon Global Water, Inc.,* 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (executive's resignation adds to inference of scienter).

statement is misleading." 15 U.S.C. § 78u-4(b)(1). Additionally, any misrepresentation or omission must be material. However, materiality is "a mixed question of law and fact, and a complaint may not be dismissed under Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (internal quotation omitted). "The materiality requirement poses a very low burden . . . . Thus, the trier of fact usually decides the issue of materiality." *Freudenberg v. E\*Trade Fin. Corp*., 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010).

The Complaint satisfies these standards by alleging that, throughout the Class Period, Defendants made material misstatements and omissions that the integration of Arctic Cat was substantially complete, that non-current inventory levels had materially declined, and that Arctic Cat was positioned to be "accretive" or profitable in 2018. These statements were false or misleading when made because Defendants knew or recklessly disregarded that the Company's persistent, massive, non-current inventory of approximately 10,000 snow units and 15,000 dirt units—the equivalent of roughly 55% of its total 2017 snow unit sales and 15-23% of its total 2017 dirt unit sales—continued to clog the sales channel, prolonging Textron's reliance on large rebates and discounting programs that negatively impacted profits throughout the Class Period. ¶¶77-79. The inventory problem was further exacerbated by integration problems, including the Company's failure to consolidate the dealer network until mid-2018 (¶¶95, 99, 101, 103), and engineering and manufacturing problems that reduced the availability of current-year dirt products (¶¶88-94). All of this caused extensive discounting which cost the Company $40-$50 million. But even when Defendants finally disclosed this information, they attempted to diminish it by indicating, "it's not

something like an impairment of goodwill or an intangible[.]" ¶146.

The misrepresented and omitted information was highly material to investors, as evidenced by both Textron's significant share price drops when the true information was revealed in disclosures on October 18, 2018 (¶¶ 142-44) and December 6, 2018 (¶¶ 149-50), and analysts' reaction to the disclosures. For these reasons, and as further discussed below, the Complaint adequately alleges material misrepresentations.

### 1.  The Alleged Inventory-Related Misrepresentations are Actionable

Defendants argue that the inventory-related misrepresentations are not actionable because: (1) Plaintiff incorrectly interpreted Defendants' 2018 statements about "older" inventory as including 2017 models; (2) Plaintiff's allegations about the amount of older inventory are too imprecise; and (3) the alleged misstatements are immaterial "puffery." MTD 7-12. These arguments are wrong and should be rejected because they are contradicted by the facts alleged in the Complaint, and raise questions of fact by asserting—before any discovery—what Defendants intended by their alleged misrepresentations. Such arguments cannot be resolved on a motion to dismiss.

First, Defendants argue that their representations concerning purported reductions in "older" inventory were not false and misleading because they only referred to MY 2016 or older products. MTD 8-9. According to Defendants, because the statements they made *in 2017* about excess non-current snow and dirt inventory related to 2016 or older models, the meaning of "older" remained the same in 2018—Defendant Donnelly's "statements during the Class Period never deviated from that benchmark". MTD 9. Contrary to Defendants' argument, the Complaint alleges that on January 31, 2018, Defendant Donnelly said he saw improved demand in snow products, "allowing dealers to *clear older inventory and drive 2018 model sales,*" apparently including 2017 models in the "older" category. ¶ 107. Thus, by the start of the Class Period, Defendants' reference

17

to "older inventory" included excess inventory of 2017 snow and dirt units.

This reading also comports with the common understanding that the important issue to Textron investors was whether a glut of inventory was hurting 2018 sales and margins, as demonstrated by analysts' discussions with Defendants. For instance, in the analyst Q&A on April 18, 2018, concerning Textron's financial results, an analyst asked about "clearing the *channel overstock* at Arctic Cat"—without any reference to the MY or age of the overstock. ¶123. In response, Defendant Donnelly represented—again without identifying particular MY—"you've got lower inventory of aged stuff and you've got a lot of *exciting new stuff will be on the floors* that dealers are pretty excited about." *Id*. Defendants' suggestion that 2017 MY products were not included in the "aged stuff," and thus, presumably, were part of the "exciting new stuff [that] will be" on dealer floors sometime after April 18, 2018, is implausible and should be rejected.[10]

Likewise, Defendants' argument that falsity is inadequately alleged because the Complaint has not alleged "the number of aged vehicles inherited in the acquisition [compared] with the number of such vehicles at the start of the Class Period" is also wrong. Defendants never disclosed any of these numbers; indeed they hid them, and the allegation is that they lied when they represented they had cleared enough of the inventory to "drive 2018 model sales" and make Arctic Cat profitable in 2018. The CI allegations of essentially static aged inventory levels—which in 2018, would naturally include 2017 models—supports the claim that inventory had not been reduced significantly.[11]

Finally, Defendants' argument that their representations about the "pretty significant reductions" of aged inventory are immaterial puffery is wrong because such representations "are

---

[10] Similarly, on July 18, 2018, Donnelly stated: "…a lot of the stuff that was really the *older inventory* has been moved off [dealers'] books . . . [and] *these guys are taking restockings of current model year product*." ¶131. Thus, every indication is that "older inventory" included any inventory that was older than the current model year, 2018.

[11] Defendants also argue that the inventory figures alleged are too imprecise because they include 2017 models, but as previously explained, their 2018 statements about "older" or "aged" inventory are alleged to include 2017 models.

reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991); *see also*, *Ark. Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) (finding the term "high quality" was "clearly a material misrepresentation when applied to assets that are entirely worthless"). Indeed, "[h]ere, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was "in good shape" or "under control" while they allegedly knew that the contrary was true." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000). Thus, these statements are actionable.

### 2. The Alleged Misrepresentations About Arctic Cat's and Textron's Performance are Actionable

Defendants argue that the alleged misrepresentations about Arctic Cat's and Textron's 2018 performance are not actionable because they were pure opinion statements that were truly-held, and are forward-looking statements protected by the PSLRA safe harbor. MTD 12-14. Both arguments are wrong.

Defendants argue that their alleged misrepresentations are "pure expression[s] of opinion" (MTD 13), but as demonstrated by the statements they quote, Defendants made representations about current or historical facts. For example, in the July 18, 2018 statement quoted, Defendant Donnelly said, "I think ***we are seeing profit improvement*** at Arctic Cat" and "I think the end market of all the data I see is positive here ***in the last couple of months***." MTD 12. Courts have repeatedly found that statements like these are actionable misrepresentations of existing facts. *See, e.g.*, *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190–191 (S.D.N.Y. 2010) (finding statements that "[w]e are seeing significant organic growth in cash, assets and credit" and "we enter 2007 ideally positioned to capitalize on secular growth trends in the industry" are actionable misrepresentations of fact); *Manavazian v. Atec Grp., Inc*., 160 F. Supp. 2d 468, 480 (E.D.N.Y.

2001) (statements actionable that the Company is "position[ed] . . . for dramatic revenue and earnings growth" and that the "revenue and earnings growth model 'is still on track'" because allegedly failed to disclose negative trend); *In re Computer Assocs. Class Action Secs. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (statements actionable that there was "strong worldwide demand" for products, and that the company was "solidly positioned for growth" because allegedly failed "to disclose materially misleading adverse business trends.").[12]

But even if these statements are deemed to be opinions, they are actionable because Defendants did not believe them at the time they were made, as demonstrated by Donnelly's massive stock dump after his July 2018 statement quoted above, and both Donnelly's and Connor's stock sales after their April 2018 statements.[13] ¶¶157-60. Further, the statements are actionable because they did not "fairly align[] with the information in the issuer's possession at the time," as described above. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188–189 (2015); *see also, Pearlstein v. Blackberry Ltd.*, No. 13-CV-7060 (CM), 2018 WL 1444401, at *3 (S.D.N.Y. Mar. 19, 2018) (finding opinion statement actionable where "failing to disclose the adverse sales and return data could plausibly be misleading to a reasonable investor").

Second, Defendants argue that their performance-related misstatements are protected by the PSLRA safe-harbor (MTD 13-14), but that protection only applies to forward-looking statements that are: (1) identified as such and accompanied by meaningful cautionary statements; (2) immaterial; or (3) made without actual knowledge that the statements were false or misleading.

---

[12] Moreover, Defendants' insertion of "I think" before statements of verifiable present and historical facts does not convert those statements into opinions. *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999) ("[I]nserting the word "belief" before stating, 'The fundamentals of our business remain strong,' [and] 'our business remains profitable[]' . . . does not change the assertive nature of the statements.").

[13] For an opinion to be actionable, a plaintiff must plead either that (1) "the speaker did not hold the belief she professed," (2) a "supporting fact she supplied" for the opinion was untrue, or (3) the speaker has "omit[ted] information whose omission makes the [opinion] statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 575 U.S. at 184-186).

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016). The safe harbor does not apply here because the challenged misstatements are mixed statements of present or historical fact, as discussed above,[14] none of them are accompanied by "meaningful" cautionary language, and Defendants knew or recklessly disregarded that the statements were false or misleading.

Defendants claim safe harbor protection based on the cautionary language accompanying some of the alleged misrepresentations, but ignore that the Complaint alleges this language was materially false or misleading because it failed to disclose that the risks had already materialized. ¶¶121-22. *See In re Van der Moolen*, 405 F. Supp. 2d at 400 (upholding allegedly false risk disclosures where the company "was warning investors about regulatory risk, [when] it knew or was recklessly ignorant of the fact that [its] employees were violating NYSE rules"); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").[15]

Finally, the protections do not apply because there are ample allegations that Defendants knew or recklessly disregarded that their statements were false or misleading at the time they were made. *In re Vivendi*, 838 F.3d at 247; *City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 CM THK, 2013 WL 1197755, at *11 (S.D.N.Y. Mar. 25, 2013) (safe harbor does not protect statements that "imply that the company's lower earnings are the product of a temporary inventory problem . . . without disclosing that the company anticipated that the problem might well extend into succeeding quarters (as it did)" because unpopular merchandise had been pre-ordered); *see*

---

[14] The safe harbor "does not protect representations of current or historical fact." *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 n.36 (S.D.N.Y. 2010); *accord P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). Statements such as some of those alleged here, "that a project is 'on-track,' 'on-budget,' or 'on-schedule,' are not forward-looking but statements relating to *current* conditions," and not protected by the safe harbor. *In re MGM Mirage Sec. Litig.*, No. 2:09-CV-01558-GMN, 2013 WL 5435832, at *8 (D. Nev. Sept. 26, 2013).

[15] *See also*, *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.").

*also*, Section III.C., above. Defendants therefore cannot avail themselves of the PSLRA safe-harbor protection, and the performance-related statements are actionable.

### 3.   The Alleged Misrepresentations About Arctic Cat Integration are Actionable

Defendants argue that the alleged misrepresentations that reference "integration" are not actionable because they are not materially false or misleading and are mere "puffery" or corporate optimism. MTD 14-18. These arguments fail.

First, Defendants contend that the alleged misrepresentation that "we've successfully integrated the integration of Arctic Cat" was not false or misleading because Defendants elsewhere indicated that some integration efforts were ongoing. MTD 14. But, read in context and in the light most favorable to Plaintiff, the clear message of Defendants' statement was that integration was ***substantially*** complete. In the sentence after saying Defendants had successfully integrated Arctic Cat, Defendant Donnelly said, "[w]ith these accomplishments ***behind us*** in improving end markets, we're well positioned coming into 2018" (¶109), representing that the ***key*** integration measures necessary to drive 2018 profitability for Arctic Cat were accomplished.[16] Indeed, this is how analysts understood Defendant Donnelly's representation, as reflected in their reports on the call,[17] and it is consistent with Defendants' pre-Class Period statements in October 2017 that "Arctic Cat frankly is going to plan" and "[t]here's still some things to work on, but I think this is something we'll have behind us as we head into 2018 and clearly we expect the Arctic Cat deal itself to be accretive as we go into 2018" (¶64). In context, Defendants' statement thus represented to investors that by the beginning of the Class Period, the integration was substantially completed.

---

[16] *See also*, ¶115 (after the analyst call, Defendant Connor reportedly told analysts that "[i]ntegration of its recent ACAT acquisition is going well; and ACAT has cleared the channel oversupply of its dirt and snow vehicles in Q4 and gained market share with new products . . . .   TXT feels that the challenges of consolidating vehicle production into its Augusta plant are now behind it, positioning the business for better results in 2018.").

[17] *See, e.g.*, ¶114 (Jefferies: "Industrial Issues in 2017 Should Not Repeat in 2018 . . . The company has largely addressed the issues and has harvested opportunities cross marketing Textron branded vehicles with the Arctic Cat Portfolio."); ¶113 (similar comments by J.P. Morgan).

Defendants also argue that statements about integration are immaterial puffery "at least when . . . the statements are not accompanied by concrete or specific benchmarks." MTD 15. But the Complaint alleges that Defendants' statements *were* accompanied by such benchmarks—most importantly, the reduction of non-current inventory to drive 2018 sales and profitability. ¶56. Defendants' integration-related statements were therefore not puffery, but rather, highly material information that investors understood as impacting Arctic Cat profitability in 2018. *See, e.g.,* *Galestan*, 348 F. Supp. 3d at 303 ("Defendants offered more than 'rosy predictions' because they stated that integration was going smoothly and they made positive statements about the new loan offerings . . . all while being aware of material productivity and delinquency concerns relating to the new loans that contradicted their public representations."); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 817-18 (N.D. Ill. 2017) (finding actionable statements that company was on-track to fully integrate acquisition by the end of the year and realize $20 million in cost synergies); *In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1117 (C.D. Cal. 2010) (statement that sales force integration "went beautifully well" is "capable of objective verification and is therefore actionable"); *In re Nash Finch Co.*, 502 F. Supp. 2d 861, 879 (D. Minn. 2007) (statements about integration progress were not puffery because, "when analyzed in context . . . [they] form a portion of press releases or conference calls in which Defendants make specific predictions about growth and earnings per share or specific representations about the procession of the integration."). Defendants' cases (at MTD 15-16) do not support a different result, as they either involved allegations about "integration" without any concrete details, or in which falsity was insufficiently alleged.[18]

---

[18] *See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 392 (2d Cir. 2015) (finding statements were puffery where "there are no allegations that defendants did not reasonably believe them"); *Rombach*, 355 F.3d at 174 (finding statements were puffery because plaintiffs did not "allege with particularity any actual falsity in defendants' press releases"); *In re Razorfish, Inc. Sec. Litig.*, No. 00

Defendants argue that another of the alleged integration objectives, the consolidation of dirt vehicle production facilities, was not "clearly articulated" to investors, other than in Defendant Donnelly's confirmation in October 2017 that two particular dirt facilities had been combined. MTD 16. This ignores Defendant Donnelly's extended comments on July 19, 2017 regarding efforts to integrate Arctic Cat's dirt products with Textron's, including "operational restructuring and aligning our production facilities . . . ." ¶61. More importantly, it ignores the material, undisclosed problems that allegedly arose with respect to the integration of dirt product engineering and manufacturing, which caused 2018-model dirt products to be delayed or unavailable (¶¶88-94), contributing to the poor third quarter 2018 results (¶143).

Additionally, Defendants argue that the alleged integration objective of enhancing dealer networks was consistent with Defendants' efforts to cull unproductive dealers in mid-2018 (MTD 16-17), but this misses the point. Plaintiff alleges that this dealer consolidation did not occur until mid-2018, exacerbating the Company's problems with overstocked non-current inventory and deep discounting to motivate sales.[19] Defendants did not disclose any of these material integration issues to investors, rendering their statements about Arctic Cat's successful integration and position to achieve profitability false and misleading.

Finally, Defendants argue that their statements in the 2017 10-K and first and second quarter 10-Qs that the "Arctic Cat plan" was "substantially completed" referred *only* to the portion of the statement regarding charges of $40 million for restructuring and integration costs. But the alleged misstatement *begins* with a description of the "restructuring plan" Defendants initiated

---

CIV. 9474 (JSR), 2001 WL 1111502, at *2 (S.D.N.Y. Sept. 21, 2001) (rejecting alleged misrepresentations where "only one of these references to 'integration' meaningfully specifies the respects as to which such integration is said to have occurred," but the complaint did not allege that it "had not in fact occurred").

[19] *See, e.g.*, ¶95 (too many dealers in a territory contributed to buildup of aged inventory and discounting); ¶97 (hundreds of unprofitable dealers as of April 2018); ¶100 (terminated dealers' inventory returned to Textron); ¶101 (dealer terminations commenced in the summer of 2018); ¶103 (summer 2018 elimination of underperforming dealers and write-off of $50 million in losses).

"[i]n connection with the acquisition of Arctic Cat . . . to integrate this business into our Textron Specialized Vehicles business within the Industrial segment and reduce operating redundancies and maximize efficiencies." ¶116. It then describes charges that were recorded "[u]nder the Arctic Cat plan"—a clear reference to the plan described in the prior sentence. MTD 18. Thus, the charges were one component of the referenced plan, not the entirety of it. Defendants' reading of the final sentence of the paragraph, the "Arctic Cat plan [is] substantially completed . . . " as referring solely to the costs of the plan is not more plausible than Plaintiff's reading, by which the "Arctic Cat plan" includes the achievements for which those costs were purportedly incurred (i.e., the costs of integrating the businesses, reducing operating redundancies, and maximizing efficiencies). At this stage of the proceeding, Plaintiff is entitled to all plausible inferences. *Rescuecom*, 562 F.3d at 127 (at motion to dismiss, "a court must accept as true all of the factual allegations set out in plaintiff's complaint [and] draw inferences from those allegations in the light most favorable to plaintiff").[20] Thus, Defendants' argument should be rejected.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.[21]

Dated:  March 27, 2020                    Respectfully submitted,
        New York, NY

                                          /s/   Frederic S. Fox
                                          Frederic S. Fox
                                          Donald R. Hall
                                          Jeffrey P. Campisi
                                          **KAPLAN FOX & KILSHEIMER LLP**
                                          850 Third Avenue, 14th Floor

---

[20] Additionally, because Textron's 2017 10-K and first and second quarter 10-Qs contained these alleged misrepresentations, the SOX certifications in those filings are also material misrepresentations, made with scienter. ¶¶119, 127, 138; *see also*, III.B. (scienter adequately alleged for all misrepresentations). Thus, the alleged SOX certification misrepresentations should be upheld.

[21] In the event that any part of the Complaint is dismissed, leave to amend can and should be granted in the interests of justice. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (overturning denial of leave to amend where plaintiff had pre-motion opportunity to amend because "[w]ithout the benefit of a [motion to dismiss] ruling, many a plaintiff will not . . . be in a position to weigh the practicality and possible means of curing specific deficiencies").

New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: ffox@kaplanfox.com
         dhall@kaplanfox.com
         jcampisi@kaplanfox.com

*Lead Counsel for Lead Plaintiff IWA Forest
Industry Pension Plan and the Proposed
Class*