UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
 IN RE TEXTRON, INC. SECURITIES        :        19cv7881 (DLC)
 LITIGATION                            :
                                       :        OPINION AND ORDER
-------------------------------------- X

APPEARANCES

For the Lead Plaintiff:
Kaplan Fox & Kilsheimer LLP
Frederic S. Fox
Donald R. Hall
Jeffrey P. Campisi
850 Third Avenue, 14th Floor
New York, NY 10022

For the defendants:
Kirkland & Ellis LLP
Sandra C. Goldstein
Stefan Atkinson
Kevin M. Neylan, Jr.
601 Lexington Avenue
New York, New York 10022

DENISE COTE, District Judge:

      Investors in Textron Inc. ("Textron") have brought this

putative securities class action against the company, its CEO

Scott Donnelly, and its CFO Frank Connor.  Lead Plaintiff

alleges that the defendants made misleading statements related

to Textron's acquisition and integration of Arctic Cat Inc.

("Arctic Cat"), a manufacturer of small recreational vehicles.

According to Lead Plaintiff, the defendants' statements

artificially inflated the price of Textron's stock between

January 31 and December 6, 2018 (the "Class Period").

Defendants have moved to dismiss for failure to state a claim.
The defendants' motion is granted.

## Background

The following facts are drawn from the Second Amended
Complaint ("SAC") and documents relied upon by the SAC.  For the
purposes of deciding this motion, Lead Plaintiff's factual
allegations are accepted as true and all reasonable inferences
are drawn in Lead Plaintiff's favor.

Textron's Acquisition and Planned Integration of Arctic Cat

Textron is a manufacturer and distributor of aircraft,
recreational vehicles, and other mechanical products.  Textron
has five operational segments -- at issue in this litigation is
the Industrial Segment, which contains the Specialized Vehicles
business.

On January 25, 2017, Textron announced that it would be
acquiring Arctic Cat, which manufactures all-terrain vehicles
("ATVs"), recreational off-highway vehicles ("ROVs" or "side-by-
sides"), and snowmobiles.  These Arctic Cat products were
colloquially referred to as "dirt" or "snow" vehicles.  Arctic
Cat marketed and sold its products through a network of
approximately 800 independent dealers.

When Textron acquired Arctic Cat, it predicted that the
acquisition would produce business synergies, but Textron

officers publicly observed that Arctic Cat had struggled with an

oversupply of inventory in its distribution channels.  As

Donnelly put it during an earnings call on January 25, 2017,

> The industry, frankly, after a lot of years of growth,
> had some issues this year just in terms of the economy
> and lack of net growth.  The snow side of the
> business, obviously, had a couple bad winters.  <u>On the</u>
> <u>dirt side, they had just, again, as an industry, not</u>
> <u>unique to Arctic Cat, a lot of stuff built up in the</u>
> <u>channel</u>, and I think it's a business that has
> tremendous opportunities going forward.  But it's been
> in a bit of a tough time unwinding and managing their
> way through a lot of the inventory issues and,
> frankly, positioning themselves for future growth.
>
> So when we looked at the company, if you look at the
> products that we have today and the products that
> we've had in development and you look at the products
> they have today and the products, frankly, which they
> have in the development pipeline, it's just a
> beautiful fit.  I think that dealers and customers are
> going to be really impressed over the next couple
> years about what that product line looks like.  I
> think it will be a very attractive line for dealers.
> <u>I think a lot of progress has been made with respect</u>
> <u>to the channel.  That work will have to continue after</u>
> <u>we acquire it, I think, through the first year to</u>
> <u>really get that repositioned and ready to go.</u>

(emphasis added).

Similarly, during an April 19, 2017 earnings call, in

response to an analyst's question about the impact of the Arctic

Cat acquisition on Industrial Segment financials, Donnelly

answered,

> Well, look, <u>most of the negative impact of the</u>
> <u>acquisition in terms of the 2017 financials is driven</u>
> <u>by solving the inventory issue which has been out</u>
> <u>there for some time and which we knew about</u>,

obviously, and talked about as part of the deal.  And that was clearly factored into our valuation of the deal economics.  So, this issue of 2017 operating performance is really very highly correlated to those rebate programs associated with clearing out the older model product. . . .

We expect to clear the lion's share of that out. Frankly, we're already getting pretty good traction. The guys are very, very focused on resolving that issue, so we've already seen a fair bit, which is why we had some impact in the quarter of coming out of the gate and we know we have to go clean up the dealer channel to get this thing back on a growth trajectory and then generating good profit, and that's certainly our expectation for 2018.

(emphasis added).  During the same call Donnelly further explained,

[T]he challenge that we have on the company [Arctic Cat] as we acquired it was they frankly had too much inventory.  And so, the first step out of the gate here has been to put together these programs to help put rebating together to help the dealers move it out. I think that's been very well received and as I said, we're already starting to see the impact of that.

During the remainder of 2017, the defendants made similar statements concerning Textron's progress with integrating Arctic Cat and clearing its inventory.  For example, on a July 19, 2017 earnings call, Donnelly said, "We continue to make progress with the integration of Arctic Cat as we've begun consolidating operations and enhancing our dealer network."  In response to an analyst's question concerning Textron's projected growth in its vehicle business, Donnelly explained,

> Obviously, mostly growth is driven by the Arctic Cat deal and <u>our focus there continues to be, as we talked about, really moving a lot of the older inventory out of the channel, that's gone well, frankly</u>.  And really, at this point, focused on getting new products and getting those launched and getting the dealer channel set-up to take on a lot of that new product.  And <u>that'll be our focus through the balance of the year</u>.

(emphasis added).

During an October 19, 2017 earnings call, Donnelly offered the following statement concerning Arctic Cat:

> Moving to Industrial, we saw an 18% increase in revenues, primarily reflecting the impact of Arctic Cat.  Overall margins were down, largely reflecting the dilutive impact of the Arctic Cat acquisition, and unfavorable volume and mix in other businesses.  <u>At Arctic Cat, we're continuing to execute to our integration plan and we remain on track for the business to be accretive in earnings in 2018.</u>

(emphasis added).  In response to an analyst's question concerning Textron's reduced Industrial Segment margins, Donnelly explained,

> I think we had a fairly tough quarter in Industrial, particularly in our vehicle business.  <u>The Arctic Cat work is going well.  But we have thrown a lot of resources, particularly people at making sure that integration goes well.</u>  And frankly, we got a little behind on some of the rest of the business in terms of line rates and production output as we've worked our way through the quarter and as we go here into the beginning of the fourth quarter, it looks like most of the line rates are back up to where we need them to be, but we are not likely to be able to catch up on some of the miss from Q3.

(emphasis added).  When asked whether the resources devoted to the Arctic Cat integration would continue to impact Textron's business, Donnelly opined, "[T]he piece specifically around Arctic Cat frankly is going to plan.  We're very happy with how that's proceeding, the inventory levels that we knew we needed to drive down in the dealer base are happening, retail sales are up considerably."

Lead Plaintiff characterizes these pre-Class-Period statements as an "Arctic Cat turnaround plan."  The alleged elements of this plan were: (1) integrate Arctic Cat into Textron's existing Specialized Vehicles business, (2) clear non-current Arctic Cat inventory, and (3) make the Arctic Cat acquisition accretive during 2018.  Lead Plaintiff's theory is that Textron misleadingly suggested that it was achieving these objectives during 2018, while actually failing on all three fronts.

The Defendants' Class-Period Statements

The Class Period begins on January 31, 2018, when Textron held a conference call concerning its fourth-quarter 2017 earnings.  During the call, Donnelly said of the Industrial Segment:

> [R]evenues were up 20% for the quarter, primarily reflecting the impact of Arctic Cat.  We saw improved demand in the snow retail channel, allowing dealers to clear older inventory and drive 2018 model sales,

including our new introductions in the youth and
mountain categories.

* * *

To summarize the year, we continued to execute our
plan for growth through strategic acquisitions and new
product innovation to create long-term shareholder
value.  At Industrial, <u>our integration of Arctic Cat
continues</u> and reflects our strategy of acquisitions
that complement our core businesses and product lines.

(emphasis added).  Donnelly also said, in listing Textron's 2017

accomplishments, "[W]e successfully integrated the integration

of Arctic Cat."

During the same call, an analyst asked where Textron hoped

to see improvements in its various operating segments.  Donnelly

answered, in relevant part, "Industrial is probably I mean a

pretty solid guide I think.  I mean there's – <u>it sort of gets</u>

<u>Arctic Cat to where it's accretive, it's pretty solid</u>

<u>performance</u>.  But I think that's where we would really expect to

be." (emphasis added).  Shortly afterwards, Donnelly

acknowledged, "[T]here's obviously still work to do in finishing

the integration . . . ."  Later in the Call, a Morgan Stanley

analyst asked, "And a quick <u>clarification on Arctic Cat, did you</u>

<u>say that it is going to hit the target of being accretive this</u>

<u>year</u>?" (emphasis added).  Both Connor and Donnelly answered,

"<u>Yes</u>." (emphasis added).

On February 15, 2018, Textron filed its Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K").  In the notes to Textron's financial statements, the 2017 10-K described certain special charges that Textron had recorded:

> In 2016, we initiated a plan to restructure and realign our businesses by implementing headcount reductions, facility consolidations and other actions in order to improve overall operating efficiency across Textron. . . .
>
> In connection with the acquisition of Arctic Cat . . . we initiated a <u>restructuring plan in the first quarter of 2017 to integrate this business into our Textron Specialized Vehicles business within the Industrial segment and reduce operating redundancies and maximize efficiencies</u>.  Under the Arctic Cat plan, we recorded restructuring charges of $28 million in 2017, which included $19 million of severance costs, largely related to change-of-control provisions, and $9 million of contract termination and other costs.  In addition, we recorded $12 million of acquisition-related integration and transaction costs in 2017.
>
> <u>Both the 2016 plan and [the] Arctic Cat plan are substantially completed with the majority of the remaining cash outlays of $44 million expected to be paid in the first half of 2018</u>.

(emphasis added).[1]  Donnelly and Connor certified the accuracy of the 2017 10-K.

On April 18, 2018, Textron held another earnings call. During the call, a Cowen and Company analyst observed that Arctic Cat had weak first-quarter results and requested an

---

[1] This representation was repeated in Textron's Forms 10-Q for both the first and second quarters of 2018.

update about Textron's progress in "clearing the channel

overstock at Arctic Cat."  Donnelly answered, in relevant part:

> I think the whole industry in outdoor power equipment,
> when you look at this, the difficulty is that
> January/February into March timeframe, you're done
> selling snow, but you haven't started selling dirt.
> So, it tends to be a quarter where basically you have
> the cost of the business, but you don't have a lot of
> revenue within the business.  So I think that's just
> [its] natural cycle and it doesn't affect our
> perspective on how we feel about the year.
>
> In terms of the inventory reduction, we're pleased
> with – if you look at both dirt and snow inventory
> reductions that happened through the course of the
> year, which was a big focus of ours, yielded a lot of
> result, so there's pretty significant reductions in
> that aged inventory.  And so I think combined between
> that and the fact that we have a lot of new product
> that we think the dealers are pretty excited about.
> When you look across both the dirt and the snow
> product lines, you've got lower inventory of aged
> stuff and you've got a lot of exciting new stuff
> [that] will be on the floors that dealers are pretty
> excited about.  So we feel pretty good about where we
> are for the year.

(emphasis added).  On April 25, 2018, Textron filed its Form 10-

Q for the first quarter of 2018, which represented that "Arctic

Cat provides a platform to expand our product portfolio and

increase our distribution channel to support growth within our

Textron Specialized Vehicles business in the Industrial

segment."

On July 18, 2018, Textron held its earnings call for the

second quarter of 2018.  In response to an analyst's question

about Arctic Cat inventory levels, Donnelly said,

I'm afraid I don't have those numbers at my fingertips here.  But, I mean, we continue to make progress, and I would say most importantly when we look at what's in the inventories, it's pressure stuff, right?  So, I mean, <u>a lot of the stuff that was really older inventory has been moved off their books</u>.  I mean, obviously, these guys are taking re-stockings of current model year product.

Probably not a lot of change in snow.  I mean, we're at that time of the year, obviously, where we're producing all the snow product for next year, and we'll start those load-ins here as we get into the latter part of the year.  I'd say the good news is demand from the dealers, what we're seeing is up.  And we've got a couple great new products.  <u>I mean, last year was great in terms of burning down a lot of the inventory.</u>  We had some new stuff that came out last year that helped, but we've got a couple pretty exciting 2019 models that are driving some pretty strong preseason order demand, which we're building now, we'll start to load in here in the next couple months.

(emphasis added).

In response to a question about improving Arctic Cat's

profit, Donnelly answered,

<u>I think we are seeing profit improvement at Arctic Cat and we would continue to expect to see incremental margins frankly overall in our Industrial segment improving as the year goes on.</u> . . .  Look, the snow is obviously not in a retail phase right now, right?  We're kind of in the production side of that and the stocking.  So, that's – which, again, I think is quite favorable for us.  We feel really good about where that business is and what the stocking orders look like.

On the dirt side of the business, we're seeing improvements.  Having the [Wildcat XX side-by-side] out there is – it's later than was expected when we did the acquisition, but it is fully in the market and we're frankly struggling to meet demand of producing

them, and we've just launched the Prowler Pro, which launches into really the largest segment of that market.  We think we got a great product.  But, again, that's one that's just barely starting to run through the production line and get deliveries out to the dealers.

So, again, a model [for] which we're seeing strong demand.  We just got to produce as quickly as we can. So, I think the end market of all the data I see is positive here in the last couple months.  We're certainly seeing strong demand on the products that we've launched into the marketplace and, obviously, expect to see the revenue and the margin continue to expand through the balance of the year.

(emphasis added).[2]

Reports from Confidential Informants

Lead Plaintiff alleges that defendants' class-period statements were misleading concerning Textron's progress towards clearing older Arctic Cat inventory and integrating Arctic Cat into the Specialized Vehicles business.  The principal basis for this allegation is information that Lead Plaintiff has obtained from various confidential informants ("CIs").

CI 1 visited Arctic Cat's headquarters twice during 2017 and observed that older model ATVs and side-by-sides were

---

[2] At the start of each of the earnings calls at issue, the defendants noted that they would be discussing future estimates and expectations, and that those forward-looking statements were subject to various risk factors detailed in Textron's SEC filings.  The SEC filings, in turn, disclosed various risks, including -- as relevant here -- the difficulty of integrating acquired businesses and the possibility that such businesses would not achieve profit projections.

stacked up for miles at the facility.  According to CI 2, formerly a Textron Specialized Vehicles regional sales director, snow and dirt inventory buildup was routinely discussed during weekly sales calls.  CI 2 reports that a 2017 sales program spent $15-20 million to incentivize dealers to clear old inventory, but that Textron restocked dealers' sold inventory with more vehicles from model years 2015-17.  Most importantly, according to CI 2, Arctic Cat had a steady number of 22,000-25,000 non-current year vehicles at dealerships from the acquisition of Arctic Cat in early 2017 through at least the summer of 2018.  It is this allegation that forms the heart of Lead Plaintiff's case.

CI 3 attests that at the start of 2018, Textron had over 22,000 snow and dirt vehicles from model years 2015-17 unsold at dealerships.  Snow inventory of approximately 10,000 units represented approximately 55% of Textron's snow sales during 2017.  And dirt inventory of 12,000-15,000 units was equivalent to 15-23% of Textron's 2017 dirt sales.  CIs 3 and 4 indicate that Textron used rebates and financing agreements to encourage sales of older inventory.

The CIs also describe a smorgasbord of operational problems related to the integration of Arctic Cat and Textron.  These alleged issues include: duplicative departments for parts,

service, and computer systems; separate platforms for customer relationship management; delays and lost sales related to the unintegrated departments and platforms; confusion related to product design and manufacturing; engineering problems with new products; a lack of new products in the development and manufacturing pipelines; communication problems between Arctic Cat dealers and Textron; Arctic Cat dealers upset by overlapping sales turf and a lack of marketing assistance; and termination of Textron's agreements with underperforming Arctic Cat dealers.

Textron's Third-Quarter 2018 Earnings Miss

On October 18, 2018, Textron issued a press release indicating that Industrial Segment profit was down $48 million as compared to the third quarter of 2017, a decline of 98%. The same day, Textron held an earnings call. At the outset of the call, Donnelly reported,

> Segment profit was down in the quarter largely due to lower profit in Industrial which more than offset higher profit at Bell and Aviation. At Industrial, segment profit was breakeven primarily due to unfavorable operating performance in Specialized Vehicles. Specialized Vehicles has undergone significant change over the past two years as we've expanded the product portfolio. While we've seen increasing revenue in the segment, we haven't seen the planned level of growth or deliver[ed] the operating leverage necessary to support expected returns.
>
> We've made progress on new product introductions and continue to be encouraged by the favorable trends in the powersports market, but we need to work on our go-to-market strategy and focus on cost performance.

(emphasis added).  In response to an analyst's question

concerning the Industrial Segment, Donnelly explained,

> I think what you're seeing in Industrial in the
> quarter is primarily, as we said, driven by the
> Specialized Vehicle business.  And particularly, it's
> around some of the consumer markets, and it's a
> recognition that we still have more work to do in
> terms of strengthening that channel.  And so we
> recognized a fair bit of that cost here in the
> quarter.

A JP Morgan analyst followed up about the Specialized

Vehicles business, and Donnelly offered the following relevant

statements:

> I don't think this is a problem [of] overall pricing
> in the market so much as <u>our team has been going
> through sort of a painful learning experience about
> how that channel is managed and how discounting is
> handled and how that plays out through the course of
> the year.  So it for sure has manifested itself in
> more discounting than we would like to continue to
> work that channel.</u>  I think the team will get better
> at that and it's things we're learning.  And I think
> the team is going to make progress on it.
>
> * * *
>
> On the dirt side, we missed a better part of last year
> because some of the product that was sort of in the
> pipeline wasn't really ready to go, and we didn't want
> to release it until it was ready.  <u>So we're kind of
> maybe a year behind in terms of the new product
> feeding into that channel</u>, but those things are
> introducing now.  So I think we'll start to see some
> momentum and a little more excitement in channel as we
> go forward.  But look, the bottom line answer is I
> think that the revenue number you're talking about is
> probably consistent with where we'll end up this year,
> but we need to see more growth particularly through
> that channel.

(emphasis added).

Another analyst asked how long it would likely take to sort out the issues in Specialized Vehicles.  Donnelly responded,

> I think that we're probably a year behind the schedule that we would like to have had, right.  I mean, obviously, we went into this expecting to be able to generate accretion in year one.  Obviously, that's not going to happen as we've kind of realized these costs in the quarter.  But we still feel with the products coming out, the strength, and again we're kind of seeing this as momentum builds on the snow side, where [you're] kind of two launches into that second season. . . .  So it's probably a one year delay again.

(emphasis added).  On the day of this call, October 18, Textron's stock price declined from $64.78 to $57.49 per share, a decline of 11.25%.

Statements Related to Goodwill and Intangible Assets

Also during the October 18, 2018 call, a Wells Fargo analyst asked, "[I]s there any way to just look at the Industrial this segment [sic] and tell us is there any sort of quantification of one-time costs, was there an impairment or when you do the next impairment test?"  Donnelly responded,

> I wouldn't characterize it as one-time, right?  This is not some special charge, but when we look at what we reserve and accrue around anticipated discounting programs and things like that, I mean we had to make adjustments to that given the nature of where we are and where the inventory is.  So there's some probably it's more in the quarter than we would expect, but it's not something like an impairment of goodwill or intangible or something of that nature.

(emphasis added).  Lead Plaintiff alleges that this statement was misleading because Donnelly knew about the 98% year-over-

15

year decrease in the Industrial Segment's third-quarter profits, and about the various other problems related to the Arctic Cat integration described by the CIs.

A week later, on October 25, 2018, Textron filed its Form 10-Q for the third quarter of 2018, which included the following disclosure concerning Industrial Segment goodwill and intangible assets:

> At September 29, 2018, we have an aggregate of $86 million in intangible assets associated with the products sold under the Textron Off Road and Arctic Cat brands within the Specialized Vehicles product line of the Industrial segment. . . .
>
> The Specialized Vehicles product line has undergone significant change recently as we have expanded the product portfolio and integrated manufacturing operations and retail distribution with the acquisition of Arctic Cat.  In the third quarter of 2018, the operating results were significantly below our expectations given the new products and dealer network in place as, among other operational factors, dealer sell-through lagged.  Management is currently assessing the go-to-market strategy, along with improvements to the dealer network, cost reductions and the future financial outlook for this product line.  <u>Based on these factors, it is reasonably possible that an impairment loss of certain long-lived assets could be recognized in the fourth quarter related to this product line</u>.

(emphasis added).

Indeed, on December 6, Textron filed a Form 8-K that disclosed an impairment of intangible assets:

> On December 4, 2018, our Board of Directors approved a plan to restructure the Textron Specialized Vehicles businesses within our Industrial segment.  We expect

16

to incur pre-tax charges in the range of $60 million
to $85 million under this plan, which will be recorded
in the fourth quarter of 2018.

Textron Specialized Vehicles has undergone significant
changes since the acquisition of Arctic Cat as we have
expanded the product portfolio and integrated
manufacturing operations and retail distribution.  As
disclosed in our Form 10-Q filed for the third quarter
of 2018, the operating results for these businesses
were significantly below our expectations as dealer
sell-through lagged despite the introduction of new
products into our dealer network.  Management
conducted a strategic review of the Textron
Specialized Vehicles businesses, which included an
assessment of the acquired dealer network and go-to-
market strategy for the Textron Off Road and Arctic
Cat brands, as well as cost reduction initiatives
throughout the Textron Specialized Vehicles
businesses.  <u>The restructuring plan will result in the
impairment of intangible assets</u>, primarily related to
product rationalization, the elimination of
approximately 400 positions, representing
approximately 10% of Textron Specialized Vehicles'
workforce, and closure of several factory-direct turf-
care branch locations and a manufacturing facility.

(emphasis added).  On December 7, Textron shares declined from

$53.10 per share to $51.14 per share, or approximately 3.69%.

<u>Procedural History</u>

This action was filed on August 22, 2019.  On November 13,

IWA Forest Industry Pension Plan was appointed Lead Plaintiff,

in accordance with the Private Securities Litigation Reform Act

("PSLRA"), 15 U.S.C. § 78u-4(a)(3).  Lead Plaintiff filed an

amended complaint on December 24.  On January 24, 2020, the

defendants moved to dismiss.

In response to the motion, the SAC was filed on February 14.  Lead Plaintiff had been warned that any further opportunities to amend would be unlikely.  The SAC alleges (1) that the defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, and (2) that Donnelly and Connor violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  On March 6, the defendants moved to dismiss the SAC.  The motion became fully submitted on April 10.

## Discussion

When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must accept the factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  Loginovskaya v. Batratchenko, 764 F.3d 266, 269-70 (2d Cir. 2014).  A claim is sufficiently plausible to withstand a motion to dismiss when the "factual content" of the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (citation omitted).  In the context of a securities class action, a court may consider not only the complaint itself, but also "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally

18

required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit."  Id. (citation omitted).

A complaint alleging securities fraud must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and Fed. R. Civ. P. 9(b) by "stating with particularity the circumstances constituting fraud."  Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford, 794 F.3d 297, 304 (2d Cir. 2015).  SEC Rule 10b-5 renders it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5; see also 15 U.S.C. § 78j(b).  "To avoid dismissal under . . . Rule 10b-5, a complaint must plausibly allege: (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  Singh v. Cigna Corp., 918 F.3d 57, 62 (2d Cir. 2019) (citation omitted).

The defendants have not challenged the adequacy of Lead Plaintiff's allegations as to the statements' connection with

19

the purchase or sale of a security, reliance, economic loss, or
loss causation.  The disputed issues for the alleged violation
of Rule 10b-5 are therefore whether the Lead Plaintiff has
adequately pleaded that defendants (1) made a material
misrepresentation or omission (2) with scienter.  As explained
below, it is unnecessary to reach the issue of scienter, because
Lead Plaintiff has failed to sufficiently plead that any
defendant made a material misrepresentation.

I.   Legal Standard

     A.   Material Misrepresentations or Omissions

     "An alleged misrepresentation is material if there is a
substantial likelihood that a reasonable person would consider
it important in deciding whether to buy or sell shares of
stock."  Id. at 63 (citation omitted).  "The statement must also
be misleading, evaluated not only by literal truth, but by
context and manner of presentation."  Id. (citation omitted).
"Even a statement which is literally true, if susceptible to
quite another interpretation by the reasonable investor, may
properly be considered a material misrepresentation."  Kleinman
v. Elan Corp., PLC, 706 F.3d 145, 153 (2d Cir. 2013) (citation
omitted).  Each misleading statement must be pleaded with
particularity, including "the reason or reasons why the

statement is misleading."  15 U.S.C. § 78u-4(b)(1); see also

Blanford, 794 F.3d at 305.

Statements that are mere "puffery" cannot give rise to Rule

10b-5 liability.  ECA & Local 134 IBEW Joint Pension Tr. of Chi.

v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009).

"Puffery encompasses statements that are too general to cause a

reasonable investor to rely upon them, and thus cannot have

misled a reasonable investor.  They are statements that lack the

sort of definite positive projections that might require later

correction."  In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245

(2d Cir. 2016) (citation omitted); see also Abramson v. NewLink

Genetics Corp., No. 19-642-CV, 2020 WL 3956263, at *4 (2d Cir.

July 13, 2020) ("We do not anticipate that reasonable investors

place substantial reliance on generalizations regarding a

company's health or the strength of a company's product."

(citation omitted)).  For example, an acquiring company's

statement that "the integration . . . is off to a promising

start" constitutes inactionable puffery.  IBEW Local Union No.

58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland

Grp., PLC, 783 F.3d 383, 392 (2d Cir. 2015).  Such statements of

"general corporate optimism" are not actionable unless "they are

worded as guarantees or are supported by specific statements of

fact, or . . . the speaker does not genuinely or reasonably believe them."  Id. (citation omitted).

For a plaintiff to sufficiently allege a misleading statement of opinion,

> the investor must identify particular (and material) facts going to the basis for the issuer's opinion -- facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have -- whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

Tongue, 816 F.3d at 209 (citation omitted).  "[A] reasonable investor . . . expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession" at the time the statement is made.  Id. at 210 (citation omitted).  "In other words, when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow."  Abramson, 2020 WL 3956263, at *5.  Reasonable investors understand, however, "that opinions sometimes rest on a weighing of competing facts" and thus "a statement of opinion is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  Tongue, 816 F.3d at 210 (citation omitted); see also Abramson, 2020 WL 3956263, at *6.

22

B.   Forward-Looking Statements

The PSLRA contains a safe harbor for certain "forward-looking statements."  In re Vivendi, 838 F.3d at 245 (citing 15 U.S.C. § 78u-5(c)).  Under the safe harbor,

> [A] defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading. Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies.

Id. at 245-46 (citation omitted).  To qualify as "meaningful," cautionary language must "convey[] substantive information" and cannot be "boilerplate" or "vague."  Id. at 247 (citation omitted).

The term "forward-looking statement" includes, as relevant here, (1) "a statement containing a projection of revenues, income . . . or other financial items," (2) "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," or (3) "a statement of future economic performance."  15 U.S.C. § 78u-5(i)(1)(A)-(C); see also In re Vivendi, 838 F.3d at 246.  "[A] statement may contain some elements that look forward and others that do not, and forward-

23

looking elements may be 'severable' from non-forward-looking elements."  In re Vivendi, 838 F.3d at 246 (citation omitted).

II.  Application

Lead Plaintiff alleges misrepresentations on four subjects: (1) Arctic Cat's inventory, (2) Arctic Cat's anticipated performance, (3) the status of the Arctic Cat integration, and (4) goodwill and intangible assets of the Specialized Vehicles business.  In none of these categories has Lead Plaintiff adequately pleaded an actionable misrepresentation.

A.  Statements Concerning Arctic Cat Inventory

Lead Plaintiff alleges three misrepresentations related to Textron's progress in clearing Arctic Cat inventory: (1) Donnelly's January 31, 2018, statement that Textron had seen "improved demand in the snow retail channel, allowing dealers to clear older inventory and drive 2018 model sales;" (2) Donnelly's April 18 statements that "both dirt and snow inventory reductions" had happened, that there were "significant reductions in that aged inventory" and that there was "lower inventory of aged stuff;" and (3) Donnelly's July 18 statement that "a lot of the stuff that was really older inventory has been moved off [dealers'] books."  Lead Plaintiff alleges that these statements were misleading because, according to the CIs, Textron had 22,000-25,000 Arctic Cat vehicles at dealerships

that were model years 2015-17, a figure that did not materially
change from early 2017 to summer 2018.

Lead Plaintiff's theory fails because it treats vehicles
from model years 2015-17 as interchangeable.  It would not be
misleading for Textron to state that it was clearing "older"
inventory if it had sold off 2015 and 2016 vehicles while
simultaneously pushing 2017 inventory out to dealers.  Indeed,
Lead Plaintiff's CIs report that Textron succeeded in selling
off older inventory during 2017 and 2018 through the use of
rebates.  According to CI 2, Textron then "filled [dealers] back
up with more aged inventory from 2015-17."  There is no
inconsistency between these factual allegations and Donnelly's
statements that Textron dealers had "clear[ed] older inventory,"
that Textron had achieved "significant reductions" in aged
inventory, or that it helped dealers sell "a lot of the stuff
that was really older inventory."  Accordingly, Lead Plaintiff
has not sufficiently pleaded a material misrepresentation
concerning Arctic Cat inventory.

B.   Statements Concerning Arctic Cat's Performance

Lead Plaintiff alleges that defendants made two sets of
misleading statements concerning Arctic Cat's performance: (1)
Donnelly and Connor's expectation during the January 31 call
that the Arctic Cat acquisition would be accretive during 2018;

and (2) Donnelly's statements during the July 18 call that
Textron was "seeing profit improvement in Arctic Cat," that the
Industrial Segment "would continue to expect to see incremental
margins . . . improving as the year goes on," and that the end-
market data he saw was positive "in the last couple months."[3]

The January 31 and July 18 statements of expectation are
forward-looking statements.  The SAC fails to plead facts to
support an inference that the speakers knew the statements to be
false at the time the statements were made.[4]  Moreover, the risk
disclosures in the SEC filings that accompanied the earnings
calls (and which were expressly incorporated by the speakers in
those calls) spoke to the very type of forecasts at issue here -
- projected profits of acquired businesses.  For both reasons,
the PSLRA's safe harbor protects Textron against claims premised
on these projections.

---

[3] The term "end market" refers to "where the final transaction
takes place in a value chain."  End Markets -- Overview,
Marketlinks (last visited July 9, 2020), https://
www.marketlinks.org/good-practice-center/value-chain-wiki/end-
markets-overview.

[4] Lead Plaintiff argues that actual knowledge of falsity is
adequately pleaded due to certain stock sales that Donnelly and
Connor made following the statements at issue.  But such sales
alone are insufficient to show that corporate officers
"disbelieved their generic, positive representations" about the
state of the company.  Abramson, 2020 WL 3956263, at *4.

Donnelly's July 18 statements regarding profit improvement and positive end-market data are statements of his opinion. Lead Plaintiff has failed to plead sufficient facts concerning Arctic Cat's profit improvement or end-market data as of July 18 to state a claim that Donnelly's opinions were misleading.

Lead Plaintiff resists the conclusion that these latter two statements were statements of opinion. But both statements were prefaced with "I think" and when read in context are conveyed as statements of Donnelly's opinion. See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 187 (2015) (noting that a reasonable person "recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content"); see also Abramson, 2020 WL 3956263, at *6 (finding a statement plausibly misleading where it lacked "prefatory language like 'I believe' or 'In my estimation'"). Lead Plaintiff must therefore adequately plead that the defendants' statements did not "fairly align[] with the information in [their] possession at a time." Tongue, 816 F.3d at 210. This the SAC fails to do.

C.    Statements Concerning the Status of the Arctic Cat
      Integration

Lead Plaintiff identifies two statements concerning the progress of the Arctic Cat integration that it claims were

27

misleading: (1) Donnelly's January 31 statement that Textron had "successfully integrated the integration of Arctic Cat," and (2) the statement from the 2017 10-K that an Arctic Cat restructuring plan was "substantially completed."[5]   Lead Plaintiff has not pleaded a material misrepresentation as to either statement.

Lead Plaintiff argues that Donnelly's January 31 statement was misleading because it suggested that the integration of Arctic Cat was substantially complete.  But moments before making the statement that Lead Plaintiff focuses on, Donnelly had said, "our integration of Arctic Cat continues."  And later in the call, Donnelly noted that there was "obviously still work to do in finishing the integration."  The January 31 statement must be considered as a whole.  The various shortcomings in the Arctic Cat integration identified by Lead Plaintiff's CIs -- for example, duplicative departments for parts and service -- do not render Donnelly's presentation misleading when the entirety of the presentation is considered.

The SAC also fails to state a claim premised on Textron's 2017 10-K.  Lead Plaintiff's theory is that the Arctic Cat

---

[5] As noted above, the "substantially completed" statement was repeated in Textron's 10-Qs for the first and second quarters of 2018.  Lead Plaintiff pleads no facts as to those repetitions that change the result.

integration was incomplete -- due to redundant departments and unsold Arctic Cat inventory -- and that it was thus misleading to state that a restructuring plan had been substantially completed.

But this argument disregards the context in which Textron used the words "substantially completed." The phrase Lead Plaintiff highlights appeared in a note to Textron's financial statements about "Special Charges." In context, the "substantially completed" statement conveys that Textron had spent the majority of the funds it had allocated for the restructuring. Lead Plaintiff pleads no facts suggesting that such a representation was inaccurate.

D.    Statements Concerning Goodwill and Intangible Assets

Finally, Lead Plaintiff challenges a statement from the October 18 conference call. During that call, Textron answered questions about the sharp decline in profit in the Industrial Segment. In response to an analyst's question about whether Textron could offer any quantification of its Industrial Segment's "one-time costs" for the quarter -- for example, was there an impairment -- Donnelly answered,

> I wouldn't characterize it as one-time, right? This is not some special charge, but when we look at what we reserve and accrue around anticipated discounting programs and things like that, I mean we had to make adjustments to that given the nature of where we are and where the inventory is. So there's some probably

it's more in the quarter than we would expect, but
it's not something like an impairment of goodwill or
intangible or something of that nature.

Read in context and as a response to a question about one-
time costs, the statement "it's not something like an impairment
of goodwill" is an explanation that Textron's accounting did not
treat discounting programs as one-time costs such as an
impairment to goodwill.  It was not a guarantee that the poor
third-quarter results from the Specialized Vehicles business
would not result in an impairment to goodwill.

Indeed, when Textron filed its third-quarter 10-Q on
October 25, it disclosed under the heading "Goodwill and Other
Intangible Assets" that it was "reasonably possible that an
impairment loss of certain long-lived assets could be recognized
in the fourth quarter related to [Specialized Vehicles]."  Lead
Plaintiff does not plead facts to support a claim that
Donnelly's failure to make this disclosure a week earlier, when
responding to the specific question he was asked, was
fraudulent.

## Conclusion

In short, Lead Plaintiff has not adequately pleaded that
any of defendants' statements was an actionable
misrepresentation.  Having so concluded, it is unnecessary to
reach defendants' additional arguments that scienter was

30

inadequately pleaded.  Defendants' March 6, 2020 motion to dismiss is granted.  The Clerk of Court shall close the case.


Dated:     New York, New York
           July 20, 2020


                              _____
                                      DENISE COTE
                              United States District Judge